229 P.3d 1066 (2010)
In the Interest of RGB, A Minor.
No. 28582.
Supreme Court of Hawai`i.
April 1, 2010.
*1067 James Ireijo, for petitioner/mother-appellant.
*1068 Howard H. Shiroma, Deputy Attorney General, for respondent/petitioner-appellee.
MOON, C.J., NAKAYAMA, and RECKTENWALD, JJ.; and ACOBA, J., Dissenting, With Whom DUFFY, J., joins.
Opinion of the Court by RECKTENWALD, J.
In this appeal, we consider whether the family court abused its discretion in denying Mother's motion for relief from an order terminating Mother's parental rights. The motion alleged that Mother received ineffective assistance of counsel in the proceeding that resulted in the termination order, as well as in her direct appeal from that order.
Mother's child, RGB, was born in July of 1999. RGB was taken into protective custody on March 30, 2001, after she was found dirty and without a diaper or underclothing in the custody of Mother's ex-boyfriend, who had a history of substance abuse and had been diagnosed with chronic paranoid schizophrenia. RGB was later returned to Mother, but was placed in foster custody in April, 2002, and has remained with the same foster family since then. Mother and RGB were subsequently involved in a series of interactions with the Department of Human Services (DHS) and proceedings before the Family Court for the Third Circuit (family court). Mother was allowed to visit with RGB, but these visits had increasingly negative effects on RGB and were discontinued by the family court in 2004 after it concluded that "the visits were causing injury to [RGB's] psychological capacity as evidenced by a substantial impairment in [RGB's] ability to function."
After conducting a six-day permanency hearing, the family court issued its Findings of Fact, Conclusions of Law and Order terminating Mother's parental rights (Termination Order) on March 11, 2005.[1] On February 6, 2007, Mother filed a motion for "1) New Trial, and/or 2) To Reconsider and/or Amend Judgment and/or All Previous Orders, and/or 3) For Release of All Evidence or Files in Case, and/or 4) For Dismissal," alleging that her prior counsel was ineffective. The family court denied Mother's motion on May 8, 2007.
Mother seeks review of the May 21, 2009 judgment of the Intermediate Court of Appeals (ICA), entered pursuant to its April 9, 2009 Summary Disposition Order (SDO), affirming the family court's order denying Mother's motion. In her application for a writ of certiorari (application), Mother raises the following questions:
A. Whether The Intermediate Court Of Appeals ("ICA") "Borrowing" Of Criminal Matters Analogy To Apply To Family Court Claims Of Ineffective Counsel Is Authorized By Law And Meets Constitutional Standards?
B. Whether The ICA Upholding Of The Trial Court's Refusal To Release "Confidential" Records That Appellate's [sic] Counsel Could Not Examine But At The Same Time Requiring Counsel To "Identify Any Prejudice Stemming From This Limitation" Meets Fair Disclosure Standards?
We resolve Mother's appeal as follows. First, we consider the basis of Mother's ineffective assistance of counsel claim. Since we conclude that the family court properly determined that Mother had a right to counsel under the United States Constitution in the circumstances of this case, we do not reach the question of whether the Hawai`i Constitution provides indigent parents a right to counsel in all termination proceedings. Second, we conclude that a Hawai`i Family Court Rules (HFCR) Rule 60(b)(6) motion was an appropriate method for raising an ineffective assistance of counsel claim in the circumstances of this case.
Third, we hold that the family court did not abuse its discretion in denying Mother's motion, particularly in view of the negative impacts on RGB of the delay in resolving her custodial status. Thus, we respectfully disagree with the dissenting opinion's view that such impacts should not be considered in assessing that motion. Dissenting Opinion at ___-___, 229 P.3d at 1128-29. The motion was filed nearly two years after the *1069 family court's March 11, 2005 order terminating Mother's parental rights, and contained no allegations whatsoever about what errors had occurred in the family court proceedings leading up to the entry of the Termination Order. By the time the motion was filed, RGB had been living with the same foster family for nearly five years, and wanted to be adopted by that family. However, the adoption had been delayed pending the resolution of these proceedings. As set forth in a January 2006 report by DHS to the family court:
[RGB's foster parents] want to adopt [RGB] and have been ready to proceed with the adoption process ever since biological mother's parental rights were terminated in March 2005. However, biological Mother's pending appeal to the court. . . has prevented the DHS and [RGB's foster parents] from proceeding with the adoption. Hence, [foster parents] and [RGB] and the entire family are disappointed. Per [foster mother], [RGB] continually wonders and asks "when will she be adopted".
Given those circumstances, and given Mother's failure in the Rule 60(b)(6) motion to identify any potentially meritorious issues that would have been raised but for the ineffectiveness of her counsel, the family court did not abuse its discretion when it denied the motion.
Finally, we hold that the family court did not abuse its discretion in precluding Mother from having access to those records in this case that were generated after September 28, 2006, i.e., more than a year after her parental rights were terminated, while allowing her to have access to records created prior to that date for purposes of appeal.
Accordingly, we affirm the judgment of the ICA.

I. Background

A. Termination of Parental Rights
DHS first became involved with Mother and RGB on March 30, 2001, when RGB was taken into protective custody. On April 6, 2001, the family court awarded DHS temporary foster custody of RGB. On June 15, 2001, RGB was returned to Mother's care under family supervision. On April 4, 2002, the family court awarded foster custody to DHS. Mother was allowed supervised visitation. On April 1, 2004, the family court suspended visitation between Mother and RGB indefinitely.
A permanent plan hearing was held on August 23, August 30, September 3, September 20, September 27 and December 13, 2004.[2] On March 11, 2005, the family court issued its Termination Order, which included the following relevant Findings of Fact (FsOF):[3]
3. Mother grew up on the mainland in difficult circumstances. She was hospitalized on at least four different occasions for psychiatric conditions. Mother abused drugs and substances. She was in a series of unstable, sometimes violent relationships with men.
4. Mother had another child who was removed from her care by the State of California. Over her objection, the parental rights of Mother to her older daughter were terminated, and the child was permanently placed with Mother's sister.
. . .
6. While living in the bay area of California, Mother again became pregnant. *1070 Fearful that California authorities would remove her second child, she moved to Hawai`i when eight months pregnant with [RGB].
. . .
8. Mother encountered many difficulties living in Hawai`i after the birth of [RGB]. She did not apply for public assistance because she was fearful that State authorities might remove [RGB]. She had very little money. At times she and [RGB] were homeless.
9. On March 30, 2001, [RGB] was taken into police protective custody after she was found in the care of [Mother's ex-boyfriend]. At the time that she was placed in police custody, she was dirty and did not have on a diaper or underclothing.
10. [Mother's ex-boyfriend] and Mother had been in a relationship for many years. [Mother's ex-boyfriend] had a history of substance abuse and a mental health diagnosis of chronic paranoid schizophrenia with acute exacerbation. He had been acquitted of two sexual assault offenses due to incapacity.
11. A temporary foster custody hearing was conducted. Mother applied for and received the services of court-appointed attorney, Cynthia Linet.
12. On April 6, 2001, the Family Court awarded the Department of Human Services ("DHS"), temporary foster custody of [RGB] on the basis that she was subject to imminent harm due to Mother's past history of mental health problems and her current relationship with [Mother's ex-boyfriend].
. . .
14. On June 15, 2001, . . . the Court returned [RGB] to [Mother's] care under family supervision.
15. On November 29, 2001, DHS again petitioned the Court for foster custody of [RGB]. Mother and [RGB] had been evicted from the homeless shelter and had moved to the Rossmond Hotel. Mother was having difficulty controlling [RGB] and following through with skills taught by the parenting program that she attended.
16. The Court . . . continued family supervision of Mother and [RGB].
17. Mother's attorney, Ms. Linet, moved to withdraw as counsel. Mother asked to be allowed to represent herself. The Court allowed Ms. Linet to withdraw as Mother's counsel and allowed Mother to appear pro se.

18. On April 4, 2002, DHS again petitioned for foster custody of [RGB]. Mother and [RGB] had moved back to the homeless shelter because the Rossmond Hotel was closed for renovation. . . . Based on representations made, the Court awarded foster custody of [RGB] to DHS and scheduled a contested disposition hearing to determine whether [RGB] should remain in foster care.
19. The Court appointed Alexander W. Thoene, Jr.[[4]] to serve as counsel for Mother. The disposition hearing was conducted on April 12, 15, and May 14, 2002. Mother failed to appear for the fourth day of the disposition hearing on June 17, 2002.
20. The Court defaulted Mother for purposes of the disposition hearing and found that she suffered from a mental condition which distorted her perception of the people that she had been in contact with to the point that she considered all of them to be conspiring against her to deprive her of [RGB]. The Court concluded that this perception of Mother and her inability to control her emotions led her to have conflicts with people who had been trying to assist her. The Court found that Mother was a person of above-average intelligence and was able to pass parent education classes. Not withstanding her cognitive abilities, the Court found that Mother's mental disorder prevented her from applying the lessons learned to adequately parent [RGB], and that consequently, [RGB] was often deprived of clean and appropriate clothing, did not bathe on a regular basis, and did not have adequate supervision. The Court determined that *1071 this was not a simple matter of Mother having a different lifestyle, but more a matter of Mother being incapable of adapting to situations which were incompatible with her lifestyle and beliefs, and that this inability to adapt, was a by-product of her mental disorder, and endangered [RGB] and rendered Mother incapable of providing a safe home for [RGB]. The Court concluded that continuation of [RGB] in Mother's care would result in serious injury to [RGB], delaying physical, emotional, social, and or psychological development with long term negative consequences for [RGB].
. . .
22. On July 8, 2002, Mother filed a motion to terminate Alexander W. Thoene, Jr. as her counsel. She indicated that she would proceed pro se. On August 8, 2002, the Court granted Mother's request to proceed pro se, but required Mr. Thoene to serve as stand-by counsel for Mother to assist her in the presentation of her case.
. . .
24. At first, visits . . . between Mother and [RGB] went well. [RGB] appeared more loving towards Mother and did not seem to be resistant to visits. Mother interacted with [RGB] very appropriately,. . .
25. On September 19, 2002, a . . . visit did not go well. Mother seemed easily frustrated. When [RGB] wanted to call her foster mother or preschool teacher on a play phone, Mother stopped participating in the play. Mother became emotional and made inappropriate statements to [RGB] such as, "I'm your mommy, they want to take you away and make you think someone else is your mommy, but I am your mommy." [RGB] had to go to the bathroom five times in the last hour of the visit.
. . .
27. In the summer and fall of 2002, [RGB] began to make statements about a "man in a brown car." [RGB] made statements that suggested that the man had been violent towards Mother. [RGB] also said that the man in the brown car put a thing in her mouth and she threw up. Service providers became concerned that [RGB] may have been sexually abused by a male before she was placed into foster care.
28. Mother's response to the concern about the possible sex abuse of [RGB] was to vehemently reject any possibility that the child had been sexually abused while in her care. Much later in the case, Mother disclosed that she had owned a brown car during the time that she and [RGB] were homeless. . . .
. . .
33. During the early part of 2003, Mother's visits with [RGB] continued. While most visits went well, more difficulties arose in February. Mother began to make inappropriate comments to [RGB] during supervised visits. Comments by Mother included statements such as, "They are brain washing you" and "Mommy is looking for a house and soon you can come home." . . .
34. The foster mother reported that [RGB] returned from visits with Mother very upset with concerns about where she was going to live and whether she would be moved. . . .
. . .
35. Between January and March 2003, [RGB] had displayed numerous anxious behaviors both in the home of the foster parents and in therapy. After visits with Mother were suspended, [RGB's] anxious behaviors abated.
. . .
37. On May 1, 2003, at Mother's request, stand-by counsel, Alexander W. Thoene, Jr. withdrew and G. Kay Iopa was appointed as replacement stand-by counsel for Mother.
38. Throughout this proceeding, Mother has had difficulties with her attorneys. At times, she has insisted on proceeding pro se. At other times, she has requested new counsel or postponements until she could gather enough funds to hire counsel of her choice. Mother has proven herself unable to organize and effectively present her own case. At the same time, she has often refused to allow her court-appointed counsel to proceed on her behalf. For this *1072 reason, the Court appointed Mother stand-by counsel. Mother was allowed to present her own case and question witnesses to the extent that she was able to do so, but she was also allowed to rely on stand-by counsel to present her case when she was not able to proceed. Stand-by counsel was also available to assist Mother in the preparation of appropriate motions and pleadings.
. . .
42. On August 8, 2003, [RGB] had a visit with Mother at Parent's Inc. This visit seemed to go well, but the foster mother reported that on the drive home from the visit, [RGB] asked about what happens to mommies that hurt their babies. The foster mother asked how the mommy hurt the baby and [RGB] responded that the mother took the baby to the man in the brown car and held her down and the man "hurt me." [RGB] told the foster mother that the man said that he was going to cut her with a knife and was going to put it in her "tuni" and cut her up. "Tuni" is a word that [RGB] uses for vagina. [RGB] related that she kicked the man in his leg and he got really mad and slapped her and she screamed loud. [RGB] also said that . . . Mother[] let the man put medicine in her mouth and that she threw up all over Mother's bed. Concerns about the statements of the child caused DHS again to suspend[] visits with Mother.
43. On August 28, 2003, visits between [RGB] and Mother again resumed. . . .
44. During this period, there were numerous conflicts between Mother and the supervising agency. . . .
. . .
54. At a review hearing on January 29, 2004, the DHS worker reported that Mother continued to make inappropriate statements to [RGB] about how she was going to return to Mother. The social worker indicated that [RGB's] old fears had returned. . . .
55. [RGB] and Mother continued to visit twice a week for one and a half hours per visit under the supervision of a DHS aide. While the visits seemed to go well, [RGB] showed troubling signs of distress in her play sessions with her therapist. Prior to visits with Mother, [RGB] would cry frantically and vomited on one occasion.
56. In February 2004, in the evenings, [RGB] began complaining of a fast heart beat and gasping for breath. Her pediatrician. . . diagnosed her with adjustment disorder noting that the stress reaction was likely caused by the visits that [RGB] had with Mother.
. . .
59. On March 12, 2004, [RGB] asked to leave a supervised visit early. Mother became very upset and began to accuse the supervisor of training [RGB] to make such statements. The visitation supervisor attempted to terminate the visit, but Mother continued to escalate emotionally, threatening to sue the social worker and saying that she would talk to the Governor. [RGB] reacted by trying to reassure and placate both Mother and the visitation supervisor. [RGB] cried as the supervisor carried her back to the State Building where [RGB] was placed in an office. Mother followed [RGB] and supervisor back to the office where she created a scene, shouting and demanding to see [RGB]. After Mother finally left, [RGB] asked the visitation supervisor whether it was safe to leave.
. . .
57.[[5]] On March 18, 2004, the Court again suspended visits between Mother and [RGB] pending another court hearing.
. . .
59. On April 1, 2004, after a hearing, the Court concluded that further visits with Mother would be psychologically injurious to [RGB]. Visitations between [RGB] and Mother were suspended indefinitely.
60. Shortly after the visits with Mother were suspended, [RGB's] symptoms of distress and anxiety disappeared.

*1073 61. Mother has had no contact with [RGB] since March 12, 2004.
62. Over the years, Mother has substantially improved her circumstances. She has stopped abusing drugs and alcohol; her mental health condition has improved; she has required no hospitalization for mental health problems. Mother has consistently sought treatment and has taken medication when prescribed. Mother has found safe and stable housing, and has managed to maintain such housing for an extended period of time. She has terminated her relationship with an inappropriate, abusive partner. She has obtained and completed services, and has for the most part successfully completed the services required in her service plan.
63. Unfortunately[,] serious problems remain. Throughout the course of these proceedings, Mother has suffered from mental health disorders which seriously compromise her ability to provide appropriate care for [RGB].
64. Mother suffers from a mental health condition that distorts her perceptions of people and this causes her to come into conflict with and to refuse to cooperate with people that are trying to help her.
. . .
69. Mother does not understand or appreciate the impact that her own behavior has on [RGB]. She accepts little responsibility for [RGB's] problems and instead focuses on complaints and criticisms of others.
. . .
73. When visits with Mother were finally terminated, [RGB] was almost five. At that time, [RGB] was a very vulnerable child who suffered from anxiety, regressive behavior, negative psychological symptomatololgy [sic] and general emotional disruption. [RGB's] psychological distress threatened to interfere with her developmental growth and bonding abilities. [RGB's] psychological problems were primarily caused by stress generated by visits with Mother.
74. At the time that visits between Mother and [RGB] were terminated, the visits were causing injury to [RGB's] psychological capacity as evidenced by a substantial impairment in [RGB's] ability to function. Had the visits with Mother continued, [RGB] would have suffered continued psychological harm which would have resulted in serious injury to her, delaying physical, emotional, social, and/or psychological development with long term negative consequences for the child.
75. Despite numerous and extensive efforts by many service providers and therapists, it appears unlikely that the mother/daughter relationship between Mother and [RGB] will improve. Returning [RGB] to Mother's home and care would be harmful to [RGB].
76. [RGB] is now almost six. After visits with her mother terminated, [RGB's] symptoms of psychological distress have abated and she is doing very well.
77. Under the circumstances presented in this case, reasonable efforts were made by the DHS to make it possible for [RGB] to return to her mother's home.
78. Mother and Father[[6]] are not currently able to provide [RGB] with a safe family home, even with the assistance of a service plan. It is not reasonably foreseeable that either parent will become able to provide [RGB] with a safe family home within a reasonable period of time.
79. The proposed permanent plan is in the best interests of [RGB].
The family court concluded that "[i]t is in the best interests of [RGB] that permanent custody of the child be awarded to DHS." The family court ordered, in pertinent part:
2. Permanent custody of [RGB] is awarded to the Department of Human Services pursuant to H.R.S. 587-73(b)(1) and existing parental rights of Mother and Father of [RGB] are terminated.
. . .
4. It is in [RGB's] best interests that the participation of Mother and Father in subsequent hearings be limited or restricted to appearances on any motions for relief *1074 from this decision and order or any motions necessary to pursue an appeal.
. . .
7. G. Kay Iopa, stand-by counsel for Mother, is discharged. Based on representations as to changes in her resource status, if Mother wishes the assistance of court-appointed counsel to pursue further relief or to perfect an appeal, she must tender a new application for court-appointed counsel to the Court immediately.
(Emphasis added).

B. Mother's difficulties with counsel
As stated in the family court's March 11, 2005 FsOF, "[t]hroughout this proceeding, Mother has had difficulties with her attorneys." Mother's first attorney, Cynthia Linet, withdrew as counsel for Mother on November 30, 2001. Mother then proceeded pro se. However, during an April 4, 2002 hearing, the family court awarded DHS foster custody of RGB. Mother subsequently applied for court-appointed counsel on April 8, 2002, and the family court appointed Alexander Thoene, Jr. (Thoene) as counsel for Mother. Mother, however, continued to submit documents to the court on her own behalf, including an Objection to Proposed Order dated April 19, 2002.
On July 8, 2002, Mother filed a motion to dismiss Thoene as counsel and to proceed pro se. In its order following a hearing on August 8, 2002, the family court denied Mother's motion to dismiss Thoene, but allowed Mother to proceed pro se with Thoene as standby counsel.
On May 15, 2003, G. Kay Iopa (Iopa) was substituted "as counsel" for Mother, effective May 1, 2003. Mother continued to file motions on her own behalf, including a May 21, 2003 Emergency Motion to Advance June 13, 2003 Hearing on Mother's Motion to Restore Visitation.
It appears that Mother subsequently had difficulties with Iopa. On July 21, 2003, the family court held a hearing and issued an order that noted, "Mother can obtain a new lawyer or apply for court appointed counsel. If she obtains a new counsel, Ms. Iopa will be [discharged]." In a hearing on July 12, 2004, Mother made an oral motion for a new attorney. In its written order, which was not issued until March 7, 2005, the family court denied Mother's oral motion and noted her objection for the record. The family court noted:
[Iopa] was appointed as stand by counsel as [Mother] wanted to represent herself. At times [Mother] represented herself and at times relied on Ms. Iopa. The court accepted this as the court felt it was useful. The court has seen nothing to indicate Ms. Iopa [has] not been effective in her representation and notes Ms. Iopa has worked hard to assist [Mother]. Little purpose would be served to appoint a new attorney. The new attorney would have a difficult time getting up to speed due to the volume of documents in this case & does not see how new counsel could provide better representation.
On September 17, 2004, Mother filed a pro se Motion for Dismissal of Counsel and Continuance of September 20 [H]earing and to Grant Continuance to Submit Witness Letters. Mother stated:
3. Assigned counsel, Kay Iopa, has told me repeatedly since July 29, 2004 that "it is beyond my scope of duties as stand-by counsel" to help locate, contact, or interview witnesses.
4. By contrast, a) the lawyer has made decisions without my knowledge or consent b) Kay Iopa's assignment to this case has caused lawyers who were interested in this case to decline, because they choose not to compete with the lawyer assigned as counsel.
5. Affiant has enough money today to secure independent counsel.
6. Absence of counsel would encourage new counsel to help me conclude this case effectively, and therefore would in fact be more time and cost effective.
7. Affiant compels the court to note that this lawyer, and counsel preceding assigned by the court, have neglected proper counsel or representation and proof of my ability to work with another lawyer needs to be considered.

*1075 8. Volunteer lawyer prior to that was effective in returning my child home, then was unable to continue pro bono.
. . .
On October 21, 2004, Mother submitted an Application for Court-Appointed Counsel. A handwritten note on her application states, "Application denied[.] Ms. Iopa will continue as stand by counsel until further order."

C. Subsequent proceedings
Following the six-day permanency plan hearing, the family court issued its March 11, 2005 Termination Order, in which the court discharged Iopa.[7] On March 29, 2005, Mother filed an Application for Court-Appointed Counsel. The family court approved the application the same day, and appointed Carrie M. Yonemori (Yonemori) as Mother's counsel effective March 29, 2005. Yonemori appears to have been appointed as regular, as opposed to standby, counsel.
There are no filings in the record from either Yonemori or Mother from March 29, 2005 to March 10, 2006.[8] The record is silent during the intervening period, with the exception of several orders of the family court continuing permanent custody and various filings on the part of RGB's guardian ad litem and DHS.
For example, on August 3, 2005, DHS filed a report to the family court in which it noted that RGB was "doing well in her current placement[,]" but that Mother's appeal "may delay the adoption process[.]" On August 4, 2005, RGB's guardian ad litem filed a report stating that DHS would be unable to proceed with adoption until Mother's appeal was resolved, and noted that delaying the adoption "is certainly not in the child's best interest[.]" On January 17, 2006, DHS filed a report to the family court in which it noted that RGB "continues to do very well in the care of foster parents, . . . whom she has resided with for nearly four years." DHS further noted that RGB's foster parents were "ready to proceed with the adoption process[.]"
On March 10, 2006, Mother filed a pro se Motion for Relief from Judgment with regard to the family court's March 11, 2005 Termination Order, pursuant to HFCR Rule 60.[9] Mother submitted an affidavit along with the motion, in which she declared:
1. I am the mother of [RGB];
2. The court made a finding to terminate my parental rights on March 11, 2005.
3. Counsel assigned by this court remains ineffective to bring this matter to justice;
4. The court made it's finding based on false and inaccurate information;
5. Based on the mistake, inadvertence, surprise, excusable neglect, fraud, misrepresentation, professional error, misconduct and/or newly discovered evidence, I now bring this motion.
On March 13, 2006, Yonemori filed a Notice of Appeal of the Termination Order on Mother's behalf.[10] On March 15, 2006, Yonemori *1076 also filed a Motion for Relief from the March 11, 2005 Order, pursuant to HFCR Rule 60, on Mother's behalf. In Yonemori's Declaration of Counsel in support of the motion, she asserted:
2. I am bringing this Motion . . . because [Mother] believes that there has been (a) mistake, inadvertence, and/or excusable neglect; (b) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); and (c) fraud, misrepresentations and/or other misconduct by the state.
3. [Mother] states that the court's final judgment is based on false testimony and deficient documents, some of which she was not able to properly cross-examine, and therefore through mistake, inadvertence, and/or excusable neglect the court has rendered an erroneous decision which must be corrected.
4. Under-signed was appointed as counsel to [Mother] after the ten day time allowed for in Rule 59(b) and therefore she and [Mother] did not have an opportunity to discuss [Mother's] concerns and/or go through the voluminous record in this case.
5. [Mother] believes that the State's witnesses, documents, and testimony were fraudulent, grossly misrepresented facts, and constituted purposeful misconduct.
6. [Mother] has attempted to bring up these points and arguments, as well has [sic] have her side of the case heard, to the court in the past by [sic] was prevented from doing so by her attorneys.
On March 17, 2006, Yonemori, on behalf of Mother, filed two separate motions to extend time to file and docket the record on appeal. Although both motions were file-stamped March 17, 2006, the first was dated September 27, 2005, and the second was dated March 10, 2006.
In her Declaration of Counsel accompanying the motion dated September 27, 2005, Yonemori declared:
2. That I was unaware that a Notice of Appeal had not been filed in the case herein. I have only done a few Family Court DHS appeals and in all previous cases, the prior attorney had filed the Notice of Appeal.
. . .
6. That between late March and August of this year, I have had four (4) close family members . . . pass away. Therefore, I may have been preoccupied and not as vigilant about case details.
7. That the delay in filing the Notice of Appeal was in no way caused by the appellant, who is understandably quite anxious about this case.
In her Declaration of Counsel accompanying the motion dated March 10, 2006, Yonemori declared:
2. That on or about September 30, 2005[,] I filed a Notice of Appeal in the case herein.
3. That sometime in October, I was notified by Family Court Clerk Jodi Leialoha that my cover page was in error and that the documents were being returned to me for corrections.
4. That I waited for the return of the documents and checked my court jacket at the Circuit Court on a weekly basis. I did not realize that the documents were returned to me via my Family Court jacket until late November.
5. That my close friend . . . passed away in late November and I left shortly thereafter for the mainland to attend his funeral and for sometime off.
6. That due to the stresses of leaving for the mainland, holidays, and finishing up work for EPIC/Ohana Conferencing, I completely forgot about making the appropriate corrections for this case.
7. That the delays in filing all papers in this case are due to my irresponsibility and are in no way caused by the appellant, who is understandably quite anxious about this case.
. . .
The family court appears to have been concerned that Yonemori could have a conflict of interest in representing Mother in an appeal alleging ineffective assistance of counsel. *1077 The family court held a hearing on April 6, 2006 and found that, "[b]ased upon [Mother's] representations in court, the court finds she understands the potential conflict of interest between her & her current counsel & waives any conflict of interest." The family court further noted, "[Mother] waives any conflict of interest as to her current counsel."
On May 23, 2006, DHS filed a report to the family court, in which it noted that "[RGB] continue[d] in her placement" where she "has been [] since April 4, 2002[,]" that she "wants to remain there forever because she loves her foster parents whom she refers to as `mom' and `dad[,]'" and that "she wants to be adopted as soon as possible[.]"
On June 2, 2006, Mother, through Yonemori, filed a document styled "Specifications on Rule 60 Motions."[11] Yonemori asserted that Mother had verbally agreed to consolidate the two previously-filed Rule 60 motions. Yonemori also provided some argument on Mother's previous assertions that she was entitled to relief due to "(1) mistake, inadvertence, and/or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); and (3) fraud, misrepresentations and/or other misconduct by the state."
With regard to Mother's assertion that she was entitled to relief due to mistake, inadvertence and/or excusable neglect, Mother, through Yonemori, asserted that the court's judgment was based on false or erroneous testimony and documents. Mother further asserted that she was prejudiced by the ineffective assistance of Thoene because she was only allowed to communicate with him in writing, and of Iopa because they disagreed as to case direction. Mother further asserted that Yonemori's "failure to file a timely appeal and meet with [Mother] in 2005" had delayed resolution of the case.
With regard to Mother's assertion that she was entitled to relief due to newly discovered evidence, Mother asserted that she and RGB were beneficiaries of her parents' trust, which had been the subject of litigation at the time of the permanency plan proceedings. Mother further asserted that termination of her parental rights would impact RGB's inheritance rights, and that any "perceived deficiencies" in Mother's care of RGB would be corrected when she received the trust proceeds.
With regard to Mother's assertion that she was entitled to relief on the basis of fraud, misrepresentations and/or misconduct by the State, Mother asserted that "State's witnesses, documents and testimony were fraudulent, grossly misrepresented facts, and constituted purposeful misconduct."
Also on June 2, 2006, Yonemori filed a Motion for Withdrawal and Substitution of Counsel. In Yonemori's Declaration of Counsel in support of the motion, Yonemori asserted:
2. I am bringing this Motion for Withdrawal and Substitution of Counsel because I believe that a legal conflict exists with my continued representation of [Mother].
3. [Mother's] Rule 60 motion alleges in part ineffective assistance of counsel. I am one of the three attorneys who may not have effectively assisted [Mother].
4. [Mother] verbally executed a waiver of conflict with me at the last court hearing.
5. I do not want to see [Mother] prejudiced in anyway [sic] by her waiver and I have spoken to her about the importance of preserving all possible grounds of appeal. [Mother] stated that it was not her intent that this waiver be "permanent."
. . .
10. [Mother] is in contact with an attorney (in California, but also still actively licensed in Hawaii) who has excellent foresight and understanding about this case. I have also spoken with him about the pending Rule 60 motion and possible appeal. It is my recommendation that the court consider appointing this individual as [Mother's] counsel.
*1078 The family court held a hearing on June 2, 2006 and, in its corresponding June 26, 2006 order, found that "due to [Mother's] current appeal, this court lacks jurisdiction to act on her Rule 60(b) motion and motion for withdrawal and substitution of counsel[.]" The court "[held] in abeyance any ruling on [Mother's] Rule 60(b) motion or motion for withdrawal and substitution unless moved on; and directs her and her counsel to address these to the appellate court." On June 28, 2006, this court dismissed the appeal for lack of jurisdiction. See n. 10, supra.
Subsequently, on September 28, 2006, the family court orally denied the motions for relief and Yonemori's motion to withdraw. On October 17, 2006, prior to the issuance of the family court's written order, Mother appealed pro se from the family court's oral announcement denying her motions for relief. The ICA dismissed Mother's appeal for lack of jurisdiction, "because the family court ha[d] not reduced the September 28, 2006 oral announcement to an appealable written order."
On November 9, 2006, the family court issued its written order, denying Mother's pro se motion and Yonemori's motion for relief, as well as Yonemori's motion for withdrawal and substitution of counsel. The court found that Yonemori's motion for relief was untimely. With regard to Mother's pro se motion, the family court found:
(1) the motion only requests general relief and Rule 60(b) requires particularity with respect to [] some of the relief being sought in this motion; (2) the motion fails to provide any new evidence to support a basis for relief under Rule 60(b), Hawaii Family Court Rules; (3) as to the relief sought, the court afforded Mother . . . extensive time at trial to present evidence to support the relief currently being requested and to address all of the issues for which relief is being sought in this motion; (3)[sic] the court appointed legal counsels to assist Mother . . . to the extent she was willing to work with the legal counsels appointed; (4) Rule 6, Hawaii Family Court Rules does not permit the court to extend or enlarge the time within which to bring this motion and the court will not enlarge or extend the time within which this motion can be brought; and (5) the time within which to bring this motion has been long outstanding causing delay in the final resolution of the case and this matter needs to be put to rest[.]
The family court also found:
Mother['s] . . . parental rights have been terminated and due to this status and the possibility of dissemination of these confidential records, the court finds that future court records are not currently available to Mother . . .; provided however that court records will be made available for any appellate review of this decision.
Mother did not appeal the family court's written order.
On February 6, 2007, Mother's new counsel, James Ireijo,[12] filed a motion in the family court for "1) New Trial, and/or 2) To Reconsider and/or Amend Judgment and/or All Previous Orders, and/or 3) For Release of All Evidence or Files in Case, and/or 4) For Dismissal." The motion cited HFCR Rule 7(b), and was supported by a Declaration of Counsel, which asserted that Mother was not afforded competent legal counsel during several "pivotal" moments in the case, and was therefore denied her due process rights and equal protection of the law under the United States and Hawai`i Constitutions. Specifically, the declaration alleged that Mother was not represented by competent counsel and was denied her due process rights by:
the Order Denying Mother's Motion to Reconsider Denial of Oral Motion To Continue Trial; and Exclusion of Exhibits Filed December 23, 2004, filed on March 7, 2005,[[13]] and/or, the Order Denying Mother's *1079 Motion to Reinstate Visitation Filed January 11, 2005, filed on March 7, 2005,[[14]] and/or at the time of entry of the Court's Findings of Fact, Conclusions of Law and Order filed on March 11, 2005.
(Emphasis in original).
The Declaration further asserted:
[Mother] did not have competent or any counsel when her child was permanently removed or taken away by Order on March 11, 2005, thus, the lack thereafter of a fair and legal opportunity to have further evidence considered or not considered, as well as losing her right to appeal due to severe time constraints.
The Declaration did not specify what error, if any, occurred during the permanency plan hearing. The Declaration further asserted that denying Mother access to records available to the appellate court was "a direct violation of the right to due process[.]"
DHS filed a memorandum in opposition to Mother's motion on April 23, 2007. DHS objected to Mother's motion for relief as untimely and asserted that the motion lacked merit because "the record reflects that during the course of the case, Mother dictated who would represent her and how they would represent her and the court tried it's [sic] best to accommodate Mother and to ensure she had assistance even when she desired to represent herself pro se." DHS further asserted that "until the time Mother's parental rights were terminated, she had access to the court's records and files and any appeal would have been predicated upon the record up to the point of such termination."[15]
DHS argued that, "[a]t all relevant times herein Mother had competent representation, in that the court appointed counsel for Mother, or permitted Mother to proceed pro se if she could or appointed standby counsel to assist Mother in her case up and through the permanent plan hearing trial." DHS further argued that "Rule 60(b) should be used only where the relief will further justice without adversely affecting substantial rights of the parties. . . . it is clear the relief sought by this motion would adversely affect the child's substantial rights, and justice would not be served."
On April 24, 2007, more than two years after the filing of its Termination Order, the family court held a hearing on Mother's motion. The court denied the motion and all relief therein requested. The family court issued its written order on May 8, 2007, finding:
A. As to Mothers [sic] claim that Mother lacked representation, the record clearly reflects that both Judges involved in this case made great effort to have Mother represented throughout the proceedings. The court accommodated Mother when she requested to have her counsel discharged and had standby counsel appointed to assist Mother throughout the case, all of which is reflected in the court's prior ruling contained in it's Findings of Fact, Conclusions of Law and Order filed March 11, 2005;
B. The court adopts all of the facts, law and reasons cited in DHS' Memorandum in Opposition [to Mother's motion] . . .
*1080 On June 7, 2007, Mother filed a Notice of Appeal of the family court's May 8, 2007 order denying relief.

D. ICA Appeal
In her Opening Brief to the ICA, Mother, citing Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) and Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), argued that the family court denied her constitutional due process rights by failing to provide her with competent counsel. Mother further argued that, because she did not have appointed counsel until "a mere 12 days before [Mother's] appeal period would run. . . . she lost her opportunity to have evidence reconsidered and effectively lost her right to file a timely appeal." Mother also argued that, by refusing to allow her to review the confidential records in this case, the family court deprived her of her due process right to a fair trial. Mother requested that the matter be remanded for "a new trial with competent counsel present at all stages of her new proceeding to prove that she is a competent and fit parent that has the ability to provide a safe family home." (Emphasis in original).
In its Answering Brief, DHS argued that the family court did not abuse its discretion in its May 8, 2007 order denying relief. DHS argued that Mother's February 6, 2007 motion was not timely, because "it was not filed within one (1) year of the March 11, 2005 order terminating Mother's parental rights." DHS further argued that "there was no new evidence which would serve as a basis to re-open the case[,]" and that "Mother failed to present new evidence and/or arguments that could not have been presented at trial[.]"
DHS also argued that Mother's assertion that she was denied access to the record was without merit, because "the court did not prohibit Mother's access to records until September 28, 2006, . . . which was a year and a half after her parental rights were terminated, and six months beyond the time Mother would be permitted to file a Rule 60, HFCR motion. . . ." Finally, DHS argued that the analysis of Eldridge and Lassiter was inapplicable, because Mother "had counsel at all times during the pendency of this case[,]" and because she could not demonstrate substantial prejudice. In response to Mother's claim that she was denied time for her appellate counsel to file an appeal, DHS argued that "based upon the facts, it is Mother's own actions which caused a delay."
Mother subsequently filed a Reply Brief arguing:
Her attorney selected by the trial court was appointed so late that it was clearly foreseeable that the 30 day appeal period would run. The responsibility in initially correcting this problem laid with Judge Gaddis, who initiated and created the problem at Mother's expense. . . . Judge Gaddis could have made the appointment of new counsel while extending the due date to file a Notice of Appeal. Instead, he made a very late appointment of new counsel and jeopardized the legal and appeal interests of Mother. The trial judge not only filed an order against Mother, he failed to also protect Mother's concomitant due process interests in ensuring that she would be able to timely file a new Notice of Appeal. This is a clear violation of the due process rights of Mother that was easily preventable by the trial court.
(Emphasis in original).
Mother further asserted that "[a]s the trial court is responsible for timely appointing counsel, the court could have very easily extended the appeal due date or forewarned counsel of a pending notice of appeal due date." (Emphasis in original).
In its April 9, 2009 Summary Disposition Order (SDO), the ICA concluded that "the [f]amily [c]ourt did not err in declining to grant Mother relief based on ineffective assistance of counsel." In re RGB, No. 28582, 120 Hawai`i 282, 204 P.3d 501, 2009 WL 953392 at *2 (App. Apr. 9, 2009). The ICA further noted that "[f]rom Mother's point-of-view, this appeal concerns the termination of her parental rights with respect to her child. . . . However, the Termination Order is not before the court on this appeal." Id., 2009 WL 953392 at *1.
*1081 With regard to Mother's claim of ineffective assistance of counsel during the pre-termination period, the ICA noted:
Mother fails to identify with specificity, however, at which points in the case that she was unconstitutionally deprived of access to competent counsel. It appears from the record that Mother was represented by appointed counsel or standby consulting counsel at all hearings leading up to the Termination Order. . . . More importantly, . . . Mother does not identify any specific error or omission of counsel during the events and proceedings which culminated in the Termination Order.
Id. at *2.
With respect to the post-termination time frame, the ICA noted:
[T]his court is troubled by the impact of the Termination Order's immediate discharge of Mother's standby attorney, particularly in light of the [f]amily [c]ourt's assessment of Mother's mental health status. . . That said, Mother has not identified to this court a single "appealable issue" that could have been raised had counsel preserved her rights to an appeal from the Termination Order.
Id.
The ICA concluded by stating:
We consider, by analogy, the standard that is applied to claims of ineffective assistance of appellate counsel in criminal matters.. . . In this case, Mother has failed to even suggest a meritorious basis upon which counsel could have filed a motion to reconsider and could have raised on appeal from the Termination Order. For these reasons, we conclude that the Family Court did not err in declining to grant Mother relief based on ineffective assistance of counsel.
Id. (Citation omitted).
With regard to Mother's claim that her due process rights were violated by being denied access to the record in this case, the ICA held:
This limitation appears to be supported by HRS § 587-73(b)(4) (2006) and is grounded in the Family Court's prior final decision that Mother had no further parental rights or interests in the proceedings. Mother has not informed this court of any documents or category of documents that she reasonably requested access to or why she needs full access to the post-November 6, 2006 record in this case. Mother has failed to identify any prejudice stemming from this limitation. . . . We conclude that the Circuit Court did not err in limiting Mother's access to the post-November 6, 2006 confidential record in this case.
Id. at *3.
The ICA filed its judgment affirming the family court's May 8, 2007 order on May 21, 2009. Mother timely filed an application for writ of certiorari on August 13, 2009. DHS filed its response on August 28, 2009.
In her application, Mother "request[ed] the Court to apply or formulate a family court standard of the correct remedy for `ineffective assistance of counsel' and if found, to grant a new trial." Mother further asserted that "[i]t is legally impossible to raise any points until the records are released for review."
In its Objection, DHS argued that the ICA's analogy to the criminal standard for ineffective assistance of counsel was appropriate. DHS further argued that Mother had full access to all records upon which an appeal would have been based.

II. Standard of Review
The family court's denial of a motion under HFCR Rule 60(b)(6) is reviewed for abuse of discretion. Pratt v. Pratt, 104 Hawai`i 37, 42, 84 P.3d 545, 550 (2004). As the ICA noted in Hayashi v. Hayashi, 4 Haw. App. 286, 666 P.2d 171 (1983):
[s]ince Rule 60(b)(6) relief is contrary to the general rule favoring finality of actions, the court must carefully weigh all of the conflicting considerations inherent in such applications. Once the court has made a determination to grant or deny relief, the exercise of its discretion will not be set aside unless the appellate court is persuaded that, under the circumstances of the case, the court abused its discretion.
Id. at 291, 666 P.2d at 175 (citations omitted).
An "abuse of discretion occurs where the trial court has clearly exceeded *1082 the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." Buscher v. Boning, 114 Hawai`i 202, 211, 159 P.3d 814, 823 (2007) (quoting Office of Hawaiian Affairs v. State, 110 Hawai`i 338, 351, 133 P.3d 767, 780 (2006)). In addition, "[t]he burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it." State v. Hinton, 120 Hawai`i 265, 273, 204 P.3d 484, 492 (2009) (quoting State v. Wong, 97 Hawai`i 512, 517, 40 P.3d 914, 919 (2002)).

III. Discussion
In Mother's February 6, 2007 motion, Mother asserted that she was deprived of effective assistance of counsel in both the pre- and post-termination proceedings, in violation of her due process and equal protection rights under the United States and Hawai`i Constitutions. For the reasons set forth below, we construe Mother's motion as a HFCR Rule 60(b)(6) motion for relief and conclude that the family court did not abuse its discretion in denying the motion.

A. The family court properly concluded that Mother had a due process right to appointed counsel during the termination proceedings
The United States Constitution does not require the appointment of counsel in all proceedings involving the potential for termination of parental rights. Lassiter, 452 U.S. at 31, 101 S.Ct. 2153. Rather, due process requires that "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status" be balanced against the State's interest in the welfare of the child and the economy of the proceedings, as well as against the risk that "a parent will be erroneously deprived of his or her child because the parent is not represented by counsel." Id. at 27-28, 101 S.Ct. 2153 (citing Eldridge, 424 U.S. at 335, 96 S.Ct. 893). In Lassiter, the Court held that:
[t]he dispositive question . . . is whether the three Eldridge factors,[[16]] when weighed against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption and thus to lead to the conclusion that the Due Process Clause requires the appointment of counsel when a State seeks to terminate an indigent's parental status.
Id. at 31, 101 S.Ct. 2153.
This court has not determined whether article 1, section 5 of the Hawai`i Constitution affords parents a due process right to counsel in all termination proceedings.[17] However, in In re Doe, 99 Hawai`i 522, 533, 57 P.3d 447, 458 (2002) (citation omitted), we held that article 1, section 5 of the Hawai`i Constitution provides parents a "substantive liberty interest in the care, custody, and control of their children," independent of the United States Constitution, and that the state must provide parents "a fair procedure" for the deprivation of that liberty interest.
In Doe, we concluded that "parents who are in need of an interpreter because of their inability to understand English are entitled to the assistance of one at any family court hearing in which their parental rights are substantially affected." Id. at 526, 57 P.3d at 451. We further concluded that the determination of whether parental rights are substantially affected, such that due process is implicated, must be made on a case-by-case basis. Id. at 534, 57 P.3d at 459 (citing Lassiter, 452 U.S. at 32, 101 S.Ct. 2153).
Under the circumstances of Doe, however, we concluded that the Appellant-Mother had failed to demonstrate her need for an interpreter, and failed to demonstrate that she was "substantially prejudiced" by the absence of an interpreter. Id. at 526, 57 P.3d at 451. Accordingly, we affirmed the order *1083 of the circuit court, which granted foster custody of the children to DHS. Id.
In In re "A" Children, 119 Hawai`i 28, 46, 193 P.3d 1228, 1246 (App.2008), the ICA noted that the appointment of counsel remains discretionary under HRS § 587-34, which provides, in pertinent part:
Guardian ad litem; court appointed counsel. (a) The court shall appoint a guardian ad litem for the child to serve throughout the pendency of the child protective proceedings under this chapter. The court may appoint additional counsel for the child pursuant to subsection (c) or independent counsel for any other party if the party is an indigent, counsel is necessary to protect the party's interests adequately, and the interests are not represented adequately by another party who is represented by counsel.
HRS § 587-34 (2006)(emphasis added).
The ICA therefore applied the case-by-case approach adopted in Lassiter, and concluded that a father was deprived of his due process right to appointed counsel under the United States Constitution, where counsel was not appointed until two weeks before the termination proceedings. 119 Hawai`i at 59-60, 193 P.3d at 1259-60. Although the ICA expressed "grave concerns" about the case-by-case approach, it declined to adopt a bright-line rule requiring appointment of counsel for indigent parents in all termination proceedings. Id.
In this case, the family court immediately appointed counsel upon Mother's initial application. Thereafter, Mother was represented at all times by counsel or standby counsel, except when Mother expressly requested to proceed pro se, and during the period between March 11, 2005 (when the family court discharged Iopa in its Termination Order) and March 28, 2005 (when the family court appointed Yonemori). Thus, in electing to appoint counsel, it appears that the family court applied the Lassiter balancing test, and concluded that the balance of interests required that counsel be appointed for Mother in order to satisfy the demands of due process under the United States Constitution. We conclude, with respect to those aspects of the proceedings that Mother seeks to challenge here, that the family court's determination was correct given the risk that failure to appoint counsel would lead to an erroneous decision. See Lassiter, 452 U.S. at 27, 101 S.Ct. 2153.
Because the family court properly determined that Mother had a right to counsel under the United States Constitution, we decline to reach the question of whether the Hawai`i Constitution provides indigent parents a right to counsel in all termination proceedings.[18]

B. HFCR Rule 60(b)(6) is, in the circumstances of this case, a proper vehicle for raising ineffective assistance of counsel in proceedings concerning the termination of parental rights
This appeal requires us to consider whether HFCR Rule 60(b)(6) (hereinafter "Rule 60(b)(6)") is an appropriate vehicle for raising ineffective assistance of counsel in proceedings concerning the termination of parental rights. We note at the outset that Mother's February 6, 2007 motion to the trial court, styled a "Motion for 1) New Trial and/or 2) to Reconsider and/or Amend Judgment and/or All Previous Orders, and/or 3) for Release of all Evidence or Files in Case, and/or 4) for Dismissal[,]" stated only that she sought relief pursuant to HFCR Rule 7(b), which is a general rule regarding pleadings and the form of motions. However, in Mother's Opening Brief to the ICA, she asserted that the "standard of review for a denial of a motion for post-decree relief is the abuse of discretion standard." In her Reply Brief, Mother described the "motion herein" as one under Rule 60(b). Because a Rule 60(b)(6) motion appears to have been the only motion for post-decree relief available to *1084 Mother under the applicable rules,[19] and because the family court and the ICA both appeared to construe Mother's motion as a Rule 60(b)(6) motion, we review Mother's assertions under the principles applicable to Rule 60(b)(6) motions.

1. Principles applicable to HFCR Rule 60(b)(6) motions
"Rule 60(b)(6) permits the trial court in its sound discretion to relieve a party from a final judgment." Hayashi, 4 Haw.App. at 290, 666 P.2d at 174 (citing Isemoto Contracting Co. v. Andrade, 1 Haw.App. 202, 205, 616 P.2d 1022, 1025 (1980)). HFCR Rule 60(b) provides, in pertinent part:
On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from any or all of the provisions of a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . ., misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceedings was entered or taken.
(Emphasis added).
Although this court has not addressed the requirements for bringing a HFCR Rule 60(b)(6) motion, the ICA has explained that, under HFCR Rule 60(b)(6), a movant must meet three threshold requirements:
the movant must show that (1) the motion is based on some reason other than those specifically stated in clauses 60(b)(1) through (5); (2) the reason urged is such as to justify the relief; and (3) the motion is made within a reasonable time.
The first requirement is self-explanatory and merely indicates that subsection (6) is a residual clause to provide relief for considerations not covered by the preceding five clauses. The second requirement means that the movant must prove that there are exceptional circumstances justifying relief.
The third requirement calls for diligence by the moving party. Although Rule 60(b)(6) motions are not subject to the one-year limitation, they must be brought within a reasonable time. What constitutes a "reasonable time" is determined in the light of all attendant circumstances, intervening rights, loss of evidence, prejudice to the adverse party, the commanding equities of the case, and the general policy that judgments be final.
Since Rule 60(b)(6) relief is contrary to the general rule favoring finality of actions, the court must carefully weigh all of the conflicting considerations inherent in such applications.
Hayashi, 4 Haw.App. at 290-91, 666 P.2d at 174-5 (internal citations omitted).
*1085 In Hayashi, the ICA considered whether a six-year delay in filing a Rule 60(b)(6) motion was justified by any "exceptional circumstances" which would "mitigate the lengthy delay in bringing the motion." 4 Haw.App. at 291, 666 P.2d at 175. Hayashi involved Wife's allegation that Husband's coercion led her to execute a property settlement agreement (PSA) upon their divorce. Id. at 288, 666 P.2d at 173. In her HFCR Rule 60(b)(6) motion seeking relief from the PSA, Wife claimed that "before and after execution of the PSA and entry of the decree, Husband exerted extreme influence over her so that she was acting under coercion and emotional duress when she signed the PSA[,]" and that "her dominated situation created the extraordinary circumstances justifying relief." Id. at 291, 666 P.2d at 175.
The family court found no evidence of extraordinary circumstances in the record to justify Wife's six-year delay in filing an HFCR Rule 60(b)(6) motion. Id. The ICA agreed, and noted that Wife had failed to prove the existence of extraordinary circumstances because she had been represented at all times by legal counsel who was able to protect her from any coercive action, and because she had consulted with several other lawyers prior to signing the PSA. Id. Thus, while a six-year delay in filing a Rule 60(b)(6) motion was not per se unreasonable, Wife's motion was deemed untimely. Id. Accordingly, the ICA held that the family court did not abuse its discretion in denying Wife's motion. Id.
Moreover, in Nakata v. Nakata, 3 Haw. App. 51, 56, 641 P.2d 333, 336 (App.1982), the ICA held that HFCR Rule 60(b)(6) "should be used only where the relief will further justice without adversely affecting substantial rights of the parties." (citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil §§ 2857, 2864 (1st ed.1973)). The ICA further held that HFCR Rule 60(b) is not intended to "reliev[e] a party from free, calculated, and deliberate choices he, she, or it has made." Id. at 56, 641 P.2d at 336 (citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 2864 (1st ed.1973); 46 Am.Jur.2d, Judgments, § 688 (1969)).
In what the ICA construed to be a HFCR Rule 60(b) motion, id. at 55, 641 P.2d at 336, Wife sought relief from a divorce decree that gave Husband the option to purchase the marital residence at the conclusion of a six-month period if Wife failed to comply with a payoff provision, id. at 52-53, 641 P.2d at 334-35. Wife argued that "the court had the power to and should extend the six months to allow her to purchase the house upon the favorable terms stated in the decreet,]" id. at 53, 641 P.2d at 335, and the family court granted her relief. Id. at 53-54, 641 P.2d at 335. However, the ICA deemed Wife's HFCR Rule 60(b) claim "excessive," and concluded that the family court abused its discretion in granting Wife relief. Id. at 51, 56, 641 P.2d at 334, 336.

2. The use of Rule 60(b)(6) as a vehicle to raise ineffective assistance of counsel in termination of parental rights cases
A majority of states now routinely appoint counsel for indigent parents in termination of parental rights cases, and have concluded that the right to counsel includes a right to effective counsel. See Susan Calkins, Ineffective Assistance of Counsel in Parental-Rights Termination Cases: The Challenge for Appellate Courts, 6 J.App. Prac. & Process 179, 193-99 (2004). However, state courts have struggled to determine the proper procedural vehicle for raising ineffective assistance of counsel in termination of parental rights proceedings. See id. at 199.
A majority of jurisdictions has concluded that direct appeal is the most appropriate method for raising ineffective assistance of counsel in termination proceedings, due to the particular need for expeditious resolution and finality in child custody disputes. See, e.g., State ex rel. Juvenile Dep't of Multnomah County v. Geist, 310 Or. 176, 796 P.2d 1193, 1201 (1990); In re James W.H., 115 N.M. 256, 849 P.2d 1079, 1080 (Ct.App.1993); N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 929 A.2d 1034, 1040 (2007). Where an appeal of an order terminating parental rights has not been timely filed, some jurisdictions allow for an enlargement of the time for filing an appeal upon a showing *1086 of good cause. See, e.g., In re A.J., 143 P.3d 1143, 1146 (Colo.Ct.App.2006).
California allows a parent to raise ineffective assistance of counsel in a petition for a writ of habeas corpus. In re Paul W., 151 Cal.App.4th 37, 60 Cal.Rptr.3d 329, 333 (2007) (citing In re Kristin H., 46 Cal. App.4th 1635, 54 Cal.Rptr.2d 722, 725 (1996)). However, other jurisdictions have concluded that habeas corpus is not the appropriate vehicle to collaterally attack a judgment terminating parental rights on the basis of ineffective assistance of counsel because it would increase uncertainty in child custody proceedings and thereby limit the possibility of adoption. See, e.g., In re Jonathan M., 255 Conn. 208, 764 A.2d 739, 751-52 (2001); see also Lehman v. Lycoming County Children's Servs. Agency, 458 U.S. 502, 513-14, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982) (holding that federal habeas corpus may not be used to litigate constitutional issues in child-custody matters because "[t]he State's interest in finality is unusually strong in child-custody disputes. The grant of federal habeas would prolong uncertainty for children . . . possibly lessening their chances of adoption.").
Finally, some jurisdictions allow a claim of ineffective assistance of counsel to be raised under rules similar to HFCR Rule 60(b)(6). See Ex parte E.D., 777 So.2d 113 (Ala.2000); In re Georgette, 54 Mass.App.Ct. 778, 768 N.E.2d 549, 557 (2002). In Ex parte E.D., the Alabama Supreme Court held that "a [Alabama Rules of Civil Procedure (ARCP)] Rule 60(b) motion, under certain circumstances,. . . can be an appropriate means by which a parent facing the termination of parental rights can present claims of ineffective assistance of appointed counsel." 777 So.2d at 116. In that case, a mother's parental rights were terminated, and her trial counsel subsequently withdrew from the case. Id. at 114. The court appointed a new attorney for the purpose of appeal and, on appeal, the Alabama Court of Civil Appeals affirmed the termination order. Id. Less than 60 days later, the mother filed a motion pursuant to ARCP Rule 60(b)(6), alleging ineffective assistance of trial counsel. Id.
ARCP Rule 60(b)(6) is nearly identical to HFCR Rule 60(b)(6), and "permits a civil litigant to collaterally attack a civil judgment" within a "reasonable time." Id. at 116. The Alabama Supreme Court concluded that:
[w]hat constitutes a "reasonable time" depends on the facts of each case, taking into consideration the interest of finality, the reason for the delay, the practical ability to learn earlier of the grounds relied upon, and the prejudice to other parties.
Id. (quoting Ex parte W.J., 622 So.2d 358, 361 (Ala.1993) (quotation marks omitted)).
Weighing the "drastic effect of the termination of parental rights against the need for finality in the ultimate disposition of questions regarding parental rights[,]" the Alabama Supreme Court held that the mother's Rule 60(b)(6) motion, filed within 60 days of the appellate court's judgment affirming the termination order, was filed within a "reasonable time." Id.
In contrast, in In re Georgette, the Appeals Court of Massachusetts noted that a motion raising ineffective assistance of trial counsel and made pursuant to Massachusetts Rule of Civil Procedure (MRCP) Rule 60(b)(6) "should be granted only in extraordinary circumstances, which are not present when the allegedly aggrieved party could have reasonably sought relief by means of direct appeal." 768 N.E.2d at 557. In that case, a father's parental rights were terminated, and his two daughters brought a MRCP Rule 60(b)(6) motion for a new trial, alleging that their appointed trial counsel was ineffective. Id. at 551. Although the court did not expressly reject MRCP Rule 60(b)(6) as a vehicle for raising ineffective assistance of counsel, it rejected the daughters' motion as an "improper effort to obtain relief." Id. at 557. The court further noted that:
If cases are to have finality, the operation of rule 60(b) must receive "extremely meagre scope." Rule 60 is to litigation what mouth-to-mouth resuscitation is to first aid: a life-saving treatment, applicable in desperate cases. Achieving finality and minimizing delay and uncertainty are appropriate considerations when acting on any rule 60(b) motion; they are prime considerations . . . when the rights, interests, *1087 and welfare of children in custody and adoption proceedings are involved.
Id. at 557-558 (quotation marks, ellipses and citations omitted).
Recognizing that Mother cannot pursue any other avenue of relief here, we conclude that Rule 60(b)(6) was an appropriate vehicle for raising ineffective assistance of counsel in the circumstances of this case.[20]

C. We will review claims of ineffective assistance of counsel in termination of parental rights cases to determine whether fundamental fairness was compromised
State courts have also applied varying tests for determining whether appointed counsel in a termination of parental rights case was ineffective. A majority of states has adopted the standard for ineffective assistance of counsel in criminal cases that was announced in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense."[21]See, e.g., State v. T.L., 751 N.W.2d 677, 685 (N.D.2008); N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 929 A.2d 1034, 1038 (2007); In re C.H., 166 P.3d 288, 290-91 (Colo.Ct.App.2007). Aside from cases in which prejudice is presumed,[22] courts applying the Strickland standard in termination of parental rights cases rarely find ineffectiveness. Calkins, 6 J.App. Prac. & Process at 215.
Other jurisdictions apply the "fundamental fairness" test announced in State ex rel. Juvenile Department of Multnomah County v. Geist, 310 Or. 176, 796 P.2d 1193, 1204 (1990), which required a mother whose parental rights were terminated to show "not only that her trial counsel was inadequate, but also that any inadequacy prejudiced her cause to the extent that she was denied a fair trial and, therefore, that the justice of the circuit court's decision is called into serious question." In declining to apply the Strickland standard, the Geist court distinguished juvenile court proceedings from adult criminal proceedings, noting that "[t]here simply is no compelling reason that the same standards applied in adult criminal cases also should be applied in juvenile cases." Id. at 1202; see also Baker v. Marion County Office of Family & Children, 810 N.E.2d 1035, 1039 (Ind.2004) ("We conclude that transporting *1088 the structure of the criminal law, featuring as it does the opportunity for repeated re-examination of the original court judgment through ineffectiveness claims and post-conviction processes, has the potential for doing serious harm to children whose lives have by definition already been very difficult"). We note that Mother, in her application, also urged this court to "apply or formulate a family court standard of the correct remedy for `ineffective assistance of counsel.'"
In the criminal context, the United States Supreme Court has further refined the test for ineffective assistance of counsel, where counsel has failed to file a notice of appeal. Roe v. Flores-Ortega, 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000). In Flores-Ortega, the defendant pleaded guilty to second-degree murder, and was sentenced to 15 years to life in state prison. Id. at 473-74, 120 S.Ct. 1029. Flores-Ortega was informed by the trial judge that he could file an appeal within 60 days following sentencing, and that counsel would be appointed to represent him on appeal if he was indigent. Id. at 474, 120 S.Ct. 1029. However, Flores-Ortega's appointed counsel failed to file a notice of appeal, and Flores-Ortega himself was unable to communicate with counsel during the first 90 days following sentencing. Id. After Flores-Ortega's pro se attempt to file a belated notice of appeal was rejected, he filed a federal habeas petition alleging that his counsel's failure to file a notice of appeal on his behalf constituted constitutionally ineffective assistance of counsel. Id. The district court adopted the Magistrate Judge's findings and recommendations and denied Flores-Ortega's petition. Id. at 475, 120 S.Ct. 1029. Flores-Ortega appealed. Id. The United States Court of Appeals for the Ninth Circuit reversed, and certiorari was granted. Id. at 475-76, 120 S.Ct. 1029.
The United States Supreme Court held that the Strickland test applies to claims of ineffective assistance of counsel arising out of counsel's failure to file a notice of appeal. Id. at 476-77, 120 S.Ct. 1029. The Court then addressed the circumstances under which the failure to file a notice of appeal would be considered to fall "below an objective standard of reasonableness." Id. at 476-78, 120 S.Ct. 1029 (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). The Court emphasized that "a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." Id. at 477, 120 S.Ct. 1029. However, the Court declined to establish a bright-line rule deeming it per se deficient to fail to "file a notice of appeal unless the defendant specifically instructs otherwise." Id. at 478, 120 S.Ct. 1029. Rather, the Court held that:
counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.
Id. at 480, 120 S.Ct. 1029.
With regard to the prejudice prong, the Court concluded that the "denial of the entire judicial proceeding itself," which resulted from counsel's failure to file a notice of appeal, was presumptively prejudicial. Id. at 483, 120 S.Ct. 1029. However, the Court held that the Strickland standard required that "counsel's deficient performance must actually cause the forfeiture of the defendant's appeal." Id. at 484, 120 S.Ct. 1029. The Court further held that:
[i]f the defendant cannot demonstrate that, but for counsel's deficient performance, he would have appealed, counsel's deficient performance has not deprived him of anything, and he is not entitled to relief.
Id.
The Court further noted that:
As with all applications of the Strickland test, the question of whether a given defendant has made the requisite showing will turn on the facts of a particular case. Nonetheless, evidence that there were nonfrivolous grounds for appeal or that the defendant in question promptly expressed *1089 a desire to appeal will often be highly relevant in making this determination.
Id. at 485, 120 S.Ct. 1029 (citation omitted).
Applying this analysis to the facts of Flores-Ortega's case, the Court concluded that "the Magistrate Judge's findings do not provide us with sufficient information to determine whether [defense counsel] rendered constitutionally inadequate assistance." Id. at 487, 120 S.Ct. 1029. The Court further noted:
Assuming, arguendo, that there was a duty to consult in this case, it is impossible to determine whether that duty was satisfied without knowing whether [defense counsel] advised [Flores-Ortega] about the advantages and disadvantages of taking an appeal and made a reasonable effort to discover his wishes. Based on the record before us, we are unable to determine whether [defense counsel] had a duty to consult with [Flores-Ortega] (either because there were potential grounds for appeal or because [Flores-Ortega] expressed interest in appealing), whether she satisfied her obligations, and, if she did not, whether [Flores-Ortega] was prejudiced thereby.
Id. at 487, 120 S.Ct. 1029.
In In re A.J., 143 P.3d 1143 (Colo.Ct.App. 2006), the Colorado Court of Appeals considered the effect of the holding in Flores-Ortega on a claim of ineffective assistance of counsel in a termination of parental rights case, in the context of determining whether to accept a late-filed notice of appeal. The mother timely communicated her decision to appeal the termination order to her counsel, who filed an untimely notice of appeal of the family court's termination order. Id. at 1149. The court noted that the mother filed her notice of appeal just over six weeks after the family court entered its termination order, "within nine months after the child's removal from the home, [and] three months before the [expedited permanency planning (EPP)] deadline for permanent placement of the child." Id. The court noted that the statutory framework for EPP cases requires that the child "be placed in a permanent home within twelve months of his [or her] initial placement out of the home[,]" and characterized the length of delay in this case as "relatively short." Id.
The court concluded that "counsel's failure to file a timely notice of appeal after mother told him she wanted to appeal the termination order amounts to ineffective assistance of counsel." Id. However, under Colorado law, the mother was also required to demonstrate good cause warranting reinstatement of the right to appeal. Id. Because the mother had advised her counsel that she wished to appeal, the court concluded that she did not contribute to the delay in filing the appeal and, under the specific circumstances of the case, there was good cause for extending the appeal deadline. Id. at 1150. However, the court noted that:
if any one of the circumstances in this case were different, we may have reached a different result. In particular, we might have been inclined to dismiss the appeal if the untimely filing of the notice of appeal were attributable to mother's carelessness or inaction, or if the delay had been longer or exceeded the EPP deadline for permanent placement of the child.
Id.
Finally, some federal courts have declined to extend the holding in Flores-Ortega to other civil contexts in which due process requires the effective assistance of counsel. In Hernandez v. Reno, 238 F.3d 50 (1st Cir.2001), the Court of Appeals for the First Circuit noted that counsel's incompetence during immigration proceedings, which are civil in nature, "may make the proceeding fundamentally unfair and give rise to a Fifth Amendment due process objection." Id. at 55 (emphasis in original). Hernandez's counsel had filed a timely notice of appeal of Hernandez's deportation order with the Board of Immigration Appeals (Board) but failed to brief the issues on appeal, resulting in the appeal being dismissed. Id. at 52-53. Hernandez had the option to appeal the Board's decision, but his counsel failed to do so. Id. at 53. Almost four years later, Hernandez was issued a letter directing him to appear for deportation, and Hernandez then filed a petition for a writ of habeas corpus with the district court and a motion to reopen *1090 his case with the Board, alleging ineffective assistance of counsel. Id. at 53.
The First Circuit noted that:
Were this a criminal case, counsel's failure to comply with a defendant's request to appeal would be treated as prejudice per se. But we are unwilling, unless directed to do so, to incorporate into civil deportation proceedings the whole apparatus of Sixth Amendment precedent. Our concern in the immigration context is not with the Sixth Amendment but with preserving a fair opportunity to have a waiver considered; it does not include an opportunity to tie up deportation proceedings in knots through collateral attacks on defects that would not plausibly have altered the result.

Id. at 57 (citations omitted; emphasis added).
Moreover, the First Circuit noted that Hernandez "had some dutyas a condition of a successful due process claimto monitor his lawyer's actions and assure that his appeal was being pursued[,]" but did not do so. Id. Accordingly, the First Circuit affirmed the District Court's dismissal of Hernandez's habeas petition. Id.
Applying these principles to Mother's case, we hold that the right to counsel in termination of parental rights cases, where applicable, includes the right to effective counsel. We further hold that the proper inquiry when a claim of ineffectiveness of counsel is raised in a termination of parental rights case is whether the proceedings were fundamentally unfair as a result of counsel's incompetence. Cf. Geist, 796 P.2d at 1203 ("Mother must show, not only that her trial counsel was inadequate, but also that any inadequacy prejudiced her cause to the extent that she was denied a fair trial and, therefore, that the justice of the [trial] court's decision is called into serious question."); Baker, 810 N.E.2d at 1041 ("Where parents whose rights were terminated upon trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination."); Hernandez, 238 F.3d at 57 ("Our concern in the immigration context is not with the Sixth Amendment but with preserving a fair opportunity to have a waiver claim considered"). The movant bears the burden of establishing "not only that her trial counsel was inadequate, but also that any inadequacy prejudiced her cause to the extent that she was denied a fair trial and, therefore, that the justice of the [trial] court's decision is called into serious question." Id. at 1204. Although principles developed in assessing ineffective assistance of counsel claims in the criminal context may be instructive, they are not dispositive in the termination of parental rights context. Cf. Hernandez, 238 F.3d at 57 (noting that "Sixth Amendment precedent is worth consulting where counsel's performance is attacked in a deportation proceeding, but it is not binding and should not be blindly imported wholesale").
We adopt a fundamental fairness test, rather than importing criminal law concepts directly, for several reasons. First, the constitutional bases of the respective rights to counsel are different. The right to counsel in the criminal context is based on the Sixth Amendment of the United States Constitution and Article I, Section 14 of the Hawai`i Constitution. In contrast, the right to counsel in termination of parental rights proceedings is based on due process. Cf. Hernandez, 238 F.3d at 57; Anthony C. Musto, Potato, Potahto: Whether Ineffective Assistance or Due Process, An Effective Rule is Overdue in Termination of Parental Rights Cases in Florida, 21 St. Thomas L.Rev. 231, 243 (2009) ("It seems logical that if the right to counsel in a particular situation arises from due process, the issue of whether some act or omission of counsel rendered a proceeding unfair should be deemed to be one of due process."); see also In re Doe, 99 Hawai`i 522, 534, 57 P.3d 447, 459 (2002) (analyzing denial of an interpreter in a termination of parental rights proceeding under procedural due process principles).
Second, there are substantial differences in the purposes of criminal as opposed to termination of parental rights proceedings. See Baker, 810 N.E.2d at 1039 (noting that "[t]he resolution of a civil juvenile proceeding focuses on the best interests of the child, not on guilt or innocence as in a criminal proceeding"); *1091 Geist, 796 P.2d at 1202 ("There are substantial differences between adult criminal cases and juvenile court proceedings involving children and their parents. Courts have long recognized that the substantive standards and procedural rules governing criminal cases are not necessarily applicable or even desirable in juvenile court proceedings."). Consistent with that understanding, some of the protections that exist for adult criminal defendants have not been fully imported into the parental rights context. Geist, 796 P.2d at 1202 (noting that, unlike in criminal cases, under Lassiter, the right to counsel in termination of parental rights cases is determined on a case-by-case basis and that, under Santosky v. Kramer, 455 U.S. 745, 768-69, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the burden of proof in termination cases is clear and convincing evidence rather than proof beyond a reasonable doubt). Conversely, "the odds of an accurate determination in a termination case are enhanced by the fact of judicial involvement that is much more intensive than it is [in] the usual criminal case." Baker, 810 N.E.2d at 1041 (noting that the judge "is not limited to [the parties'] presentations, and . . . may require more than they present and direct further investigation, evaluations or expert testimony to assure him [or her] that the interests of the child and the respective parties are properly represented." (quoting In re Adoption of T.M.F., 392 Pa.Super. 598, 573 A.2d 1035, 1042-43 (1990))).
Third, the interests implicated by criminal and termination of parental rights cases are substantially different. Most notably, termination of parental rights proceedings implicate the interests of the child in having a prompt and permanent resolution of his or her custody statusa factor that is absent in the criminal context.[23] As the Supreme Court of Indiana noted in Baker:
In the context of termination cases, extended litigation imposes that burden on the most vulnerable people whom the system and such cases seek to protect: the children. As Justice Powell wrote, "There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current `home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." Lehman, 458 U.S. at 513-14, 102 S.Ct. 3231. Justice Joette Katz made a similar observation when Connecticut's high court decided not to permit state habeas as a vehicle for collateral attacks on judgments of termination: "[T]here exists, as the trial court noted in this case, a `frightening possibility that a habeas petition will negate the permanent placement of a child whose status had presumably been in limbo for several years.' Consequently, the state's interest as paren patriae militates against allowing the writ." In re Jonathan M., 255 Conn. 208, 764 A.2d 739, 753 (2001) (footnote omitted).
To permit the children to travel from one home to another while termination proceedings span across the years is "incongruous and contrary to the federal and state policy of minimizing the `foster care drift' that has doomed millions of children to interim, multiple or otherwise impermanent placement." In re Adoption of A.M.B., 812 A.2d 659, 667 (Pa.Super.Ct.2002). Due to the immeasurable damage a child may suffer amidst the uncertainty that comes with such collateral attacks, it is in the child's best interest and overall well being to limit the potential for years of litigation and instability. "It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty." Lehman, 458 U.S. at 513, 102 S.Ct. 3231.
Id. at 1040; see Geist, 796 P.2d at 1201 (observing that in termination proceedings, "[w]hether or not the eventual result is termination, protracted litigation extends uncertainty in the child[ren]'s life"); Musto, 21 Saint Thomas L.Rev. at 243-44 ("It also appears from a policy perspective that due process is a more fitting framework than *1092 ineffective assistance for termination cases. . . . It [] broadens the appropriate considerations in a manner that can better focus courts on the best interest of the child[ren] involved, rather than merely the impact on the parent of counsel's acts or omissions").
Applying these principles here, we decline to adopt the rule adopted in Flores-Ortega, under which prejudice is presumed when defense counsel fails to comply with a defendant's request to file an appeal in a criminal case.[24] Rather, the failure of appellate counsel to file an appeal in a termination of parental rights case must be viewed in the broader context of whether the family court proceeding was fundamentally unfair. The merit (or lack thereof) of the issues that a party intends to raise on appeal is a relevant consideration in making that determination. Cf. Hernandez, 238 F.3d at 57 (court declines to apply Flores-Ortega to an immigration proceeding, and notes that a party who claims ineffective assistance of appellate counsel in that context must show more than "defects that would not plausibly have altered the result.").

D. The family court did not abuse its discretion in denying Mother's Rule 60(b)(6) motion

1. Mother failed to establish that her pre-termination counsel was ineffective
In her application, Mother appears to request a new trial on the basis of ineffective assistance of counsel in the four-year period leading up to the family court's March 11, 2005 Termination Order. In her February 6, 2007 motion from which this appeal is taken, Mother alleged that she was denied her due process rights by:
the Order Denying Mother's Motion to Reconsider Denial of Oral Motion to Continue Trial; and Exclusion of Exhibits Filed December 23, 2004, filed on March 7, 2005, and/or, the Order Denying Mother's Motion to Reinstate Visitation Filed January 11, 2005, filed on March 7, 2005, and/or, at the time of entry of the Court's Findings of Fact, Conclusions of Law and Order filed on March 11, 2005.
(Emphasis in original).
However, Mother's February 6, 2007 motion failed to identify any specific error or omission on the part of counsel during the specified proceedings. Similarly, Mother has failed to point to any alleged errors apparent in the record. Moreover, Mother has not provided this court with transcripts from the pre-termination period or the permanent plan hearing to support her contention that Mother's counsel was ineffective, nor has she provided transcripts of the family court's hearing on her February 6, 2007 motion. Contrary to Mother's assertion that her pre-termination counsel was ineffective, the family court expressly noted in its March 7, 2005 written order denying Mother's July 12, 2004 oral motion for a new attorney that "[t]he court has seen nothing to indicate Ms. Iopa [has] not been effective in her representation and notes Ms. Iopa has worked hard to assist [Mother]."
This court has held that "[t]he burden is upon appellant in an appeal to show error by reference to matters in the record, and he or she has the responsibility of providing an adequate transcript." Bettencourt v. Bettencourt, 80 Hawai`i 225, 230, 909 P.2d 553, 558 (1995) (quoting Union Building Materials Corp. v. The Kakaako Corp., 5 Haw.App. 146, 151, 682 P.2d 82, 87 (1984)) (brackets omitted); Lepere v. United Pub. Workers, Local 646, 77 Hawai`i 471, 474, 887 P.2d 1029, 1032 (1995) ("Lepere, as appellant, had a duty to include the relevant transcripts of proceedings as a part of the record on appeal.") (footnote omitted); see Hawai`i Rules of Appellate Procedure Rule 10(b)(1)(A) ("When an appellant desires to raise any point on appeal that requires consideration of the oral proceedings before the court . . . appealed *1093 from, the appellant shall file . . . a request or requests to prepare a reporter's transcript of such parts of the proceedings as the appellant deems necessary that are not already on file."). Given the family court's findings in the record, and absent a transcript of the proceedings or other indications in the record to suggest otherwise, the record does not establish that Mother's pre-termination counsel was ineffective. Accordingly, the family court did not abuse its discretion in denying Mother's motion with respect to the pre-termination proceedings.

2. The family court did not abuse its discretion in denying Mother's motion with regard to the post-termination proceedings
The record establishes that Mother did not receive effective assistance of counsel with regard to her appeal. However, as we discuss below, Mother failed to establish that the family court proceedings were fundamentally unfair. Moreover, there was a nearly two-year delay between the March 11, 2005 order terminating custody, and Mother's filing of the Rule 60(b)(6) motion that is at issue here. A delay of that magnitude in determining permanent custodial status has a substantial negative impact on the interests of the child, which is a significant factor weighing against the granting of Rule 60(b)(6) relief. As we set forth below, Mother failed to demonstrate her entitlement to relief in the family court, and has failed on appeal to establish that the family court abused its discretion in denying the motion.
RGB was initially placed in temporary foster custody in 2001. She was later returned to Mother under family supervision, and then placed in foster custody in April, 2002. At the time of that placement, she was 2 years and 9 months old. She subsequently remained in the care of the same foster family through the permanent plan hearing.
There are several reports in the record that discuss RGB's status after that hearing. On August 3, 2005, DHS filed a report to the family court in which it noted:
[RGB] has lived with her foster parents for three years and five months and is well-adjusted and has adapted to her environment.. . .
[RGB] is happy and doing well in her current placement. It would be in the best interest of [RGB] if the adoption process were to be completed sooner rather than later. However, Deputy Attorney General, Howard Shiroma, reports that Mother is appealing the [Termination Order]. . . . Thus, Mother's appeal to the [c]ourt may delay the adoption process, negatively impacting the well-being of [RGB].
On August 4, 2005, RGB's guardian ad litem filed a report stating:
With regard to the permanency goal of adoption of he [sic] child . . ., I have spoken to Carrie Yonemori, the attorney appointed to represent Mother in her appeal of the [c]ourt's permanency order, and she has related that the necessary paperwork pertaining to such appeal should be submitted to the Supreme Court shortly. Although it is certainly not in the child's best interest, I would suppose that we would be unable to proceed with any adoption until such appeal is resolved.
On January 17, 2006, DHS filed a report to the family court in which it noted that RGB "continues to do very well in the care of foster parents, . . . whom she has resided with for nearly four years." DHS further noted that:
[RGB's foster parents] want to adopt [RGB] and have been ready to proceed with the adoption process ever since biological mother's parental rights were terminated in March 2005. However, biological Mother's pending appeal to the court. . . has prevented the DHS and [RGB's foster parents] from proceeding with the adoption. Hence, [foster parents] and [RGB] and the entire family are disappointed. Per [foster mother], [RGB] continually wonders and asks "when will she be adopted".
On May 23, 2006, DHS filed a report to the family court, in which it noted that "[RGB] continue[d] in her placement" where she "ha[d] been [] since April 4, 2002[,]" that she "wants to remain there forever because she loves her foster parents whom she refers to *1094 as `mom' and `dad[,]'" and that "she wants to be adopted as soon as possible[.]"
On June 2, 2006, RGB's guardian ad litem filed a report to the family court, stating that, "[i]n the past, foster parents had reported [RGB] making reference to her mother, . . . . However, for some time now, the only references made by [RGB] of her mother are in the context of fantasized incidents."[25]
As noted in section C, supra, the negative effect on children of delays and uncertainty in determining permanent custodial arrangements has been well documented. See, e.g., Baker, 810 N.E.2d at 1039-41. The record here clearly establishes such negative impacts on RGB. She has lived with uncertainty about the status of her family for most of her life, and wants that uncertainty to end.
At the time the family court issued its Termination Order, RGB had been in foster custody for nearly three years. See HRS § 587-72(e) (Supp.2004 & Supp.2005) (requiring DHS, with limited exception, to file a motion to set a permanent plan hearing if "the child has been residing outside of the family home for an aggregate of fifteen out of the most recent twenty-two months[.]"). The effect of the additional delay that would have been caused by granting the Rule 60(b)(6) motion was a factor that weighed substantially in favor of denying the motion. Cf. A.J., 143 P.3d at 1149-50 (although court allowed the filing of an untimely direct appeal in a termination of parental rights case, it noted that only nine months had elapsed since the child was first removed from the home and that the outcome could have been different "if the delay had been longer or exceeded the EPP deadline for permanent placement of the child"). Mother failed to establish an entitlement to relief sufficient to overcome that factor.
First, Mother has not identified, either in her Rule 60(b)(6) motion, her brief to the ICA, her application for certiorari, or oral argument in this court, what errors occurred in the permanent plan hearing that she would have challenged had Yonemori timely appealed on her behalf. In view of her failure to identify any potentially meritorious issues that could have been raised but for Yonemori's failure to timely appeal, the record does not establish that the proceedings were fundamentally unfair. Cf. Hernandez, 238 F.3d at 57 (collateral attacks in immigration proceedings based on ineffective assistance of counsel should not be permitted based "on defects that would not plausibly have altered the result").
Second, Mother's Rule 60(b)(6) motion did not adequately establish that she did not play a role in contributing to the delay in bringing the motion. See Hayashi v. Hayashi, 4 Haw.App. 286, 290, 666 P.2d 171, 174-75 (1983) (noting that relief under Rule 60(b)(6) "calls for diligence by the moving party"); cf. Hernandez, 238 F.3d at 57 (observing that "it would seem that Hernandez had some duty as a condition of a successful due process claimto monitor his lawyer's actions and assure that his appeal was being pursued"); A.J., 143 P.3d at 1150 (allowing the filing of an untimely direct appeal in a termination of parental rights case, but noting that the result could have been different "if the untimely filing of the notice of appeal were attributable to mother's carelessness or inaction"). Yonemori's representation of Mother was deficient, as Yonemori conceded in her filings in the family court, and it is Yonemori who appears to bear primary responsibility for most of the delay that occurred after the family court appointed her to represent Mother. However, the record does not explain why Mother waited until March 10, 2006 before bringing Yonemori's inaction to the attention of the family court.
Although Mother has a mental health condition, nevertheless the record shows that Mother was of "above-average" intelligence, and that she did not hesitate to bring perceived defects in her counsels' performance to the attention of the family court. There may be good explanations for why Mother did not act sooner with regard to Yonemori's failure to timely file the appeal; however, the *1095 record does not reflect them.[26] In seeking the extraordinary relief of setting aside the March 11, 2005 Termination Order nearly two years after it was entered, the burden was on Mother to establish that she was not responsible for the delay. See Hayashi, 4 Haw.App. at 290, 666 P.2d at 174 (noting that "relief [under Rule 60(b)(6)] is extraordinary and the movant must show that . . . the motion is made within a reasonable time").
Finally, we note that Mother failed to include in the appellate record any transcripts of proceedings relevant to determining whether the family court abused its discretion. As noted in section III(D)(1), supra, appellants have the burden of including in the record all transcripts relevant to their points of error. Bettencourt, 80 Hawai`i at 230, 909 P.2d at 558 ("The burden is upon appellant in an appeal to show error by reference to matters in the record, and he or she has the responsibility of providing an adequate transcript.") (brackets and citations omitted).
Although the proceedings in this case have lasted many years and included a six-day permanent plan hearing, Mother did not include any transcripts as part of the record on appeal. Mother did not include in the record any transcripts from the permanent plan hearing that might explain the circumstances surrounding the court's March 11, 2005 order discharging Iopa. Mother also did not include in the record any transcripts from the hearings held during the period between the Termination Order and the hearing on Mother's February 6, 2007 Rule 60(b)(6) motion. For example, in its written order following a hearing on April 6, 2006, the family court noted that Mother waived any conflict of interest Yonemori had in continuing to represent Mother; presumably, that hearing included some discussion of the consequences of the waiver and/or about what actions were expected to be taken subsequent to the hearing. Moreover, Mother did not include in the record any transcripts from the September 28, 2006 hearing on Mother's pro se Rule 60 motion, Yonemori's Rule 60 motion, and Yonemori's motion to withdraw.
Most notably, Mother did not include in the record a transcript of the April 24, 2007 hearing on Mother's February 6, 2007 Rule 60(b)(6) motion, which is the subject of this appeal. Thus, we do not know what, if anything, was said concerning the reasons for the delays that occurred after the Termination Order was issued, or any oral comments that might have been made by the court in explaining its ruling. The burden was on Mother to include in the record an adequate transcript of the proceeding that gave rise to this appeal. See Bettencourt, 80 Hawai`i at 230, 909 P.2d at 558. Mother's failure to provide a transcript is a substantial omission. State v. Hoang, 93 Hawai`i 333, 334, 3 P.3d 499, 500 ("Without the . . . transcript, the Intermediate Court of Appeals did not, and this court does not, have a basis upon which to review the point of error raised in the present appeal.").
For all these reasons, Mother has failed to establish that the family court abused its discretion in denying her Rule 60(b)(6) motion.

E. The family court did not abuse its discretion in limiting Mother's access to post-termination records
As noted above, the family court held a hearing on September 28, 2006, following which it issued its November 9, 2006 written order, limiting Mother's access to the court records in this case as follows:
Mother['s] . . . parental rights have been terminated and due to this status and the possibility of dissemination of these confidential *1096 records, the court finds that future court records are not currently available to Mother . . .; provided however that court records will be made available for any appellate review of this decision.
In her February 6, 2007 motion, Mother moved for, inter alia, "release of all evidence or files in case," and alleged that the family court's November 9, 2006 limitation on her access to the court records "[was] a direct violation of the right to due process[.]"
On May 8, 2007, the family court denied Mother's motion and all relief therein requested, and Mother appealed. Mother's October 30, 2007 Opening Brief to the ICA again alleged that "when the trial court refused to allow [Mother] to review `confidential' records and files, as stated in the Motion appealed from, this was yet another example of a deprivation of [Mother's] due process rights to a fair trial." The ICA concluded that the family court "did not err in limiting Mother's access to the post-November 6, 2006 confidential record in this case." In re RGB, 2009 WL 953392 at *3.
Finally, in her application for a writ of certiorari, Mother argued that "[a]s a parent's right to file an array of 60b [sic] motions continue for up to one year and in some cases beyond, a[n] unfettered right to review such records during the one year period at least should freely be given to Mother." Mother further argued that "a new trial must be granted as the only appropriate remedy."[27]
Although not entirely clear, Mother's application therefore appears to challenge the family court's November 9, 2006 order limiting her prospective access to the court records in this case. Accordingly, we construe Mother's February 6, 2007 motion as a request to vacate or reconsider the family court's November 9, 2006 written order limiting her prospective access to the court records.
The family court's November 9, 2006 order limiting Mother's access to the court records draws support from its March 11, 2005 order terminating Mother's parental rights. Upon the termination of parental rights, HRS § 587-73(b)(4) (1993 & Supp.2005 & 2006)[28] allows the family court to limit or restrict the participation of unnecessary parties in subsequent proceedings as follows:
the court shall order . . . [t]hat such further orders as the court deems to be in the best interests of the child, including, but not limited to, restricting or excluding unnecessary parties from participating in adoption or other subsequent proceedings, be entered[.]
HRS § 587-73(b)(4).
Consistent with that power, the family court, in its Termination Order, found that "it is in [RGB's] best interests that the participation of Mother and Father in subsequent hearings be limited or restricted to appearances on any motions for relief from this decision and order or any motions necessary to pursue an appeal." The family court's November 9, 2006 order limiting Mother's access to the court records stems from the termination of Mother's parental rights, and the family court's finding that limitations on Mother's participation in subsequent proceedings concerning RGB would be in RGB's best interest. This limitation is consistent with the powers afforded the family court under HRS § 587-73(b)(4).
In addition, as noted by the ICA, Mother has failed to identify "any documents or category of documents that she reasonably requested access to or why she need[ed] full access," In re RGB, 2009 WL 953392 at *3. and has not identified any relevance of the post-November 9, 2006 record to her appeal. Moreover, aside from acknowledging the length of time that has passed since the family court's March 11, 2005 Termination Order, we do not rely on the post-November 9, 2006 record in reaching our holding, and *1097 Mother therefore had access to all court records that were relevant to her appeal.
Accordingly, we hold that the family court did not abuse its discretion in issuing its November 9, 2006 order limiting Mother's prospective access to the court records or in denying Mother's February 6, 2007 motion insofar as it sought to have the court reconsider or vacate its earlier ruling.

IV. Conclusion
For the foregoing reasons, we affirm the ICA's May 21, 2009 judgment.
Dissenting Opinion by ACOBA, J., With Whom DUFFY, J., Joins.
By its decision today, the majority denies indigent persons access to justice in parental termination actions. Hawai`i is now one of only five states that leaves the appointment of counsel for indigent parents in termination-of-parental-rights proceedings to the random method of case by case determination. See In re "A" Children, 119 Hawai`i 28, 46 n. 35, 193 P.3d 1228, 1246 n. 35 (App. 2008). Despite the overwhelming national trend away from discretionary appointment, the majority embraces the majority's ultimate holding in Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), which practically every state has justly rejected.
Here, Petitioner/Mother-Appellant (Petitioner)[1] was denied the opportunity to present her side of the case on appeal. On March 11, 2005, the family court of the third circuit (the court) rendered its findings of fact (findings), conclusions of law (conclusions), and order [collectively, Termination Order], terminating Petitioner's parental rights. After entry of this Termination Order, Petitioner had twenty days to file a motion for reconsideration of the court's decision under Hawai`i Revised Statutes (HRS) § 571-54 (1993),[2] as a prerequisite for filing an appeal. The court sua sponte discharged appointed counsel without the substituted appearance of any new attorney. Thus, Petitioner was left without counsel for the first eighteen days of this crucial period. When the court appointed appellate counsel, Carrie Yonemori, Esq. (Yonemori), Yonemori failed to file Petitioner's motion for reconsideration. As a consequence, Petitioner's direct appeal was dismissed for lack of jurisdiction. Therefore, Petitioner has never had the opportunity to object to the Termination Order on appeal.
In light of these circumstances, I would hold (1) that the Intermediate Court of Appeals *1098 (ICA) did not gravely err in concluding that Petitioner's "Motion for: 1) New Trial, and/or 2) to Reconsider and/or Amend Judgment and/or All Previous Orders, and/or 3) for Release of All Evidence or Files in Case, and/or 4) for Dismissal" filed on February 6, 2007 (Rule 60 Motion) was properly considered under Hawai`i Family Court Rules (HFCR) Rule 60(b)(6), (2) that article I, section 5 of the Hawai`i Constitution guarantees indigent parents the right to court-appointed counsel in parental termination proceedings,[3] (3) that Petitioner's right to court-appointed counsel was violated when Petitioner was not provided effective assistance of counsel on appeal, and (4) that Petitioner should be allowed a direct appeal in light of the fact that this court allows such appeals for indigent criminal defendants when an attorney fails to perfect the appeal or files a late appeal. Therefore, I would direct that Petitioner have twenty days from the issuance of this court's judgment to petition the court for reconsideration pursuant to HRS § 571-54, the denial of which is subject to appeal in accordance with that statute.
Unlike the majority, I believe it is wrong to reach the findings and conclusions in the Termination Order inasmuch as Petitioner has had no opportunity to present her side of the case on direct appeal. Accordingly, I respectfully dissent.
The "facts" and procedural history that follow are taken from the record and findings and conclusions in the Termination Order which Petitioner has been precluded from appealing, except as to those matters pertaining to her ineffective assistance of counsel claim under her Rule 60 motion.

I.

A.

Pre-Termination Proceedings
Petitioner's involvement with Respondent/Respondent-Appellee Department of Human Services (DHS or Respondent) began on March 30, 2001, when Petitioner's child (RGB) was taken into police protective custody after being found in the care of Petitioner's boyfriend, who had a history of substance abuse and had been diagnosed with chronic paranoid schizophrenia with acute exacerbation. On April 6, 2001, RGB was placed in temporary foster care with DHS.
The initial hearing on the Petition was held on April 6, 2001, where Petitioner appeared with counsel Cynthia Linet, Esq. (Linet). On June 15, 2001, Petitioner stipulated to the court's jurisdiction and the court returned the child to Petitioner under family supervision.
On November 29, 2001 and November 30, 2001, Petitioner, along with Linet, appeared at hearings where DHS requested the court to award foster custody. On November 29, 2001, the court denied DHS's request. At that hearing, Petitioner requested permission to proceed pro se, and the court therefore granted Linet's oral motion to withdraw as counsel.
On April 4, 2002, DHS again requested foster custody of RGB, which was awarded. On April 8, 2002, Petitioner applied for court-appointed counsel and the court appointed Alika Thoene, Esq. (Thoene). Disposition hearings were held on April 12, 2002, April 15, 2002, May 14, 2002, and June 14, 2002. At all times, Petitioner was represented by Thoene, except at the June 14, 2002 hearing, at which Petitioner did not appear, and was defaulted for that hearing only.
Following those hearings, the court found that Petitioner suffered from a mental condition which distorted her perception of the people she came in contact with, causing her to think that everyone was conspiring against her to deprive her of the child. The court further found that Petitioner's misperceptions and her inability to control her emotions led her to have conflicts with people who were trying to assist her. The court also found that Petitioner's mental disorder prevented her from applying lessons learned to adequately parent the child and, thus, the child was not provided clean or appropriate clothing, was not bathed on a regular basis, and was not adequately supervised. The *1099 court concluded that, due to her mental disorder, Petitioner was incapable of adapting to situations not compatible with her own lifestyle and beliefs, which endangered the child and rendered Petitioner incapable of providing a safe home for the child, and therefore, Petitioner's continued care for the child would result in serious injury to her, delaying physical, emotional, social, and/or psychological development with long term negative effects.
On July 8, 2002, Petitioner filed a motion to terminate Thoene as counsel and requested to proceed pro se. On August 8, 2002, the court granted Petitioner's request, but required that Thoene act as stand-by counsel to assist Petitioner in the presentation of her case.
Over the next two years, Petitioner had visits with the child, which were often problematic. As the visitations continued to deteriorate, RGB was evaluated by psychologist Dr. John Wingert. Following the hearing on April 4, 2004, the court suspended visitation indefinitely.

B.

Termination Proceedings
The permanent custody trial was held on six separate dates between August 23, 2004 and December 13, 2004. Petitioner was present throughout the trial, along with G. Kay Iopa, Esq. (Iopa), acting as stand-by counsel.
On December 23, 2004, Iopa filed a Motion to Reconsider Denial of Oral Motion to Continue Trial. On January 11, 2005, Iopa filed a Motion to Reinstate Visitation. Both motions were denied at a hearing on January 13, 2005.
On March 11, 2005, the court entered its Termination Order. Based on numerous findings regarding Petitioner's behavior, mental condition, and ability to care for RGB, as well as the harmfulness of Petitioner's continued visits with the child, the court concluded:
1. The State of Hawai`i has established by clear and convincing evidence the criteria set forth in [HRS §]587-73(a).
2. Continued attempts at reunification of [RGB] with [Petitioner] will cause harm to [RGB] as defined in [HRS §]587(2)[sic].
3. It is in the best interests of [RGB] that permanent custody of the child be awarded to DHS.

C.

Court-Discharge of Petitioner's Counsel and Subsequent Appointment of Counsel
The court's Termination Order stated that:

[Iopa], stand-by counsel for [Petitioner], is discharged. Based on representations as to changes in her resource status, if [Petitioner] wishes the assistance of court-appointed counsel to pursue further relief or to perfect an appeal, she must tender a new application for court-appointed counsel to the [c]ourt immediately.
(Emphasis added.) At the point of discharge no counsel was substituted.
On March 29, 2005, Petitioner applied for court-appointed counsel, and counsel was appointed the same day. Yonemori, Petitioner's new counsel, failed to file a motion for reconsideration in order to preserve Petitioner's right to appeal the permanent custody ruling, as was required under HRS § 571-54 at that time.

D.

Post-Termination Proceedings

1.

2005 Proceedings
While the majority states that "[t]here are no filings in the record from either Yonemori or Petitioner from March 29, 2005 to March 10, 2006," majority opinion at ___, 229 P.3d at 1075, the record is replete with Petitioner's and Yonemori's actions leading up to Petitioner's March 10, 2006 "Motion for Relief From Judgment Order of March 11, 2005." The record indicates that DHS filed numerous reports indicating that Petitioner's appeal was pending. For example, on August 3, 2005, DHS filed a report to the court noting that Petitioner's appeal "may delay the adoption process[.]" On August 4, 2005, *1100 RGB's guardian ad litem filed a report stating that DHS would be unable to proceed with adoption unless Petitioner's appeal was resolved. The guardian ad litem report also stated that "[the guardian ad litem] ha[s] spoken to [Yonemori], the attorney appointed to represent [Petitioner] . . . and [Yonemori] has related that the necessary paperwork pertaining to such appeal should be submitted to the Supreme Court shortly."
Additionally, the record shows that between March and August of 2005, Yonemori recounted that several matters occurred that delayed her filing of Petitioner's Notice of Appeal:
2. That I was unaware that a Notice of Appeal had not been filed in the case herein. I have only done a few Family Court DHS appeals and in all previous cases, the prior attorney had filed the Notice of Appeal.
. . . .
6. That between March and August of this year [2005], I have had four (4) close family members . . . pass away. Therefore, I may have been preoccupied and not as vigilant about case details.

7. That the delay in filing the Notice of Appeal was in no way caused by [Petitioner], who is understandably quite anxious about this case.

(Emphases added.) This was stated in Yonemori's declaration of counsel, dated September 27, 2005.[4]
The record also reflects that Yonemori attempted to file a Notice of Appeal as she had represented she would to the guardian ad litem. On September 30, 2005, Yonemori attempted to file a Notice of Appeal. However, Yonemori explained that the Notice of Appeal was rejected by the clerk of court, and cited several events occurring in October and November 2005:
2. That on or about September 30, 2005[,] I filed a Notice of Appeal in the case herein.
3. That sometime in October, I was notified by [a] Family Court Clerk [] that my cover page was in error and that the documents were being returned to me for corrections.

4. That I waited for the return of the documents and checked my court jacket at the Circuit Court on a weekly basis. I did not realize that the documents were returned to me via my Family Court jacket until late November.

5. That my close friend . . . passed away in late November and I left shortly thereafter for the mainland to attend his funeral and for sometime [sic] off.

6. That due to the stresses of leaving for the mainland, holidays, and finishing up work for EPIC/Ohana Conferencing, I completely forgot about making the appropriate corrections for this case.

(Emphases added.) This was set forth in Yonemori's declaration of counsel dated March 10, 2006.[5] According to the declaration, the foregoing delays were not caused by Petitioner. Yonemori's March 10, 2006 declaration explained "[t]hat the delays in filing all papers in this case are due to my irresponsibility and are in no way caused by [Petitioner], who is understandably quite anxious about this case." (Emphasis added.)

2.

2006 Proceedings
A report from RGB's guardian ad litem dated January 26, 2006, stated that "[the guardian ad litem] was able to speak very briefly with [Yonemori]" and Yonemori had related to the guardian ad litem that "[Petitioner] ha[d] been coming to [Yonemori's] office every week and that the appeal `[was] on'."
*1101 On March 10, 2006, Petitioner filed a pro se Motion for Relief from the Order of March 11, 2005, pursuant to HFCR Rule 60. Petitioner's affidavit attached to her pro se Motion for Relief argued that "[c]ounsel assigned by this court remains ineffective to bring this matter to justice[.]" On March 13, 2006, Yonemori refiled the Notice of Appeal of the Termination Order. On March 15, 2006, Yonemori also filed a Motion for Relief from the Termination Order, pursuant to HRCR Rule 60.
On June 2, 2006, Yonemori filed a Motion for Withdrawal and Substitution of Counsel. In support of the motion, Yonemori stated in her Declaration of Counsel that she believed a legal conflict existed with her continued representation of Petitioner due to Petitioner's ineffective assistance of counsel claim:
2. I am bringing this Motion for Withdrawal and Substitution of Counsel because I believe that a legal conflict exists with my continued representation of [Petitioner].

3. [Petitioner's] Rule 60 motion alleges in part ineffective assistance of counsel. I am one of the three attorneys who may not have effectively assisted [Petitioner].

4. [Petitioner] verbally executed a waiver of conflict with me at the last court hearing.
5. I do not want to see [Petitioner] prejudiced in anyway [sic] by her waiver and I have spoken to her about the importance of preserving all possible grounds of appeal. [Petitioner] stated that it was not her intent that this waiver be "permanent."
(Emphases added.) In support of her motion for withdrawal, Yonemori indicated that she could not devote time to the case for periods in July, November, and December 2006 and that she was also anticipating a jury trial in early fall of that year:
8. I have just come through a difficult period and have not had sufficient time to devote to [Petitoner's] case and to educate myself areas [sic] of law (trust, discrimination, poverty, etc.), which may be important in the Rule 60 motion and possible appeal. [Petitioner] also requires an attorney who will meet with her on a frequent and prolonged basis. I will not be here for two weeks in early July and also for two week periods in October and December. I also anticipate that I will have a jury trial in early fall. Therefore, I am concerned that [Petitioner] would not have accessibility to my legal counsel during these numerous time periods.

(Emphases added.) Yonemori further declared that she "firmly believed" in Petitioner's arguments and asked the court to "appoint[] a competent and knowledgeable attorney" to the case:
9. I have gone through voluminous files and spoken with [Petitioner] on a number of occasions, as well as done research, and firmly believe in the various issues that she has brought up. I do not want to see her rights jeopardized or further compromised in any way and feel that she should be appointed a competent and knowledgeable attorney who will work closely with her and strenuously pursue this case.
10. [Petitioner] is in contact with an attorney (in California, but also still actively licensed in Hawai`i) who has excellent foresight and understanding about this case. I have also spoken with him about the pending Rule 60 motion and possible appeal. It is my recommendation that the court consider appointing this individual as [Petitioner's] counsel.

(Emphases added.)
On June 2, 2006, Yonemori also filed a "Specifications on Rule 60 Motions," which asserted that Petitioner had verbally agreed to consolidate the two previously-filed Rule 60 motions and provided arguments in support of the claim for relief. Yonemori also admitted that her "failure to file a timely appeal and meet with [Petitioner] in 2005, ha[d] unfortunately delayed the resolution of this matter."
After a hearing held on June 2, 2006, the court issued an order on June 26, 2006, finding that "due to [Petitioner's direct] appeal, this court lacks jurisdiction to act on her Rule 60(b) motion and motion for withdrawal and substitution of counsel[.]" Therefore, the court "[held] in abeyance any ruling on [Petitioner's] Rule 60(b) motion or motion for withdrawal and substitution unless moved on; *1102 and direct[ed Petitioner] and [Petitioner's] counsel to address th[ose issues] to the appellate court."
On June 28, 2006, this court dismissed Petitioner's direct appeal for lack of jurisdiction pursuant to HRS § 571-54, stating:

[Petitioner] did not file a motion for reconsideration within twenty days after entry of the [Termination Order], as [HRS] § 571-54[] required. Therefore, [Petitioner] failed to perfect her right to assert an appeal under HRS § 571-54[], and there is no appealable order. Absent an appealable order, we lack jurisdiction over this case.
(Emphasis added.)
Subsequently, on September 28, 2006, the court orally denied Petitioner's Rule 60 motions and Yonemori's motion to withdraw. On October 17, 2006, Petitioner, acting pro se, attempted to appeal the court's denial of these motions. On November 9, 2006, the court issued its written order denying Petitioner's Rule 60 motions and Yonemori's motion to withdraw as counsel, concluding, with respect to Petitioner's March 15, 2006 motion, "that it was not timely filed filed [sic] under Hawaii law," and with respect to Petitioner's pro se Rule 60 motion filed on March 10, 2006, that
(1) the motion only requests general relief and Rule 60(b) requires particularity ...; (2) the motion fails to provide any new evidence to support a basis for relief under [HFCR Rule 60(b)]; (3) as to the relief sought, the court afforded [Petitioner] extensive time at trial to present evidence to address all of the issues ...; (3)[sic] the court appointed legal counsels to assist [Petitioner] to the extent she was willing to work with the legal counsels appointed; (4) [HFCR Rule 6] does not permit the court to extend or enlarge the time within which to bring this motion and the court will not enlarge or extend the time within which this motion can be brought; and (5) the time within which to bring this motion had been long outstanding causing delay in the final resolution on the case and this matter needs to be put to rest[.]
(Emphases added.) On January 17, 2007, the ICA dismissed Petitioner's appeal for lack of jurisdiction under HRS § 571-54, "because [the court] ha[d] not reduced the September 28, 2006 oral announcement to an appealable written order."
On February 6, 2007, Petitioner filed the Rule 60 Motion, from which this appeal was taken. On April 24, 2007, the court orally denied this motion, and filed its order on May 8, 2007. Petitioner filed a Notice of Appeal from the May 8, 2007 order on June 7, 2007.

E.
The ICA issued its SDO on April 9, 2009. The ICA stated that the Termination Order was not before it because Petitioner had failed to file the motion for reconsideration necessary to perfect an appeal from that order:
From [Petitioner's] point-of-view, this appeal concerns the termination of her parental rights with respect to [RGB], who was born in July of 1999. [Petitioner's] parental rights were terminated in the [c]ourt's March 11, 2005 [Termination Order]. However, the Termination Order is not before the court on this appeal. On June 28, 2006, in S.Ct. No. 27814, the Hawai`i Supreme Court entered an order dismissing [Petitioner's] appeal from the Termination Order, which stated:

The [Termination Order] was not, by itself, an appealable final order under HRS § 571-54 (1993).... [Petitioner] did not file a motion for reconsideration within twenty days after entry of the [Termination Order], as HRS § 571-54 (1993) required. Therefore, [Petitioner] failed to perfect her right to assert an appeal under HRS § 571-54 (1993), and there is no appealable order. Absent an appealable order, we lack jurisdiction over this case[.]
In the Interest of RGB, a Minor, No. 28582, 120 Hawai`i 282, 204 P.3d 501, 2009 WL 953392 at *1 (Haw.App. Apr. 9, 2009) (SDO) (emphasis added).
The ICA recognized that Petitioner had sought relief from the court's May 8, 2007 Order Denying Relief, and that Petitioner raised as one of the points of error on appeal *1103 that the lack of competent counsel had violated her due process rights:
1. [Petitioner] was denied her due process rights to competent counsel; and
2. [The court] erred when it refused to allow [Petitioner] to review certain "confidential" records and files in this case.
Id. (emphasis added). The ICA decided Petitioner's arguments on their merits "[n]otwithstanding DHS's argument that [Petitioner's Rule 60 Motion] was untimely and subject to dismissal[.]" Id., 2009 WL 953392 at *2.

II.
As to the first point of error, the ICA concluded that "[Petitioner] fail[ed] to identify with specificity [] at which points in the case that she was unconstitutionally deprived of access to competent counsel[,]" id., and "[i]t appears from the record that [Petitioner] was represented by appointed counsel or standby consulting counsel at all hearings leading up to the Termination Order[,]" id. Specifically with regard to the post-termination time frame, the ICA noted that it was "troubled by the impact of the [Termination Order's] immediate discharge of [Petitioner's] standby attorney ..., particularly in light of [the court's] assessment of [Petitioner's] mental health status," id., and that, "[a]lthough new counsel apparently was appointed on the same day that [Petitioner] finally got her application in to the court, [counsel] failed to preserve [Petitioner's] rights to challenge the Termination Order by failing to immediately file a motion for reconsideration[,]" id. (emphasis in original).
Despite recognizing that "[counsel] herself later described her performance as falling below the level of competence required to protect [Petitioner's] rights[,]" id., the ICA rejected Petitioner's claim because "[Petitioner] ha[d] not identified ... a single `appealable issue' that could have been raised had counsel preserved her rights to an appeal from the Termination Order[,]" id. Therefore, applying by analogy the standard for ineffective assistance used in criminal matters, the ICA concluded that "[Petitioner] has failed to even suggest a meritorious basis upon which counsel could have filed a motion to reconsider and could have raised on appeal from the Termination Order[,]" and thus, "[the court] did not err in declining to grant [Petitioner] relief based on ineffective assistance of counsel." Id. The ICA concluded that "[the court] did not err in limiting [Petitioner's] access to the post-November 6, 2006 confidential record in this case." Id. at *3. Based on the foregoing, the ICA affirmed the court's May 8, 2007 Order Denying Relief. On August 13, 2009, Petitioner filed a petition for writ of certiorari (Application).

III.
Petitioner presented two questions in her Application:
[1] Whether the [ICA's] "borrowing" of criminal matters analogy to apply to family court claims of ineffective counsel is authorized by law and meets constitutional standards?
[2] Whether the ICA [sic] upholding of the trial court's refusal to release "confidential" records that appellate's counsel could not examine but at the same time requiring counsel to "identify any prejudice stemming from this limitation" meets fair disclosure standards?
In my view as to Question 1, the ICA gravely erred (1) in failing to hold that Yonemori was ineffective because she did not file the motion for reconsideration and (2) in failing to hold that Petitioner should be allowed to perfect her appeal because of such ineffectiveness.

IV.
Petitioner's Rule 60 Motion from which this appeal was taken has been subsequently treated by the parties, and apparently by the court and the ICA, as a motion for relief from judgment under HFCR Rule 60(b). HFCR Rule 60(b) provides, in relevant part:
On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from any or all of the provisions of a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered *1104 evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceedings was entered or taken.

(Emphasis added.)
The central argument presented in Petitioner's Motion, as well as on appeal, appears to be that she was denied due process due to ineffective assistance of counsel. Petitioner's claim could only fall under HFCR Rule 60(b)(6), inasmuch as none of the other provisions would encompass a claim of ineffective assistance. The ICA has characterized HFCR Rule 60(b)(6) as follows:

Rule 60(b)(6) permits the trial court in its sound discretion to relieve a party from a final judgment. Such relief is extraordinary and the movant must show that (1) the motion is based on some reason other than those specifically stated in clauses 60(b)(1) through (5); (2) the reason urged is such as to justify the relief; and (3) the motion is made within a reasonable time.

The first requirement is self-explanatory and merely indicates that subsection (6) is a residual clause to provide relief for considerations not covered by the preceding five clauses. The second requirement means that the movant must prove that there are exceptional circumstances justifying relief.[6]
The third requirement calls for diligence by the moving party. Although Rule 60(b)(6) motions are not subject to the one-year limitation, they must be brought within a reasonable time. What constitutes a "reasonable time" is determined in the light of all attendant circumstances, intervening rights, loss of evidence, prejudice to the adverse party, the commanding equities of the case, and the general policy that judgments be final.
Since Rule 60(b)(6) relief is contrary to the general rule favoring finality of actions, the court must carefully weigh all of the conflicting considerations inherent in such applications. Once the court has made a determination to grant or deny relief, the exercise of its discretion will not be set aside unless the appellate court is persuaded that, under the circumstances of the case, the court abused its discretion.
Hayashi, 4 Haw.App. at 290-91, 666 P.2d at 174-75 (citations omitted) (emphases added).

A.
In support of Petitioner's Rule 60(b) motion, the declaration of counsel dated January 24, 2007, stated that "[Petitioner] was not afforded competent legal counsel and was therefore denied her constitutionally protected [right to] due process and equal protection of the laws under the Hawai`i ([a]rticle I, [s]ection 5), and [the] United States of *1105 America Constitution (14th Amendment)[.]" With regard to Petitioner's appellate counsel, the declaration stated that "[t]he Order Appointing Court-Appointed Counsel [] was filed on March 29, 2005, or 12 days before the `Notice of Appeal' 30 day appeal period was due in this case, thereby denying [Petitioner's] right to appeal her adverse decision by competent counsel."[7]
As stated above, following the April 24, 2007 hearing, the court issued an order denying the Rule 60(b) Motion. Although the court did not indicate that it was treating the Rule 60(b) Motion as one for relief under HFCR Rule 60(b)(6), the court addressed Petitioner's ineffective assistance argument on the merits, concluding that the record reflected that both judges involved in the case made "great effort[s]" to ensure that Petitioner was represented throughout the proceedings.
As to [Petitioner's] claim that [Petitioner] lacked representation, the record clearly reflects that both [j]udges involved in this case made great effort to have [Petitioner] represented throughout the proceedings. The court accommodated [Petitioner] when she requested to have her counsel discharged and had standby counsel appointed to assist [Petitioner] throughout the case, all of which is reflected in the court's prior ruling contained in it's [sic] Findings of Fact, Conclusions of Law and Order filed March 11, 2005[.]
On appeal from that order, Petitioner argued that she "was denied her right to competent counsel in violation of her constitutional rights to due process of law expressed... in [a]rticle I, [s]ection 5 Hawaii [c]onstitutional rights [sic][,]" and stated that the "standard of review for a denial of a motion for post-decree relief is the abuse of discretion standard." (Emphases added.) The only provision in the HFCR which would allow a "motion for post-decree relief" based upon denial of the right to counsel is HFCR Rule 60(b)(6).
The ICA opted to "consider the substance of [Petitioner's] arguments on this appeal[,]" "[n]otwithstanding DHS's argument that [Petitioner's] February 6, 2007 Motion for Relief was untimely and subject to dismissal." RGB, 2009 WL 953392, at *2. Thus, the ICA presumably believed the motion was brought "within a reasonable time" under HFCR Rule 60(b)(4), (5), or (6). Id.
Consistent with the ICA's ruling on the merits, DHS, in its Response to the Application, characterized Petitioner's motion "from which this appeal was taken" as one under HFCR Rule 60(b). The DHS in its Response proceeded to argue that the ICA's decision on the merits was correct, without contending that Petitioner's Motion from which the appeal was taken was untimely under HFCR Rule 60(b), and thus, apparently abandoned that argument.

B.

1.
In order for Petitioner's Rule 60(b) Motion to be properly considered under HFCR Rule 60(b)(6), it must meet the requirements of Hayashi. First, as set forth supra, the motion must be "based on some reason other than those specifically stated in clauses 60(b)(1) through (5)[.]" Hayashi, 4 Haw.App. at 290, 666 P.2d at 174. A due process violation based on a claim of ineffective assistance of counsel satisfies this requirement, as it does not fall within any of the first five clauses of HFCR Rule 60(b).[8]

*1106 2.
Second, the "reason urged" must be "such as to justify the relief[.]" Id. As explained further infra, the circumstances set forth herein present "exceptional circumstances justifying relief[,]" id. at 290, 666 P.2d at 175, inasmuch as Petitioner urges (1) that she was denied her due process right to effective assistance of counsel under the Hawai`i Constitution, (2) in the context of a proceeding in which her constitutionally protected right to the care and custody of her child was permanently terminated, under circumstances where (3) the court dismissed Petitioner's counsel immediately upon the termination of parental rights without substituted counsel and required Petitioner to request court-appointed counsel for purposes of appeal, (4) despite the court's finding that "[Petitioner] suffers from a mental health condition that distorts her perceptions of people and this causes her to come into conflict with and to refuse to cooperate with people that are trying to help her[,]" RGB, 2009 WL 953392, at *2. Under the particular circumstances of this case, then, consideration of the merits of Petitioner's arguments is warranted under HFCR Rule 60(b).

3.
Finally, the motion must be "made within a reasonable time[.]" Hayashi, 4 Haw.App. at 290, 666 P.2d at 174. Under Hayashi, reasonableness requires "diligence by the moving party." Id. at 290, 666 P.2d at 175. Petitioner acted with diligence in this case, inasmuch as, despite her mental condition, she consistently attempted to assert her right to effective assistance of counsel, both before and after the Termination Order was entered, as noted in sections (a) and (b) below.

a.

Before the Termination Order

2004 Proceedings
On September 17, 2004, Petitioner filed pro se, a Motion for Dismissal of Counsel and Continuance of September 20, 2004 Hearing and to Grant Continuance to Submit Witness Letters. In that motion, Petitioner alleged, inter alia, that (1) "[Petitioner has] been seeking new counsel, that [sic] has slowed my ability to bring in all needed witnesses and letters"; (2) "[a]ssigned counsel, [Iopa], has told me repeatedly ... that `it is beyond [the] scope of [her] duties as standby counsel' to help locate, contact, or interview witnesses"; (3) "[a]ffiant has enough money today to secure independent counsel"; (4) "[a]ffiant compels the court to note that [Iopa], and counsel preceding assigned by the court, have neglected proper counsel or representation"; (5) "[l]ack of [e]ffective counsel has slowed the progress of this case"; (6) "I pray the court will allow modification, and dismissal of this lawyer, so new counsel can work with me more effectively, to continue this *1107 matter to September 27, 2004 for a successful hearing"; and (7) "[a] fair conclusion of these hearing[s] is in the best interest of my child." Without explanation, the court denied Petitioner's subsequent motion for court-appointed counsel, stating only: "Application denied[.] [Iopa] will continue as stand by [sic] counsel until further order[.]"
Despite having denied Petitioner's previous request to dismiss Iopa as counsel for the termination hearing based on Petitioner's allegations that (1) Iopa was ineffective and (2) Petitioner had the resources to secure her own attorney, the court sua sponte concluded in its March 11, 2005 Termination Order that "Iopa ... is discharged. Based on representations as to changes in her resource status, if [Petitioner] wishes the assistance of court-appointed counsel to pursue further relief or to perfect an appeal, she must tender a new application for court-appointed counsel to the [c]ourt immediately." Thus, the court unilaterally and sua sponte discharged Iopa without any indication that new counsel had been substituted to take on the case at the point that Iopa was discharged. As previously noted, on March 29, 2005, Petitioner filed her application for court-appointed counsel, which was granted, appointing Yonemori.

b.

After the Termination Order

2005 Proceedings
As noted previously, the record reflects that Yonemori attempted to file Petitioner's Notice of Appeal in 2005. Yonemori stated that she "was unaware that a Notice of Appeal had not been filed in the case herein" and she "had four (4) close family members... pass away [and t]herefore may have been preoccupied and not as vigilant about case details." Indeed, Yonemori declared that "the delay in filing the Notice of Appeal was in no way caused by the [Petitioner.]" (Emphasis added.) To recount further, Yonemori stated on the record that "on or about September 30, 2005[, Yonemori] filed a Notice of Appeal in the case[,]" but that "sometime in October [2005], [Yonemori] was notified ... that [her] cover page was in error," that she "did not realize that the documents were returned to [her] via [her] Family Court jacket until late November[,]" "[her] close friend ... passed away in late November and [Yonemori] left ... for the mainland[,]" and for these reasons, she "completely forgot about making the appropriate corrections for this case." Again, Yonemori admitted that "the delays in filing all papers in this case [were] due to [her] irresponsibility and [were] in no way caused by the [Petitioner], who [was] understandably quite anxious about this case." (Emphasis added.)

2006 Proceedings
As noted above, on March 10, 2006, Petitioner, acting pro se, filed a HFCR Rule 60 motion seeking relief from the March 11, 2005 judgment, alleging that "[c]ounsel assigned by this court remains ineffective to bring this matter to justice[.]" A few days later, on March 13, 2006, Petitioner, represented by Yonemori, filed a Notice of Appeal, appealing from the March 11, 2005 Order. Two days later, on March 15, 2006, Petitioner, represented by Yonemori, filed another Motion for Relief from the March 11, 2005 Order pursuant to HFCR Rule 60(1), (2), and (3).
As stated above, on June 2, 2006, Yonemori filed the "Specifications on Rule 60 Motions," noting that Petitioner had agreed to consolidate the two Rule 60 motions, and alleging, inter alia, that "[Petitioner's] case may have been [] prejudiced by ineffective assistance of counsel[,]" that Yonemori "fail[ed] to file a timely appeal and meet with [Petitioner] in 2005"; on that same day, Yonemori filed a Motion for Withdrawal and Substitution of Counsel, alleging, inter alia, that she had "not had sufficient time to devote to [Petitioner's] case and to educate [her]self [on the] areas of law[,]" and due to various commitments, "[Petitioner] would not have accessibility to [her as] legal counsel[.]" Yonemori concluded that Petitioner "should be appointed a competent and knowledgeable attorney[.]"
Also as noted before, on June 26, 2006, "due to [Petitioner's] current appeal," the court held rulings in abeyance on "[Petitioner's] Rule 60(b) motion and motion for withdrawal and substitution of counsel[.]"
*1108 On June 28, 2006, this court dismissed Petitioner's appeal for failing to timely file a Motion for Reconsideration; on October 17, 2006, Petitioner, acting pro se, filed a Notice of Appeal from the Order denying her Rule 60 motion; and on November 9, 2006, the court issued its "Order Denying Motion for Withdrawal and Substitution of Counsel filed [June 2, 2006]; Motion for Relief from March 11, 2005 Order filed March 15, 2006; and Motion for Relief from Judgement of March 11, 2005 filed March 10, 2006." Petitioner's pro se appeal from the denial of her Rule 60 motion was dismissed by the ICA for lack of jurisdiction on January 12, 2007, because "the [] court ha[d] not reduced the September 28, 2006 oral announcement to an appealable written order." It appears that subsequently, Petitioner was able to secure private counsel who, on February 6, 2007, filed the motion, from which the instant appeal was taken.

c.
The record in this case, recounted above, reveals that Petitioner consistently made efforts to assert her rights, inter alia, to effective assistance of counsel, and that any lack of diligence was, by court-appointed appellate counsel's own admission, on the part of Yonemori. See Lowther, 99 Hawai`i at 576-77, 57 P.3d at 501-02 (recognizing that "when there is gross neglect by counsel and an absence of neglect by the party, some courts have refused to impute the attorney's negligence to the party and have granted relief under Rule 60(b)(6)"). In light of the foregoing circumstances, Petitioner acted with diligence in pursuing post-judgment relief.

C.
Furthermore, according to the Hayashi court, "[w]hat constitutes a `reasonable time' is determined in the light of all attendant circumstances, intervening rights, loss of evidence, prejudice to the adverse party, the commanding equities of the case, and the general policy that judgments be final." 4 Haw.App. at 290, 666 P.2d at 175. As noted supra, in its Answering Brief, Respondent asserted that "[i]n considering what is a `reasonable time' to bring a Rule 60(b)(6) motion the court must consider all of the attendant circumstances including prejudice to the adverse party, and in this case the prejudice would be considerable since the child has spent the vast majority of her life in foster care." This was the only argument regarding "attendant circumstances" presented by Respondent. As stated above, Respondent apparently abandoned any argument as to the timeliness of the Rule 60(b) Motion in its Response on certiorari. While the rights of the child are undoubtedly of vital import, those rights are not inconsistent with Petitioner's constitutional right to effective assistance of counsel, and allowing Petitioner relief to which she is entitled at this point does not mean that the child's rights will be negatively impacted.

D.
Based on the foregoing, the ICA did not gravely err in concluding that Petitioner's Rule 60 Motion may be considered a motion made within the meaning of HFCR Rule 60(b)(6). Petitioner satisfied the three requirements set forth in Hayashi, and therefore it is appropriate to address the merits of Petitioner's arguments.

V.
Petitioner's first argument is essentially that she was denied effective assistance of counsel both during and after the termination proceedings. The threshold issues in determining whether Petitioner's due process rights were violated are (1) whether there is a due process right to counsel in termination proceedings and, if so, (2) the standard of effectiveness to be applied.

A.
With respect to the first threshold issue, the Supreme Court in Lassiter has not mandated counsel in termination proceedings as a due process right under the United States Constitution. In Lassiter, the Supreme Court, by a 5-4 majority, determined that an absolute right to counsel exists only where the indigent "may be deprived of his [or her] physical liberty." 452 U.S. at 27, 101 S.Ct. 2153. The Court ruled that, in all other *1109 cases, including a termination of parental rights proceeding, the balancing test set forth in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), should be applied on a case-by-case basis. 452 U.S. at 27, 101 S.Ct. 2153. That test "propounds three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." Id. The Supreme Court held that, in determining whether court-appointed counsel is required by due process, "[w]e must balance these elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom." Id.
Starting from that proposition, the majority discussed at length the importance of the interests at stake in a termination proceeding:
This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to the companionship, care, custody and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection. Here the State has sought not simply to infringe upon that interest but to end it. If the State prevails, it will have worked a unique kind of deprivation. A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore[,] a commanding one.

Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision. For this reason, the State may share the indigent parent's interest in the availability of appointed counsel. If, as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests, the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal. North Carolina itself acknowledges as much by providing that where a parent files a written answer to a termination petition, the State must supply a lawyer to represent the child.
The State's interests, however, clearly diverge from the parent's insofar as the State wishes the termination decision to be made as economically as possible and thus wants to avoid both the expense of appointed counsel and the cost of the lengthened proceedings his presence may cause. But though the State's pecuniary interest is legitimate, it is hardly significant enough to overcome private interests as important as those here, particularly in light of the concession in the respondent's brief that the potential costs of appointed counsel in termination proceedings is [sic] admittedly de minimis compared to the costs in all criminal actions.

Finally, consideration must be given to the risk that a parent will be erroneously deprived of his or her child because the parent is not represented by counsel.
Id. at 27-29, 101 S.Ct. 2153 (quotation marks, citations, and footnote omitted) (emphases added).
The Supreme Court summarized its analysis of the Eldridge factors as applied to termination proceedings as follows:
The dispositive question, which must now be addressed, is whether the three Eldridge factors, when weighed against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption and thus to lead to the conclusion that the Due Process Clause requires the appointment of counsel when a State seeks to terminate an indigent's parental status. To summarize the above discussion of the Eldridge factors: the parent's interest is an extremely important one (and may be supplemented by the dangers of criminal liability inherent in some termination proceedings); the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, *1110 in some but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high.

Id. at 31, 101 S.Ct. 2153 (emphases added). However, the majority concluded that it could not "say that the Constitution requires the appointment of counsel in every parental termination proceeding[,]" and, instead, it is for the trial court to weigh the factors in the first instance to determine whether counsel must be appointed, subject to appellate review. Id. at 32, 96 S.Ct. 893. Although determining that based on the specific circumstances of that case, it could not determine that lack of representation had rendered the proceedings "fundamentally unfair," the Lassiter court emphasized that
our Constitution imposes on the States the standards necessary to ensure that judicial proceedings are fundamentally fair. A wise public policy, however, may require that higher standards be adopted than those minimally tolerable under the Constitution. Informed opinion has clearly come to hold that an indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, but also in dependency and neglect proceedings as well. Most significantly, 33 States and the District of Columbia provide statutorily for the appointment of counsel in termination cases. The Court's opinion today in no way implies that the standards increasingly urged by informed public opinion and now widely followed by the States are other than enlightened and wise.

Id. at 33-34, 101 S.Ct. 2153 (emphases added) (citations omitted).

B.
This court has not previously decided whether there is a due process right to counsel in termination proceedings. However, the ICA has, with some reservation, employed the approach adopted in Lassiter for determining whether court-appointed counsel must be provided to indigent parents in a termination case. See "A" Children, 119 Hawai`i at 48-57, 193 P.3d at 1248-57; In re D.W., 113 Hawai`i 499, 501-05, 155 P.3d 682, 684-88 (App.2007).

1.
Applying the standard set forth in Lassiter in D.W., the ICA rejected the Mother's argument that she "was denied her due process right to full representation of counsel[,]" because "consulting counsel had limited powers and duties." 113 Hawai`i at 505, 155 P.3d at 688. To the contrary, the ICA determined that, "[a]lthough the family court's ... memorandum supports Mother's assertion `that consulting counsel had limited powers and duties,' it does not support Mother's assertion that she was thereby denied her constitutional right to due process[,]" but instead "supports the contrary assertion that Mother had the benefit of `full representation of counsel' and was not denied her right to due process." Id. The ICA further based its conclusion on the fact that "[t]he record does not support Mother's assertions that `consulting counsel lacked the resources to exercise ordinary subpoena powers, let alone seek expert witnesses.'" Id.

2.
Subsequently, in "A" Children, the ICA addressed at length the question of whether a right to counsel attaches in termination proceedings. Initially, the ICA noted that "[t]he Hawai`i Supreme Court has affirmed that `independent of the federal constitution, parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article [I], section 5 of the Hawai`i Constitution.'" 119 Hawai`i at 44-45, 193 P.3d at 1244-45 (quoting In re Doe, 99 Hawai`i 522, 533, 57 P.3d 447, 458 (2002)). With regard to the magnitude of the deprivation of rights at issue in a termination proceeding, the ICA stated that "[t]he right of a parent to his or her child is more precious to many people than the right of life itself. Indeed, it has been recognized that the permanent termination of parental rights is one of the most drastic actions the state can take against its *1111 inhabitants." Id. at 46, 193 P.3d at 1246 (quotation marks, citations, and brackets omitted) (emphasis added). However, as the ICA noted, under our statutory law, "appointment of counsel for an indigent parent who is a party to a child-protective proceeding remains discretionary in Hawai`i[.]" Id.

a.
In that connection, HRS § 587-34(a) (1993) provides that
[t]he court shall appoint a guardian ad litem for the child to serve throughout the pendency of the child protective proceedings under this chapter. The court may appoint additional counsel for the child pursuant to subsection (c) or independent counsel for any other party if the party is an indigent, counsel is necessary to protect the party's interests adequately, and the interests are not represented adequately by another party who is represented by counsel.

(Emphases added.) As recognized by the ICA, "Hawai`i thus remains one of only a handful of states that does not, by statute or case law, guarantee indigent parents a right to appointed counsel, at least at the stage of a child-protective proceeding at which parents are threatened with the prolonged and/or indefinite deprivation of custody of their children." 119 Hawai`i at 46, 193 P.3d at 1246 (emphasis added). The ICA noted that "in only five states (Delaware, Hawai`i, South Carolina, Tennessee, and Wyoming) is the appointment of counsel for indigent parents in termination-of-parental-rights proceedings left to the discretion of the trial court." Id. at 46 n. 35, 193 P.3d at 1246 n. 35.
Tracing the history of the case law on this subject, the ICA noted that "[p]rior to 1981, the overwhelming majority of state and federal courts that had addressed the issue held that constitutional due process required that indigent parents be provided with court-appointed counsel in termination-of-parental-rights and prolonged-deprivation-of-custody cases." Id. at 46, 193 P.3d at 1246. The ICA recognized, however, that, in 1981, in Lassiter, the Supreme Court "rejected the prevailing case law and held that under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, indigent parents in a state-initiated termination-of-parental-rights proceeding do not have a per se right to be represented by court-appointed counsel." Id. at 48, 193 P.3d at 1248 (footnote omitted). The ICA summarized the holding in Lassiter as requiring that courts "balance the presumption that the right to court-appointed counsel is triggered only when an indigent parent is threatened with the loss of his or her personal liberty against ... (1) the private interests at stake, (2) the government's interest, and (3) the risk that the failure to appoint counsel will lead to an erroneous decision." Id. at 57, 193 P.3d at 1257. The ICA interpreted Lassiter as providing that, "[b]ecause the private interests of the parents and the competing interests of the government are evenly balanced, the court's determination invariably hinges on the third factor." Id.

b.
Applying Lassiter to the facts of "A" Children, the ICA "conclude[d], in light of the record, that [Father] was denied his constitutional right to due process when he was not provided with counsel until sixteen days prior to trial." Id. Because the ICA in that case based its decision on the specific facts of the Father's case, it declined to explicitly "decide in this case whether to join the vast majority of states that require, as a bright-line rule, that counsel be appointed for indigent parents in all termination-of-parental-rights cases." Id. at 60, 193 P.3d at 1260. The ICA "express[ed] grave concerns, however, about the case-by-case approach adopted in Lassiter for determining the right to counsel[,]" id., because, as set forth in Justice Blackmun's dissenting opinion in Lassiter, that approach
places an even heavier burden on the trial court, which will be required to determine in advance what difference legal representation might make. A trial judge will be obligated to examine the State's documentary and testimonial evidence well before the hearing so as to reach an informed decision about the need for counsel in time to allow preparation of the parent's case.
*1112 Id. (quoting Lassiter, 452 U.S. at 51 n. 19, 101 S.Ct. 2153 (Blackmun, J., dissenting)).

VI.

A.
However, this court has "affirm[ed], independent of the federal constitution, that parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article [I], section 5 of the Hawai`i Constitution." Doe, 99 Hawai`i at 533, 57 P.3d at 458 (emphasis added). In that regard, in Doe, this court held that
[p]arental rights guaranteed under the Hawai`i Constitution would mean little if parents were deprived of the custody of their children without a fair hearing. Indeed, parents have a fundamental liberty interest in the care, custody, and management of their children and the state may not deprive a person of his or her liberty interest without providing a fair procedure for the deprivation. Furthermore, the Supreme Court has said that parental rights cannot be denied without an opportunity for them to be heard at a meaningful time and in a meaningful manner.

Id. (first emphasis added) (second emphasis in original) (quotation marks, citations, and brackets omitted). This court determined in Doe that an opportunity to be heard in "a meaningful manner" included the right to an interpreter "where [] parental rights are substantially affected[,]" id. at 534, 57 P.3d at 459, including "where one purpose of the hearings was to determine whether or not parental rights should eventually be terminated[,]" id. at 535, 57 P.3d at 460.
In light of the constitutionally protected liberty interest at stake in a termination of parental rights proceeding, this court should hold, consistent with the great majority of states, that indigent parents are guaranteed the right to court-appointed counsel in termination proceedings under the due process clause in article I, section 5 of the Hawai`i Constitution.

B.
Even assuming the balancing test in Lassiter were appropriate, weighing the Eldridge factors on a case-by-case basis will always come out in favor of appointing counsel under the Hawai`i Constitution. As Lassiter recognized, "a parent's desire for and right to the... custody ... of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection[,]" and, therefore, "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is ... a commanding one." 452 U.S. at 27, 101 S.Ct. 2153 (emphasis added). Thus, the private interests at stake in a termination proceeding weigh strongly in favor of appointing counsel, especially in light of the substantive liberty interest in custody embodied in the Hawai`i Constitution.
As for the State's interest, the Lassiter court indicated that the State's interests actually weighed largely in favor of appointing counsel, stating that "the State has an urgent interest in the welfare of the child," and thus, "it shares the parent's interest in an accurate and just decision." Id. The Lassiter court recognized that "[i]f, as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests, the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal." Id. at 28, 101 S.Ct. 2153 (emphasis added). Additionally, although recognizing that the State has an interest in the economy of the proceedings, Lassiter noted that "it is hardly significant enough to overcome private interests as important as those here[.]" Id. (emphasis added). Thus, under the Supreme Court's formulation the competing interests weigh heavily in favor of appointing counsel.
The final consideration in the balancing test is "the risk that a parent will be erroneously deprived of his or her child because the parent is not represented by counsel." Id. Contrary to the Lassiter court's conclusion that the risk may be determined on a case-by-case *1113 basis, the risk of erroneous deprivation is undeniably present in every case. Due to the nature of the interests at stake, even in cases where the issues may not seem extremely complex and thus the risk may seem lesser in degree, the balance weighs in favor of appointing counsel.

C.
Other courts have similarly rejected Lassiter's "case by case" approach on state constitutional grounds. In M.E.K. v. R.L.K., 921 So.2d 787, 790 (Fla.App. 5 Dist.2006), the Florida District Court of Appeals for the Fifth District rejected this aspect of Lassiter, because Lassiter "addressed only the minimum due process requirements under the federal due process clause[,]" and "[t]he citizens of Florida are also protected by the due process clause in Article [I], section 9 of the Florida Constitution." That court held that
[i]n the area of termination of parental rights, the Florida due process clause provides higher due process standards than the federal due process clause. Under the federal provision, Lassiter does not require appointment of counsel in every case. It only requires a case-by-case determination. But under the state due process clause, [Florida case law] requires appointment of counsel in "proceedings involving the permanent termination of parental rights to a child."
Id. (emphasis added).
Similarly, in Matter of K.L.J., 813 P.2d 276, 282 (Alaska 1991), the Supreme Court of Alaska "reject[ed] the case-by-case approach set out by the Supreme Court in Lassiter[,]" based on the due process clause of the Alaska Constitution, and because it agreed with the dissenters in Lassiter that due process balancing clearly comes out in favor of appointing counsel in every case. In evaluating the interests at stake, the K.L.J. court stated that "[t]he private interest of a parent whose parental rights may be terminated via an adoption petition is of the highest magnitude[,]" because "[t]he right to direct the upbringing of one's child is one of the most basic of all civil liberties." Id. at 279 (quotation marks and citation omitted). That court noted that "[t]he United States Supreme Court has called the right to have children a basic civil right of man, and noted that custody is a right far more precious than property rights." Id. (internal quotation marks, citations and ellipsis omitted).
As for the State's interest, the Alaska Supreme Court determined that "[a]ppointment of counsel will make the fact-finding process more accurate, thereby furthering the state's interest in terminating the rights of parents who do in fact neglect or abandon their children[,]" and "[t]he state's interest in its citizens receiving a just determination on such a fundamental issue cannot be open to question." Id. at 280 (emphasis in original). The K.L.J. court conceded "the state undoubtedly has a legitimate interest in avoiding the cost of appointed counsel and its consequent lengthening of judicial procedures[,]" but agreed with Lassiter that "`though the State's pecuniary interest is legitimate, it is hardly significant enough to overcome private interests as important as those here[.]'" Id. (quoting Lassiter, 452 U.S. at 28, 101 S.Ct. 2153).
Regarding the third factor, "the risk that a parent will be erroneously deprived of his or her right[,]" that court reasoned:
[a]lthough the legal issues in a given case may not be complex, the crucial determination of what will be best for the child can be an exceedingly difficult one as it requires a delicate process of balancing many complex and competing considerations that are unique to every case. A parent who is without the aid of counsel in marshalling and presenting the arguments in his favor will be at a decided and frequently decisive disadvantage which becomes even more apparent when one considers the emotional nature of child custody disputes, and the fact that all of the principals are likely to be distraught.
Id. (emphasis added).
In rejecting the Lassiter approach, that court agreed with Justice Blackmun's dissent in Lassiter that "the due process balancing in the abstract favors a bright line rule where `the private interest is weighty, the procedure devised by the state fraught with risks of error, and the countervailing governmental *1114 interest insubstantial.'" Id. at 282 n. 6 (quoting 452 U.S. at 48-49, 101 S.Ct. 2153 (Blackmun, J., dissenting)). The Alaska Supreme Court further recounted the following disadvantages associated with the case-by-case approach:
First, as Justice Blackmun illustrated, the case-by-case approach adopted by the majority does not lend itself practically to judicial review. The transcript of a termination proceeding alone will not be dispositive of whether an unrepresented indigent was disadvantaged. The transcript will not show whether the indigent litigant had adequate discovery or access to legal resources necessary for constructing a defense. Consequently, the reviewing court must expand its analysis into a "cumbersome and costly," time-consuming investigation of the entire proceeding. Since the case-by-case approach involves a constitutional inquiry, "it necessarily will result in increased federal interference in state proceedings." A case-by-case approach is also time consuming and burdensome on the trial court. Not only must it determine in advance the need for counsel, it must develop pretrial procedures and standards in order to determine properly the need for counsel. There is no guarantee that these standards will produce equitable decisions in every case. Additionally, it will not always be possible for the trial court to predict accurately, in advance of the proceedings, what facts will be disputed, the character of cross-examination, or the testimony of various witnesses. These factors increase the possibility that appointment of counsel will be denied erroneously by the trial court. Because of the procedural delays encountered in litigation of appeals, the parent's rights could be terminated erroneously for an extended period of time. The parent also would be denied the custody of his or her children during this period. An absolute right to counsel would avoid any erroneous denial of appointment of counsel and would eliminate the need for cumbersome and time-consuming standards, while preserving the right to family integrity.

Id. (quoting Note, Lassiter v. Department of Social Services: A New Interest Balancing Test for Indigent Civil Litigants, 32 Cath. U.L.Rev. 261, 282-83 (1982)) (ellipsis omitted) (emphases added).

D.
Both M.E.K. and K.L.J. echo the sound determination that has been made by almost every state, either in the legislature or by the courts, that a right to counsel should inhere in the context of parental termination proceedings. See, e.g., In re J.A.H., 285 Kan. 375, 172 P.3d 1, 7 (2007) (recognizing that "[b]ecause the statute requires the appointment of counsel to indigent parents, ... the analysis is instead limited to whether the statutory right to counsel has been denied" (emphasis added)); In re Kafia M., 742 A.2d 919, 927 n. 5 (Me.1999) (recognizing that "[i]n Danforth v. State Dept. of Health and Welfare, 303 A.2d 794 (Me.1973), we held that the due process clause requires the appointment of counsel to indigent parents faced with the termination of their parental rights[,]" and that, subsequently, "[t]he requirement of appointed counsel has been embodied in the child protection statutes" (emphasis added)); Div. of Youth & Family Servs. v. V.J., 386 N.J.Super. 71, 898 A.2d 1059, 1062 (Ch. Div. 2004) (recognizing "that New Jersey has recognized the parent's fundamental interest in the care and custody of children[,]" and that counsel must be appointed in both temporary and permanent deprivation proceedings, because "[f]or the State to intrude permanently or only temporarily in a manner designed to disassemble the nuclear family, society's most basic human and psychological unit, without affording counsel ... to a class of society's least equipped adversaries strikes the court as a fundamental deprivation of procedural due process" (quotation marks and citations omitted) (emphasis added)); In re Adoption of R.I., 455 Pa. 29, 312 A.2d 601, 602 (1973) (noting that "[i]t has long been established that an individual is entitled to counsel at any proceeding which may lead to the deprivation of substantial rights[,]" and holding that "[w]hile [such] cases are criminal in nature, the logic behind them is equally applicable to a case involving an indigent parent faced with the loss of her child" (internal quotation marks and citations omitted) *1115 (emphases added)); In re Welfare of J.M., 130 Wash.App. 912, 125 P.3d 245, 249 (Div. 3 2005) (recognizing that "[i]t is well settled in Washington that the right to counsel attaches to indigent parents in termination proceedings by way of [statute]" and that "[t]his right derives from the due process guaranties of article I, section 3 of the Washington Constitution as well as the Fourteenth Amendment" (citations omitted)); In re Stephen Tyler R., 213 W.Va. 725, 584 S.E.2d 581, 589 n. 9 (2003) (noting that "[i]n child neglect proceedings which may result in the termination of parental rights to the custody of natural children, indigent parents are entitled to the assistance of counsel" by virtue of both constitutional due process and statutory requirements);. The rationale of those cases applies equally under the due process clause of the Hawai`i Constitution, especially given the special protection afforded to parents' liberty interests in the care and custody of children. See Doe, 99 Hawai`i at 533, 57 P.3d at 458. Thus, article I, section 5 encompasses a right to court-appointed counsel for indigent parents in a termination proceeding.

E.
The majority asserts that (1) "[b]ecause the family court properly determined that [Petitioner] had a right to counsel under the United States Constitution, we decline to reach the question of whether the Hawai`i Constitution provides indigent parents a right to counsel in all termination proceedings," majority opinion at ___, 229 P.3d at 1083, and (2) "the determination of what protections the Hawai`i Constitution provides to indigent parents is not properly before us[,]" id. at ___, 229 P.3d at 1083 & n. 18. Respectfully, these assertions are incorrect for at least two reasons.
First, these assertions ignore the fact that parents, such as Petitioner, have a constitutional right to the "care, custody, and control of their children[,]" under the due process clause of article I, section 5 of the Hawai`i Constitution. Doe, 99 Hawai`i at 533, 57 P.3d at 458. This court has already determined that parents in termination proceedings "have a substantive liberty interest ... protected" by that clause. Id. Furthermore, this "substantial liberty interest" is "independent of the federal constitution[.]" Id. Given the nature of this interest, the majority's discretionary appointment approach is inimical to the protection guaranteed parents under the Hawai`i Constitution, for the reasons recounted above.
Second, the majority's assertion that "the determination of what protections the Hawai`i Constitution provides to indigent parents is not properly before us" is incorrect inasmuch as the majority opinion establishes the standard of ineffective assistance of counsel in parental terminations proceedings. This court has recognized that the right to effective assistance of counsel is protected under the Hawai`i Constitution. See State v. Montalbo, 73 Haw. 130, 828 P.2d 1274 (1992) ("Appellant had a right to effective counsel under the Hawaii Constitution, art. I, § 14 and the U.S. Constitution, Sixth and Fourteenth Amendments."); State v. Smith, 68 Haw. 304, 309, 712 P.2d 496, 499-500 (1986) (stating that the "assistance of counsel guaranteed by the ... Hawaii Constitution is satisfied only when such assistance is effective"). As discussed fully infra, while the majority rejects "importing criminal law concepts directly," majority opinion at ___, 229 P.3d at 1090, it in fact utilizes the "potentially meritorious defense" factor, one of the two factors constituting Hawaii's criminal standard for ineffective assistance of counsel under the Hawai`i Constitution. See Briones v. State, 74 Haw. 442, 465-66, 848 P.2d 966, 977 (1993) (establishing that the standard for ineffective assistance at the appellate level "centers on whether counsel informed him or herself enough to present appropriate appealable issues in the first instance" and "[a]n appealable issue is an error or omission... resulting in the withdrawal or substantial impairment of a potentially meritorious defense)" (emphasis added); State v. Antone, 62 Haw. 346, 348-49, 615 P.2d 101, 104 (1980) (stating that in order to prove ineffective assistance of counsel at the trial level, the appellant must "[f]irst[,] ... establish specific errors omissions of defense counsel ... [and s]econd, ... establish that these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially *1116 meritorious defense") (emphasis added). Thus, the majority's opinion implicates Petitioner's due process right to effective counsel under the Hawai`i Constitution. In rejecting that right, the majority's decision today will have a deleterious effect on indigent parents, but especially on those parents who most need legal representation.[9]

VII.

A.
Having determined that article I, section 5, of the Hawai`i Constitution encompasses a right to counsel at termination proceedings, the question arises as to the standard of effectiveness to be applied. This court has stated that the right to counsel "cannot be satisfied by mere formal appointment, for the assistance of counsel guaranteed by the United States and Hawai`i Constitutions is satisfied only when such assistance is effective." Smith, 68 Haw. at 309, 712 P.2d at 499-500 (internal quotation marks, citations, and ellipsis omitted); see also McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (holding that "the right to counsel is the right to the effective assistance of counsel"); Matter of D.D.F., 801 P.2d 703, 707 (Okl.1990) ("Taking into consideration both the constitutional and statutory requirements that counsel be provided [in a termination of parental rights proceeding], we must also agree with [the father] that the right to counsel is the right to effective assistance of counsel. The right to counsel would be of no consequence if such counsel were not required to represent the parent in a manner consistent with an objective standard of reasonableness.") (Emphasis added.). Thus, plainly, in order for it to be meaningful, the right to counsel in a termination proceeding must necessarily mean the right to effective counsel.

B.
The liberty interest of a parent in the care, custody and control of his children is as fundamental as the interest of a criminal defendant in personal liberty, and the deprivation of that parental interest, in fact, may be more "grievous." As Justice Stevens stated:
A woman's misconduct may cause the State to take formal steps to deprive her of her liberty. The State may incarcerate her for a fixed term and may permanently deprive her of her freedom to associate with her child. The former is a pure deprivation of liberty; the latter is a deprivation of both liberty and property, because statutory rights of inheritance as well as the natural relationship may be destroyed. Although both deprivations are serious, often the deprivation of parental rights will be the more grievous of the two.

Lassiter, 452 U.S. at 59, 101 S.Ct. 2153 (Stevens, J., dissenting) (emphases added). Thus, as Justice Stevens recognized, "the Due Process Clause of the Fourteenth Amendment entitles a defendant in a criminal case to representation by counsel [and] appl[ies] with equal force to a case of [parental termination]." Id. at 60, 101 S.Ct. 2153 (emphasis added).
The judicial procedures utilized for termination proceedings resembles a criminal prosecution. The State has considerable expertise and resources in prosecuting the case in comparison to an indigent parent defendant. Id. at 44-45, 101 S.Ct. 2153 (Blackmun, J. dissenting, joined by Brennan, J. and Marshall, J.). "The legal issues ... are neither simple nor easily defined" and the legal standard against which the defendant parent is judged is "imprecise and open to the subjective *1117 values of the judge." Id. at 45, 101 S.Ct. 2153.
Because the liberty interest at stake in a termination proceeding parallels that in a criminal proceeding, "the range of competence demanded of attorneys in criminal cases" should be similar to that demanded of attorneys in termination proceedings. A survey of other jurisdictions demonstrates that the great majority of courts apply the criminal standard for determining the ineffective assistance of counsel in termination proceedings. See, e.g., V.F. v. State, 666 P.2d 42, 46 (Alaska 1983) (applying Alaska's criminal standard for ineffective assistance of counsel as announced in Risher v. State, 523 P.2d 421, 425 (Alaska 1974)); Jones v. Ark. Dep't of Human Servs., 361 Ark. 164, 205 S.W.3d 778, 794 (2005) (adopting the federal criminal "standard for ineffectiveness set out in Strickland [v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)]"); In re V.M.R., 768 P.2d 1268, 1270 (Colo.Ct.App. 1989) (holding that the Strickland standard applied to non-criminal cases such as parental termination cases); State v. Anonymous, 179 Conn. 155, 425 A.2d 939, 943 (1979) (adopting the Connecticut criminal standard for ineffective assistance of counsel enunciated in Buckley v. Warden, 177 Conn. 538, 418 A.2d 913, 916 (1979)); In re A.H.P., 232 Ga.App. 330, 500 S.E.2d 418, 421-22 (1998) ("`In order to prevail on a claim of ineffective assistance of counsel [the mother] must show that [her] counsel's performance was deficient and that the deficient performance was prejudicial to [her] defense.'" (Quoting Smith v. Francis, [253 Ga. 782] 325 S.E.2d 362[, 363] ([Ga.] 1985). (Citing Strickland [].))); In re R.G., 165 Ill.App.3d 112, 116 Ill.Dec. 69, 518 N.E.2d 691, 700-01 (1988) ("[W]hether respondent shall prevail on her claim that she was deprived of her right to the effective assistance of counsel is guided by the standards set out in Strickland [], and adopted by our supreme court in People v. Albanese[, 104 Ill.2d 504, 85 Ill.Dec. 441,] 473 N.E.2d 1246[, 1255 (Ill.1984)]."); In re D.W., 385 N.W.2d 570, 579 (Iowa 1986) ("Although the sixth amendment is not implicated here, we nonetheless will apply the same standards adopted for counsel appointed in a criminal proceeding.") (Citations omitted.); In re Rushing, 9 Kan.App.2d 541, 684 P.2d 445, 449 (1984) ("While the case before us is not a criminal prosecution, we are not asked to and we see no justification to decline application of Sixth Amendment right to effective assistance of counsel law and yardsticks to this parental severance case."); In re Stephen, 401 Mass. 144, 514 N.E.2d 1087, 1091 (1987) (concluding that "the [criminal] standard set forth in [Commonwealth v. Saferian, 366 Mass. 89, 315 N.E.2d 878, 882-83 (1974),] for judging the effectiveness of counsel's assistance is appropriate for evaluating claims of ineffective assistance of counsel in care and protection proceedings"); Powell v. Simon, 171 Mich.App. 443, 431 N.W.2d 71, 74 (1988) (applying "by analogy the principles of ineffective assistance of counsel as they have developed in the criminal law context" (citing In re Trowbridge, 155 Mich.App. 785, 401 N.W.2d 65 (1986))); New Jersey Div. of Youth & Family Servs. v. V.K., 236 N.J.Super. 243, 565 A.2d 706, 712-13 (App.Div.1989) (applying Strickland); In re Matthew C., 227 A.D.2d 679, 682, 641 N.Y.S.2d 753 (App.Div.1996) (affording parents the "protections equivalent to the constitutional standard of effective assistance of counsel afforded defendants in criminal proceedings" (citing In re Erin G., 139 A.D.2d 737, 527 N.Y.S.2d 488, 490 (App.Div.1988))); Jones v. Lucas County Children Servs. Bd., 46 Ohio App.3d 85, 546 N.E.2d 471, 473 (1988) ("[T]he two-part test for ineffective assistance of counsel used in criminal cases, announced in Strickland[,] is equally applicable in actions by the state to force the permanent, involuntary termination of parental rights."); In re K.L.C., 12 P.3d 478, 480-81 (Okla.App.2000) (using Strickland as a "guiding principle[]" in determining whether counsel was ineffective in termination of parental rights case); In re Bishop, 92 N.C.App. 662, 375 S.E.2d 676, 678 (1989) (applying the criminal standard for ineffective assistance of counsel as set out in State v. Braswell, 312 N.C. 553, 324 S.E.2d 241, 248 (1985)); In re M.S., 115 S.W.3d 534, 544-45 (Tex.2003) (applying Strickland to civil parental-rights termination proceedings); In re E.H., 880 P.2d 11, 13 (Utah App.1994) (adopting "the Strickland test to determine a claim for ineffective assistance of counsel in *1118 proceedings involving termination of parental rights"); In re M.B., 162 Vt. 229, 647 A.2d 1001, 1004 (1994) (applying Strickland); In re M.D.(S)., 168 Wis.2d 995, 485 N.W.2d 52, 55 (1992) (stating that "the Strickland test also has application to proceedings for the involuntary termination of parental rights"). Thus, the ICA appropriately determined that the criminal standard should apply.

C.
In the criminal context, this court has set forth the standard for ineffective assistance of counsel at the trial level as follows:
The burden of establishing ineffective assistance of counsel rests upon the appellant. His burden is twofold: First, the appellant must establish specific errors or omissions of defense counsel reflecting counsel's lack of skill, judgment or diligence. Second, the appellant must establish that these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. Where an appellant successfully meets these burdens, he will have proven the denial of assistance "within the range of competence demanded of attorneys in criminal cases."
Antone, 62 Haw. at 348-49, 615 P.2d at 104 (citations and footnote omitted) (emphasis added). This court has also established a standard for ineffective assistance of appellate counsel, as follows:
[I]t is counsel's responsibility, in the limited time and space allowed, to present issues that may have influenced the trial court's decision adversely to his or her client. Our focus, therefore, is not upon the possible, or even probable, influence appellant's counsel's actions had on the appellate court, but, instead, we center on whether counsel informed him or herself enough to present appropriate appealable issues in the first instance.

An "appealable issue" is an error or omission by counsel, judge, or jury resulting in the withdrawal or substantial impairment of a potentially meritorious defense. Every appealable issue is not required to be asserted. The page limitation on the appellate briefs and the dictates of effective appellate advocacy compel appellate counsel to advance a limited number of key issues.
... Counsel's scope of review and knowledge of the law are assessed, in light of all the circumstances, as that information a reasonably competent, informed and diligent attorney in criminal cases in our community should possess. Counsel's informed decision as to which issues to present on appeal will not ordinarily be second-guessed. Counsel's performance need not be errorless. If, however, an appealable issue is omitted as a result of the performance of counsel whose competence fell below that required of attorneys in criminal cases[,] then appellant's counsel is constitutionally ineffective.

Briones, 74 Haw. at 465-67, 848 P.2d at 977-78 (emphases added) (emphases and footnotes omitted).

VIII.

A.
Applying Hawaii's criminal standard to the pre-termination period in this case, the ICA was correct that Petitioner "fails to identify with specificity [] at which points in the case that she was unconstitutionally deprived of access to competent counsel[,]" RGB, 2009 WL 953392, at *2, and, moreover, fails to meet her burden of identifying "specific errors or omissions of defense counsel reflecting counsel's lack of skill, judgment or diligence[,]" Antone, 62 Haw. at 348-49, 615 P.2d at 104, in the pre-termination proceedings. As noted by the ICA, Petitioner "was represented by appointed counsel or standby consulting counsel at all hearings leading up to the Termination Order." RGB, 2009 WL 953392, at *2.

B.
With regard to the post-termination proceedings, the ICA, despite (1) being "troubled by the impact of the immediate discharge of [Petitioner's] standby attorney in the Termination Order," id., (2) "particularly in light of [the court's] assessment of [Petitioner's] mental health status[,]" id., (3) *1119 recognizing that "[Petitioner's counsel] failed to preserve [Petitioner's] rights to challenge the Termination Order by failing to immediately file a motion for reconsideration[,]" id., (4) and "herself later describ[ing] her performance as falling below the level of competence required to protect [Petitioner's] rights in this case[,]" id., "conclude[d] that [the court] did not err in declining to grant [Petitioner] relief based on ineffective assistance of counsel[,]" id. That decision was based on the ICA's determination that "[Petitioner] has not identified to this court a single `appealable issue' that could have been raised had counsel preserved her rights to an appeal from the Termination Order." Id.
The ICA recited the definition of an appealable as "`an error or omission by counsel, judge, or jury resulting in the withdrawal or substantial impairment of a potentially meritorious defense.'" Id. (quoting Dan v. State, 76 Hawai`i 423, 432-33, 879 P.2d 528, 537-38 (1994)); see also Briones, 74 Haw. at 465-67, 848 P.2d at 977-78 (quoted supra). However, in Dan and in Briones, upon which Dan relied, the defendants claiming ineffective assistance of appellate counsel in fact filed a timely appeal. Thus, neither Dan nor Briones presents the same circumstance as in this case, in which Petitioner's counsel forfeited Petitioner's right to appeal altogether, by failing to file a motion for reconsideration.
Briones requires that "counsel inform[] him or herself enough to present appropriate appealable issues in the first instance[.]" 74 Haw. at 465, 848 P.2d at 977. By counsel's own admission, that standard was not met in this case, as counsel allowed the filing date to lapse, and simply failed to file a motion for reconsideration as the necessary prerequisite for a timely appeal, or, by her own admission, even to meet with Petitioner in 2005. Counsel did not make an informed decision that no appealable issues existed such that an appeal was unnecessary, but failed to make any decision at all.[10] Such representation manifestly falls below the level of competence required of attorneys in a termination proceeding. For these reasons, I would hold that the court abused its discretion in denying Petitioner's Rule 60 Motion. Therefore, the ICA gravely erred in concluding that "[the court] did not err, in declining to grant [Petitioner] relief based on ineffective assistance of counsel." RGB, 2009 WL 953392, at *2.

C.
In opposition to the foregoing, the majority states three reasons for not "importing criminal law concepts directly." Majority opinion at ___-___, 229 P.3d at 1090-92. These reasons do not justify the majority's rejection of the ineffective assistance standard used in criminal cases.

1.
The majority's first reason is that the right to counsel in the criminal context is based on the Sixth Amendment of the United States Constitution and article I, section 14 of the Hawai`i Constitution and the right to counsel in termination of parental rights proceedings is based on the Due Process Clause in the Fourteenth Amendment and the due process clause in article I, section 5 of the Hawai`i Constitution.
Of course, the Sixth Amendment does not apply directly to the states, but through the Due Process Clause of the Fourteenth Amendment.[11] Furthermore, it is not the source of the right that triggers the right to *1120 appointment of counsel, but the importance of the defendant's personal liberty interest. See Lassiter, 452 U.S. at 26, 101 S.Ct. 2153 (recognizing that "as a litigant's interest in personal liberty diminishes, so does his right to appointed counsel"). The majority in Lassiter stated that "it is not simply the special Sixth and Fourteenth Amendments right to counsel in criminal cases, which triggers the right to appointed counsel" and that the Due Process Clause of the Fourteenth Amendment requires "a right to appointed counsel even though proceedings may be styled `civil' and not `criminal.'" Id. (quoting In re Gault, 387 U.S. 1, 41, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)) (emphasis omitted and emphases added). Therefore, that the source of a right to counsel may differ is not only an unremarkable proposition; it is immaterial. As Lassiter itself recognized, that the right to counsel in the criminal cases and in parental rights cases originate in different constitutional clauses does not alter the fact that each implicates a right to counsel whether the proceeding is denominated as civil, as in termination proceedings, rather than criminal.

2.
The majority's second reason that "there are substantial differences in the purposes of criminal as opposed to termination of parental rights[,]" majority opinion at ___, 229 P.3d at 1090, is unpersuasive.[12] These differences could not have escaped the Lassiter court and made no difference in the assessment of the need for counsel. The considerations for affording indigent defendants the right to counsel in criminal and termination proceedings are the same.
The right to counsel in criminal cases is "designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law." Gideon, 372 U.S. at 344, 83 S.Ct. 792. Gideon held that "any person hailed to court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." Id. Gideon reasoned that there was a disparity in the resources and knowledge of the law between the State and the unrepresented defendant as "[g]overnments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime[,]" id., while on the other hand "[e]ven the intelligent and educated layman has small and sometimes no skill in the science of law[,]" id. at 345, 83 S.Ct. 792. "[An intelligent and educated layperson] is incapable, generally, of determining for himself whether the indictment is good or bad [and is] unfamiliar with the rules of evidence." Id. "Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible." Id. Thus, "[h]e lacks both the skill and knowledge adequately to prepare his defense, even though he have [sic] a perfect one." Id.
Similarly, the majority in Lassiter recognized that "the ultimate issues" in a termination case "are not always simple[.]" 452 U.S. at 30, 101 S.Ct. 2153. "Expert medical and psychiatric testimony, which few parents are equipt to understand and fewer still to confute, is sometimes presented." Id. The "legal standard against which the [] parent is judged ... adds another dimension to the complexity of the termination proceeding[,]" id. at 44, 101 S.Ct. 2153 (Blackmun, J., dissenting, joined by Brennan, J. and Marshall J.), as the "legal issues posed by the State... are neither simple or easily defined[,]" id. at 45, 101 S.Ct. 2153, and the "standard is imprecise and open to the subjective values of the judge[,]" id.
There is a "gross disparity in power and resources between the State and the uncounseled indigent parent." Id. at 44, 101 S.Ct. 2153 (Blackmun, J., dissenting, joined by Brennan, J. and Marshall J.). "[T]he *1121 State's counsel [] is an expert in the legal standards and techniques employed at the termination proceeding" and "has access to public records concerning the family[,]" to "professional social workers who are empowered to investigate ... and testify against the parent[,]" and to "experts in family relations, psychology, and medicine to bolster the State's case." Id. at 43, 101 S.Ct. 2153 (Blackmun, J., dissenting, joined by Brennan, J. and Marshall J.).
Moreover, as the Lassiter majority stated, "parents [in termination proceedings] are likely to be people with little education," "have had uncommon difficulty in life," and are "thrust into a distressing and disorienting situation." Id. at 30, 101 S.Ct. 2153. A "parent cannot possibly succeed without being able to identify material issues, develop defenses, gather and present sufficient supporting nonhearsay evidence, and conduct cross-examination of adverse witnesses." Id. at 45-46, 101 S.Ct. 2153 (Blackmun, J., dissenting, joined by Brennan, J. and Marshall J.). The Lassiter majority recognized that the State "shares the parent's interest in an accurate and just decision[,]" which is "most likely to be obtained through the equal contest of opposed interests." Id. at 28, 101 S.Ct. 2153 (emphasis added). Further, the State's "urgent interest in the welfare of the child," id. at 27, 101 S.Ct. 2153, "may perhaps best be served by a hearing in which both the parent and the State ... are represented by counsel, without whom the contest of interests may become unwholesomely unequal [,]" id. at 28, 101 S.Ct. 2153 (emphasis added).
Given the sometimes complex issues presented at termination proceedings, the State's "gross disparity in power and resources[,]" and the laypersons' inability to adequately represent themselves, affording counsel in parental termination cases accomplishes the same purpose as affording counsel for indigent persons in criminal cases  the assurance of "fair trials before impartial tribunals in which every defendant stands equal before the law." Gideon, 372 U.S. at 344, 83 S.Ct. 792. Thus, the purposes of appointing counsel for indigent persons share a commonality in criminal and termination proceedings that compel adoption of a criminal standard for effective assistance of counsel.

3.
The majority's third reason is that the "interests implicated by criminal and termination of parental rights are substantially different." Majority opinion at ___, 229 P.3d at 1091. Respectfully, this reason is incongruous in light of the foregoing judicial statements likening criminal and termination proceedings to each other and the adoption of guaranteed counsel in termination proceedings in forty-five states.
"[T]he interest of parents in the care, custody, and control of their children-is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). As the Lassiter majority acknowledged, "a parent's desire for and right to `the companionship, care, custody and management of his or her children' is an important interest that `undeniably warrants deference and, absent powerful countervailing interest, protection.'" 452 U.S. at 27, 101 S.Ct. 2153 (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Thus, to reiterate, "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is ... a commanding one." Id. (emphasis added). "The fundamental significance of the liberty interest at stake [in termination proceedings] is undeniable." Id. at 43, 101 S.Ct. 2153 (Blackmun J., dissenting, joined by Brennan, J. and Marshall, J.) (emphases added).
"A termination of parental rights is both total and irrevocable" and "leaves the parent with no right to visit or communicate with the child, to participate in, or even know about, any important decision affecting the child's religious, educational, emotional or physical development." Id. at 39, 101 S.Ct. 2153. "This deprivation is of critical significance" and "[s]urely there can be few losses more grievous than the abrogation of parental rights." Id. As discussed supra, this court has also held that "parents have a fundamental liberty interest in the care, custody, *1122 and management of their children[.]" Doe, 99 Hawai`i at 533, 57 P.3d at 458 (emphasis added). Respectfully, given the longstanding recognition of the liberty interest in the care, custody, and control of one's children by the Supreme Court, the grievous nature of terminations, and this court's acknowledgment that parents have a "fundamental liberty interest" with respect to their children, the majority's assertion that a parent's liberty interest is somehow less important or "substantially different[,]" majority opinion at ___, 229 P.3d at 1091, rings hollow.
Moreover, in asserting that the "termination of parental rights proceedings implicate the interests of the child in having a prompt and permanent resolution" of his or her custody status, majority opinion at ___- ___, 229 P.3d at 1091, the majority assumes that a natural parent's position is contrary to the child's best interest. But the best interests of the child is best served when both sides are equally represented. See Lassiter, 452 U.S. at 28, 101 S.Ct. 2153. In In re Emilye A., 9 Cal.App.4th 1695, 1699, 12 Cal. Rptr.2d 294, 298 (Cal.App.1992), a father appealed the lower court's order contending, in part, that he was deprived of the effective assistance of his first attorney at the jurisdiction hearing. The California Court of Appeals concluded that the father in this case had "a constitutional right to counsel in dependency proceedings," and was "entitled to effective assistance of counsel." Id. at 1707, 12 Cal.Rptr.2d at 301. That court recognized that some courts "have held or stated in dicta that a parent may not seek reversal of an order in a dependency proceeding on the grounds of incompetency of counsel, using the rationale that the paramount concern is the child's welfare," but rejected that view. Id. at 1707 n. 9, 12 Cal.Rptr.2d at 301 n. 9.

[T]he implicit and erroneous assumption on which this reasoning is based is that the child's welfare has been served by the interruption of the parents' custody and control despite the fact that the child's parents were not effectively represented during the proceedings. Can it be said that it is in the best interest of a child to be taken from the accustomed custody and control of his or her parents when there has not been a fair hearing related to the need for such intervention?
Id. (emphasis added). Furthermore, reversal does "not necessarily mean that the status quo is reinstated and that the child can no longer be protected.... [I]t simply requires that the proceedings be reconducted because the parents were not properly represented." Id.
The majority's view in the instant case that "parental proceedings implicate the interests of the child in prompt and permanent resolution" erroneously assumes that the child's best interest can only be served by the termination of Petitioner's parental rights even though Petitioner was not effectively represented during her appeal. Even the Lassiter majority would not go so far. According to Lassiter, while "the State has an urgent interest in the welfare of the child," "it shares the parent's interest in an accurate and just decision." Lassiter, 452 U.S. at 27, 101 S.Ct. 2153 (emphasis added). To reiterate, because "accurate and just results are most likely to be obtained through equal contest of opposed interests," "the State's interest in the child's best interest may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal." Id. at 28, 101 S.Ct. 2153 (emphasis added).

D.
After reciting three reasons for not "importing criminal law concepts directly," the majority purportedly adopts "a fundamental fairness test" from State ex rel. Juvenile Department of Multnomah County v. Geist, 310 Or. 176, 796 P.2d 1193 (1990) [hereinafter Geist II], affirming on other grounds, State ex rel. Juv. Dep't v. Geist, 97 Or.App. 10, 775 P.2d 843 (1989) [hereinafter Geist I]. In Geist II, mother, on direct appeal to the Oregon court of appeals, sought review of the Oregon circuit court's order terminating her parental rights. Id. at 1196. The court of appeals refused to review mother's claim that her trial counsel was inadequate because the *1123 legislature had not created an appropriate forum in which to bring a direct appeal.
"[E]ven though we can accept mother's assertion of a right to competent and effective counsel under the statute, direct appeal on the trial court record is not the appropriate forum. The legislature has not created a special forum, as it has in criminal matters (ORS 138.510-ORS 138.680), and there is no source from which we may derive the authority to create one. We hold that the question of the effectiveness of counsel may not be reviewed on direct appeal."
Id. at 1200 (quoting Geist I, 775 P.2d at 848). However, the Oregon Supreme Court decided that "[a]bsent an express legislative procedure..., this court may fashion an appropriate procedure[,]" id., that "any challenges to the adequacy of appointed trial counsel must be reviewed on direct appeal," id. at 1201, and that "a standard which seeks to determine whether a termination proceeding was `fundamentally fair[,]'" id., must be adopted. Under this "fundamental fairness test," a parent "must show, not only that [the parent's] trial counsel was inadequate, but also that any inadequacy prejudiced [the parent's] cause to the extent that [the parent] was denied a fair trial, and therefore, that the justice of the circuit court's decision is called into serious question." Id. at 1204 (emphasis added). That court concluded that "mother's trial counsel represented her with professional skill and judgment" and on de novo review, concluded that the evidence justified terminating mother's parental rights. Id. at 1205.
Other jurisdictions, however, have criticized the Geist II test by pointing out that there is little practical difference between the Geist II test and the test of ineffective assistance of counsel in criminal cases as set forth in Strickland. See L.W. v. Dep't of Children & Families, 812 So.2d 551, 554 (Fla.App. 2002) (declining to follow the fundamental fairness test because "[i]t is not clear to us how these civil standards of ineffective assistance of counsel [such as the fundamental fairness test employed in Geist II] differ in practice from the criminal standard announced in Strickland"); New Jersey Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 929 A.2d 1034, 1038 (2007) (declining to adopt the fundamental fairness test because the court "see[s] little practical difference between the [Geist II and Strickland] standards"); In re Termination of Parental Rights of James W.H., 115 N.M. 256, 849 P.2d 1079 (App.1993) (describing Strickland as the majority position and noting that while "contrary authority [such as Geist II] appears to provide lesser standards, ... we are not certain that the result reached would have been different under the criminal law standard [of Strickland]"); State in Interest of E.H. v. A.H., 880 P.2d 11, 13 n. 2 (Utah App.1994) ("We believe that Geist [II] essentially adopts the Strickland test in holding that the parent must show inadequate performance by counsel and that the inadequacy prejudiced the parent's case." (Citing Geist II, 796 P.2d at 1204.)).
In Strickland, the Supreme Court adopted the federal standard for ineffectiveness of counsel in a criminal proceeding, to the effect that (1) "counsel's performance was deficient[,]" 466 U.S. at 687, 104 S.Ct. 2052, and (2) counsel's "deficient performance prejudiced the defense[,]" id.,  i.e., there must be "a reasonable probability, that but for counsel's unprofessional errors, the result of the proceeding would have been different[,]" id. at 694, 104 S.Ct. 2052 (emphases added). This court has expressly rejected the Strickland standard. Briones, 74 Haw. at 462, 848 P.2d at 976 ("We have declined, however, to adopt the federal standard for reviewing trial counsel's performance." (Citation omitted.)); Smith, 68 Haw. at 310 n. 7, 712 P.2d at 500 n. 7 (criticizing the Strickland test as being "unduly difficult for a defendant to meet."). In rejecting the Strickland standard, this court criticized the federal prejudice requirement:
One need not be a lawyer to appreciate the difficulty of meeting the prejudice requirement established by the Court. Given the inherent subjectivity of determining whether past results would probably have been different, defendants will successfully prove clear cases of prejudice only where there is evidence that they should not have been convicted.
*1124 Id. at 310, 712 P.2d at 500 (quoting Genego, The Future of Effective Assistance of Counsel: Performance Standards and Competent Representation, 22 Am.Crim. L.Rev. 181, 199).
In Briones, this court explained that the Strickland standard was "too burdensome for defendants to meet" because the "prejudice requirement [is] almost impossible to surmount."
Federal cases concerning effective assistance of trial and appellate counsel rely on the standard enunciated in [Strickland], a test criticized as being too burdensome for defendants to meet because it imposes a double burden upon defendants trying to show their counsel's ineffective assistance, resulting in a prejudice requirement almost impossible to surmount. [Smith], 68 Haw. [at] 310 n. 7, 712 P.2d [at] 500 n. 7[]. Strickland required not only that trial counsel's action or omission be an "unprofessional error," but that that error resulted in a "reasonable probability that ... the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052[.]
Briones, 74 Haw. at 462, 848 P.2d at 976 (emphases added). Thus this court concluded that "[t]he holding in Smith specifically rejected the standard enunciated in Strickland." Id.
Unlike the standard adopted in Hawai`i, both Strickland and Geist II require that persons challenging the adequacy of counsel demonstrate that, if not for their counsel's ineffectiveness, the outcome of the case would be different. As noted above, Strickland describes its prejudice prong as requiring "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Similarly, Geist II will not require reversal or remand where "on de novo review of the record, the reviewing court is satisfied ... that even with adequate counsel, the result inevitably, would have been the same." 796 P.2d at 1204 (emphasis added). In affirming the circuit court's decision, Geist II concluded that there was no "reasonable likelihood that a remand to the circuit court would produce evidence to establish trial counsel's inadequacy, or that any deficiency of counsel affected the outcome of the termination proceedings." Id. at 1205 (emphasis added).
Requiring a showing that the result would not inevitably have been the same in order to qualify for remand or reversal imposes an identical burden on parents in termination proceedings as on defendants in federal criminal cases under Strickland. As noted before, this court has rejected the Strickland standard "[g]iven the inherent subjectivity of determining whether past results would probably have been different." Smith, 68 Haw. at 310, 712 P.2d at 500. In my view, then, this court must also reject the Geist II test because, like Strickland, there is an "inherent subjectivity" in determining whether the outcome of the case would or would not be "inevitably" the same and, like Strickland, imposes "a requirement almost impossible to surmount." See Briones, 74 Haw. at 462, 848 P.2d at 976. Hawaii's ineffective assistance standard in the criminal context, on the other hand, is significantly less demanding, allowing parties to prove ineffective assistance of counsel without a showing of "`actual' prejudice" and instead requiring "an evaluation of the possible, rather than probable, effect of the defense on the decision maker." Dan, 76 Hawai`i at 427, 879 P.2d at 532 (quoting Briones, 74 Haw. at 464, 848 P.2d at 977). Respectfully, it is illogical and unfair for this court to impose a stricter standard on parents in family court proceedings than on defendants in criminal court proceedings where this court has recognized that parents in termination proceedings "have a substantial liberty interest ... protected by the due process clause of article I, section 5 of the Hawai`i Constitution." Doe, 99 Hawai`i at 533, 57 P.3d at 458. As stated before, the "Due Process Clause of the Fourteenth Amendment entitles a defendant in a criminal case to representation by counsel [and] appl[ies] with equal force to a case of [parental termination]." Lassiter, 452 U.S. at 60, 101 S.Ct. 2153 (Stevens, J., dissenting). Thus, inasmuch as (1) other jurisdictions have criticized Geist II for having "little practical difference" from the Strickland standard, (2) this court has rejected Strickland because of its prejudice requirement, (3) Geist II imposes a prejudice requirement like *1125 that in Strickland, and (4) Geist II would impose a heavier burden on parents than on criminal defendants to demonstrate ineffective assistance of counsel, the Geist II test should be rejected and the ICA's analogue of Hawaii's criminal standard should be applied to questions of ineffective assistance in termination cases.

IX.

A.
"[I]t is well settled that this court may relax the deadline for filing a notice of appeal `where justice so warrants' and `the untimely appeal had not been due to the defendant's error or wilful inadvertence.'" State v. Shinyama, 101 Hawai`i 389, 393 n. 6, 69 P.3d 517, 521 n. 6 (2003) (quoting State v. Caraballo, 62 Haw. 309, 312, 315, 615 P.2d 91, 94, 96 (1980)). In numerous cases, and under varying circumstances, this court and the ICA have heard appeals in criminal cases despite the fact that the attorney failed to perfect the appeal, or that the appeal was not timely filed. See, e.g., State v. Ontiveros, 82 Hawai`i 446, 448, 923 P.2d 388, 390 (1996) (declining to dismiss, although "[t]echnically, the conviction was not properly appealed[,]" because "we have established, as a general proposition, that counsel's failure to perfect an appeal in a criminal case does not preclude an appellant's right to appeal"); State v. Knight, 80 Hawai`i 318, 323-24, 909 P.2d 1133, 1138-39 (1996) (declining to dismiss the appeal "[i]n the interest of justice" because, "[n]otwithstanding counsel's failure to comply with the time requirements of HRAP Rule 4(b), Knight, as a criminal defendant, is entitled, on his first appeal, to effective counsel who may not deprive him of his appeal by failure to comply with procedural rules"); State v. Erwin, 57 Haw. 268, 269, 554 P.2d 236, 237-38 (1976) (refusing to dismiss the appeal although it was "inescapable that timely filing of the notice of appeal did not take place[,]" because "it is clear that an indigent criminal defendant is entitled, on his first appeal, to court-appointed counsel who may not deprive him of his appeal by electing to forego compliance with procedural rules"); State v. Graybeard, 93 Hawai`i 513, 518, 6 P.3d 385, 390 (App.2000) (declining to dismiss because "our appellate courts have ignored formal jurisdictional defects that are due to the derelictions of a criminal defendant's attorney"); State v. Maumalanga, 90 Hawai`i 96, 99-100, 976 P.2d 410, 413-14 (App.1998) (although "[the d]efendant filed his notice of appeal fifty-nine days late[,]" holding that "the interests of justice require us to hold that [the d]efendant's failure to comply with HRAP Rule 4(b) does not preclude his right to appeal"); State v. Ahlo, 79 Hawai`i 385, 391-92, 903 P.2d 690, 696-97 (App.1995) (where defendant was financially unable to obtain counsel and appellate counsel was late-appointed, holding that, "[u]nder these circumstances, faulting [the d]efendant for his failure to comply with the 30-day rule would lead to harsh and unjust results"). As discussed above, the liberty interests at stake in a termination proceeding make it far more akin to a criminal proceeding than a typical civil matter.
The rationale underlying some of the foregoing cases was that the defendant was denied due process due to counsel's failure to perfect the appeal. In Erwin, this court agreed with the State "that a notice of appeal complying with [Hawai`i Rules of Criminal Procedure] Rule 37(b), was not filed within the ten-day period prescribed by Rule 37(c)." 57 Haw. at 269, 554 P.2d at 237. This court further conceded that "[n]o provision is made in Rule 37 for an extension of time to appeal in a criminal case[,]" and "[t]imely filing of a notice of appeal has been held to be a jurisdictional requirement." Id. at 269, 554 P.2d at 238. Nevertheless, this court "den[ied] the motion to dismiss the appeal and proceed[ed] to consideration of the merits," because "it is clear that an indigent criminal defendant is entitled, on his first appeal, to court-appointed counsel who may not deprive him of his appeal by electing to forego compliance with procedural rules[,]" and "failure by appointed counsel to commence the simple steps for appeal is a blatant denial of due process." Id. (emphasis added) (internal quotation marks and citation omitted).
In Knight, defendant's counsel failed to timely file the notice of appeal based upon negligence on the part of his secretary. 80 *1126 Hawai`i at 323, 909 P.2d at 1138. This court noted that, "[a]s a general rule, compliance with the requirement of timely filing of a notice of appeal is jurisdictional, and we must dismiss an appeal on our motion if we lack jurisdiction." Id. (internal quotation marks and citation omitted). However, "[i]n the interest of justice, [this court] decline[d] to dismiss this appeal and [] address[ed] the merits of Knight's alleged points of error[,]" id. at 324, 909 P.2d at 1139, because "we have permitted belated appeals under certain circumstances, namely, when defense counsel has inexcusably or ineffectively failed to pursue a defendant's appeal from a criminal conviction in the first instance[,]" id. at 323, 909 P.2d at 1138 (brackets, ellipsis, internal quotation marks, and citation omitted). Petitioner, then, should be allowed to perfect her direct appeal, just as persons charged with crimes have been permitted to do because of counsel's ineffective late or imperfect filing of an appeal.

B.
Perhaps acknowledging that our precedent would mandate that Petitioner be permitted to file a direct appeal, the majority places additional burdens on parents not imposed on criminal defendants in this state, stating in a footnote that, "even if the holding in [Roe v.] Flores-Ortega, [528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000),] were to apply ... [,] counsel's failure to file a notice of appeal will only be considered per se ineffective where the party has specifically instructed his or her counsel to file a notice of appeal." Majority opinion at ___, 229 P.3d at 1092 n. 24 (citing 528 U.S. at 477, 120 S.Ct. 1029) (emphasis added).
In Flores-Ortega, a criminal defendant sought habeas corpus relief alleging that his defense counsel had been ineffective in failing to file a notice of appeal. 528 U.S. at 474, 120 S.Ct. 1029. The Court noted that counsel's actions in failing to file an appeal ranged between "two poles." Id. at 477, 120 S.Ct. 1029. On one pole, the Court recognized that "a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." Id. (citing Rodriquez v. United States, 395 U.S. 327, 89 S.Ct. 1715, 23 L.Ed.2d 340 (1969)). At the other pole, "a defendant who explicitly tells his attorney not to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently." Id. (citing Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (emphasis in original)). The question presented in Flores-Ortega "[lay] between two poles" because the defendant had not "clearly conveyed his wishes [to appeal] one way or the other[.]" Id.
In deciding the question that lay between the two poles, the Supreme Court rejected the rule in the First and Ninth Circuits that "[c]ounsel must file a notice of appeal unless the defendant specifically instructs otherwise," and that failure to do so "is per se deficient." Id. at 478, 120 S.Ct. 1029. The Supreme Court held such a rule was "inconsistent with," id., the two-part test in Strickland, id. at 477, 120 S.Ct. 1029. With regard to the first part, the Court determined that "where the defendant neither instructs counsel to file an appeal nor asks that an appeal be taken," the appropriate test is to first ask "whether counsel in fact consulted with the defendant about an appeal." Id. at 478, 120 S.Ct. 1029. If counsel has consulted with the defendant, then "[c]ounsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." Id. If counsel had not consulted with defendant, the question becomes "whether counsel's failure to consult with the defendant itself constitutes deficient performance." Id.
With regard to the second part, which requires a defendant to show prejudice from counsel's deficient performance, the court "followed the pattern established in Strickland... requiring a showing of actual prejudice (i.e., that, but for counsel's errors, the defendant might have prevailed)[.]" Id. at 484, 120 S.Ct. 1029 (emphasis added). The Court rejected the per se prejudice rule because it "ignore[d] the critical requirement that counsel's deficient performance must actually cause the forfeiture of the defendant's appeal" and held, instead, that "a defendant must demonstrate that there is a reasonable *1127 probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." Id. (emphases added).
Obviously, Flores-Ortega is not applicable to this case or in this jurisdiction. First, Flores-Ortega observed that "the question presented [in the case lay] between [] two poles" because the defendant had not "clearly conveyed his wishes [to appeal] one way or the other." 528 U.S. at 477, 120 S.Ct. 1029. The Court noted, however, that if a lawyer "disregard[ed] specific instructions from the defendant to file a notice of appeal," then he "act[ed] in a manner that is professionally unreasonable." Id. (citing Rodriquez v. United States, 395 U.S. 327, 89 S.Ct. 1715, 23 L.Ed.2d 340 (1969)). Here, Petitioner clearly conveyed her desire to appeal the Termination Order but was unsuccessful only because Yonemori was ineffective in failing to file the motion for reconsideration. Thus, the case here does not "lie between those two poles," id., but, if anything, lies at the first pole where "a lawyer ... disregards specific instructions from the defendant to file a notice of appeal," id.
Second, Flores-Ortega applied the Strickland test, which requires a defendant to prove that "but for counsel's deficient failure to consult[,] he would have timely appealed." 466 U.S. at 484, 104 S.Ct. 1942. This court has rejected Strickland's requirement as being "too burdensome" and "almost impossible to surmount." Briones, 74 Haw. at 462, 848 P.2d at 976. For the reasons stated supra, it would be inconsistent and unwarranted for this court to impose an ineffective assistance standard on parents more burdensome than that placed on criminal defendants.

X.
As recounted before, despite the court's determination that "[Petitioner] suffers from a mental health condition that distorts her perceptions of people and this causes her to come into conflict with and to refuse to cooperate with people that are trying to help her[,]" as noted by the ICA, the court unilaterally and sua sponte dismissed Petitioner's trial counsel. At the point of discharge, no counsel was substituted in place of discharged counsel. Hence, Petitioner was without counsel during a crucial period following the termination hearing, from March 11, 2005, through March 29, 2005. Petitioner was not schooled in the law and presumably was unaware of the requirement that a motion for reconsideration was required to be filed. As recognized in K.L.J., discussed supra, "[a] parent who is without the aid of counsel in marshalling and presenting the arguments in his favor will be at a decided and frequently decisive disadvantage." 813 P.2d at 280. Newly-appointed counsel, Yonemori, had two days in which to file a timely motion for reconsideration of the court's Termination Order in order to preserve Petitioner's right to subsequently challenge that Order by appeal. Yonemori did not.
Petitioner's counsel therefore ineffectively failed to pursue Petitioner's appeal in the first instance. Yonemori herself admitted that her failure to immediately file the motion for reconsideration fell below the level of competence required to protect Petitioner's rights.[13] As a result of Yonemori's ineffective assistance, Petitioner's direct appeal was later rejected by this court for lack of jurisdiction because Petitioner had failed to timely file a motion for reconsideration as required by HRS § 571-54. Thus, Petitioner was permanently deprived of one of the most basic liberties under our constitution, never having had the opportunity to challenge the findings of fact and conclusions of law supporting the Termination Order by way of direct appeal.[14]
*1128 As discussed in Knight, this court "in the interest of justice[,]" 80 Hawai`i at 324, 909 P.2d at 1139, has declined to dismiss an appeal "when defense counsel has inexcusably or ineffectively failed to pursue a defendant's appeal from a criminal conviction in the first instance[,]" id. at 323, 909 P.2d at 1138. Likewise, this court should permit Petitioner's appeal to be taken because Yonemori "ineffectively failed to pursue [Petitioner's] appeal in the first instance." Id. Based on the facts and circumstances in this case and the principle set forth herein that due process requires effective representation in termination proceedings, in the interests of justice, Petitioner should be allowed twenty days from the issuance of this court's judgment to petition the court for reconsideration pursuant to HRS § 571-54, the denial of which is subject to appeal in accordance with the statute.

XI.
In arriving at the conclusion that there was no abuse of discretion in denying Petitioner's Rule 60(b) Motion, the majority asserts that (1) "the delay ... in determining permanent custodial status has a substantial negative impact on the interests of the child[,]" majority opinion at ___, 229 P.3d at 1093, (2) Petitioner has failed "to identify any potentially meritorious issues that could have been raised but for Yonemori's failure to timely appeal," id. at ___, 229 P.3d at 1094, (3) "[Petitioner's] Rule 60(b) Motion did not adequately establish that she did not play a role in contributing to the delay in bringing the motion[,]" id. at ___, 229 P.3d at 1094, and (4) Petitioner "failed to include in the appellate record any transcripts of proceedings relevant to determining whether the family court abused its discretion[,]" id. at ___, 229 P.3d at 1095. I respectfully disagree with the majority's conclusion for the reasons following.

A.
As to its first assertion, the majority argues that the additional delay that would be caused by granting the Rule 60(b)(6) motion was a factor that weighed substantially in favor of denying the motion and "[Petitioner] failed to establish an entitlement to relief sufficient to overcome that factor." Majority opinion at ___, 229 P.3d at 1094. Additionally, the majority's assertion that this opinion stands for the proposition that the "negative impacts on RGB of the delay in resolving her custodial status" "should not be considered in assessing [Petitioner's Rule 60(b)(6)] motion[,]" id. at ___, 229 P.3d at 1068, is wrong.
First, the equities in this case, such as the child's present status or the best interests of the child, are factors that must be determined after Petitioner is given the opportunity to present her side of the case. Cf. Lassiter, 452 U.S. at 28, 101 S.Ct. 2153 (recognizing that "accurate and just results" are most likely to be obtained when both sides are "equally represented"); In re Emilye A, 9 Cal.App.4th at 1707, 12 Cal.Rptr.2d at 298 (noting that it is an "implicit and erroneous assumption" to assume that "the child's welfare has been served by the interruption of the parents' custody and control despite the fact that the child's parents were not effectively represented during the proceedings"). Otherwise, only one side of the issues is presented for our consideration. This court cannot reasonably address the merits of Petitioner's position because Petitioner's direct appeal was dismissed before Petitioner could submit briefs on the merits. *1129 Thus, Petitioner is entitled to present her side of the case.
By deciding the merits of Petitioner's case without affording Petitioner her right to respond, the majority has undermined the legal calculus that includes the best interests of the child. It should be the judicial process that determines the result or outcome of the case, i.e., whether Petitioner had fair and equal treatment. As discussed supra, Lassiter recognizes that, as "our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests" and therefore "the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal." 452 U.S. at 28, 101 S.Ct. 2153.
In this vein, the majority's assertion that inasmuch as Petitioner failed to point to any alleged errors in the record,[15] majority opinion at ___, ___, 229 P.3d at 1068-69, 1902, and reliance upon the court's findings because Petitioner "did not dispute the family court's [findings] in her [Rule 60 motion], in her appeal to the ICA, or in her application to this court," id. at ___, 229 P.3d at 1069 n. 3, are fundamentally unfair. Petitioner's Rule 60(b) motion, her appeal to the ICA, and application to this court did not concern the merits of Petitioner's termination but, instead, concerned whether Petitioner's counsel, including Yonemori, was ineffective. The Declaration of Counsel attached to Petitioner's Rule 60 motion asserted that "[Petitioner] was not afforded competent legal counsel and was therefore denied her constitutionally protected due process and equal protection of the laws under the Hawai`i (Article I, Section 5), and United States of America Constitution (14th amendment)[.]" Petitioner's appeal to the ICA asserted that "when [Petitioner] was appointed [Yonemori], she lost her opportunity to have evidence reconsidered and effectively lost her right to file a timely appeal" and "[w]hen the notice of appeal was finally filed on [October 17, 2006], the court herein rejected the appeal as untimely." Petitioner's Application asserted that "[Yonemori] failed to preserve [Petitioner's] right to an appeal from the Termination Order" and "in allowing the appeal to run and in also not filing for post-judgment relief... were clearly prejudicial to [Petitioner]." As discussed supra, Petitioner was foreclosed from challenging the merits of her parental termination because Yonemori failed to properly preserve Petitioner's appeal. It was because of the ineffective assistance provided by Yonemori that Petitioner's direct appeal was dismissed. Therefore, Petitioner has not had an opportunity to challenge the findings or conclusions on the merits on direct appeal. Consequently, in fairness, Petitioner cannot be treated as if she had had that opportunity.
Furthermore, the majority's argument that this opinion "relies in part on the family court's [findings] regarding [Petitioner]'s mental health condition to dispute the propriety of the family court's decision to discharge [Petitioner]'s counsel, ... and also relies on DHS's Answering Brief to the ICA, which draws significantly from the [findings]," majority opinion at ___, 229 P.3d at 1069 n. 3, underscores a misconception of the issues presented. As discussed infra, because Petitioner has not been afforded effective assistance of counsel on appeal, she has never had a meaningful opportunity to address the findings. Had Petitioner been provided effective assistance of counsel, this court could properly assess the court's findings on the merits. Because Petitioner has not had an opportunity to address such findings, both the majority and the dissent must refer to findings as yet unaddressed by Petitioner. But, those findings relating to Petitioner's mental illness and underlying her ineffective counsel claim have been addressed by both sides and the ICA. It is undisputed that (1) the court sua sponte discharged Petitioner's trial counsel *1130 without any indication that new counsel had been substituted to take on Petitioner's case, (2) Petitioner was left without counsel for the first eighteen of the twenty day period in which Petitioner needed to file her motion to reconsider, a prerequisite to filing an appeal, (3) Yonemori failed to file the required motion to reconsider, and (4) Petitioner's direct appeal was dismissed for lack of jurisdiction. As discussed above, Petitioner asserted in her Rule 60 motion, in her appeal to the ICA, and in her application to this court, that Yonemori was ineffective. Therefore, it is legally wrong to use the findings on the merits against Petitioner because Petitioner required competent counsel to effectively respond to the findings in the first place. Because this court dismissed Petitioner's direct appeal, the present appeal concerns not the merits of the termination, but the constitutional prerequisite that she have competent counsel in order to respond to such findings. Thus, with all due respect, the majority castigates Petitioner for the very reasons that she should have had effective counsel.
Second, Petitioner had a right to bring a motion to relieve her from the Termination Order under Rule 60(b)(6). In fact, the majority concedes that Petitioner's Rule 60(b)(6) motion "was an appropriate vehicle for raising ineffective assistance of counsel in the circumstances of this case."[16] Majority opinion at ___, 229 P.3d at 1087. It is inherently wrong for the majority to assert that the delay caused by the Rule 60(b)(6) motion should "weigh substantially in favor of denying the motion" when Petitioner was entitled to bring a Rule 60(b)(6) motion and the Rule 60 motion was necessitated not by her, but by ineffective assistance of counsel. In penalizing Petitioner for the delay caused by appellate counsel in filing an invalid appeal and weighing the delay "substantially in favor of denying the motion[,]" the majority ignores the cause of the delay and renders Petitioner's right to bring a HFCR 60(b)(6) motion meaningless.

B.
As to its second assertion, the majority contradictorily faults Petitioner for not having a meritorious defense, despite its denouncement of the criminal standard in termination cases. The majority states, "In view of [Petitioner's] failure to identify any potentially meritorious issues that could have been raised but for Yonemori's failure to timely appeal, the record does not establish that the proceedings were fundamentally unfair." Majority opinion at ___, 229 P.3d at 1094 (emphasis added). But, demonstrating that a potentially meritorious defense exists is part of Hawaii's criminal standard for ineffective assistance of counsel. As discussed supra, this court has held that the ineffective assistance of appellate counsel in the criminal context "center[s] on whether counsel informed him or herself enough to present appropriate appealable issues in the first instance." Briones, 74 Haw. at 465, 848 P.2d at 977. "An `appealable issue' is an error or omission by counsel, judge, or jury resulting in the withdrawal or substantial impairment of a potentially meritorious defense." Id. at 465-66, 848 P.2d at 977 (emphasis added). Thus, while the majority states that it adopts the "fundamental fairness test" purportedly from Geist II, in applying a meritorious defense requirement, the majority actually fashions a different test from Geist II. The majority's test, as argued by it, embodies a "potentially meritorious defense" which is inconsistent with Geist II and, thus, abandons any resemblance to Geist II.
Furthermore, the majority's reliance on the lack of a so-called meritorious issue as a basis for denying a Rule 60(b)(6) motion is wrong. Nowhere does HRFC 60(b)(6) require *1131 the movant to show a meritorious defense. Hayashi required that a movant "show that (1) the motion is based on some reason other than those specifically stated in clauses 60(b)(1) through (5); (2) the reason urged is such as to justify the relief; and (3) the motion is made within a reasonable time." 4 Haw.App. at 290-91, 666 P.2d at 174-75.
Additionally, a potentially meritorious defense construct is inapplicable in this case. Whether a defendant has a potentially meritorious defense is either raised during or after a direct appeal. In cases determining the question of ineffective assistance of appellate counsel, petitioners have first been afforded a direct appeal. See, e.g., Loher v. State, 118 Hawai`i 522, 532-34, 193 P.3d 438, 448-50 (2008) (requiring that appellate counsel have the opportunity to be heard on the issue of whether appellate counsel rendered ineffective assistance on direct appeal by failing to raise an issue of whether defendant's "forced" testimony violated his right against self-incrimination); Dan, 76 Hawai`i at 432-33, 879 P.2d at 537-38 (affirming the court's conclusion that petitioner was not denied the effective assistance of counsel when his appellate counsel failed to file a motion for reconsideration of this court's memorandum opinion affirming his conviction); Briones, 74 Haw. at 468, 848 P.2d at 978 (holding that appellate counsel was ineffective on defendant's direct appeal because counsel's failure to raise an appealable issue was the "result of constitutionally inadequate preparation") (internal quotation marks and citation omitted). Thus, as Loher, Dan, and Briones reflect, only after a direct appeal is taken is review for a meritorious defense undertaken. Unlike in Loher, Dan, and Briones, Petitioner was not allowed a direct appeal due to Yonemori's ineffectiveness. Yonemori herself admitted that her representation fell below the level of competence required to protect Petitioner's rights and as a result of Yonemori's ineffective assistance, Petitioner's direct appeal was rejected by this court.

C.
As to its third assertion, the majority again faults Petitioner for "not adequately establish[ing] that she did not play a role in contributing to the delay in bringing the motion" and for "not explain[ing] why [Petitioner] waited until March 10, 2006 before bringing Yonemori's inaction to the attention of the family court." Majority opinion at ___, 229 P.3d at 1094. To the contrary, the record does establish that Petitioner was not at fault so as to disqualify her from bringing the motion.
With respect to the first eighteen days after the issuance of the Termination Order, the record reflects that despite having denied Petitioner's previous request to dismiss Iopa as counsel for the termination hearing, the court apparently unilaterally and sua sponte dismissed Petitioner's counsel without explaining why trial counsel was dismissed. As noted before, no counsel was substituted at the point the court took it upon itself to discharge counsel. As a result of the court's order, Petitioner was improperly left without counsel for eighteen out of the crucial twenty-day time period for filing her motion for reconsideration. As noted in detail in section IV.B.3.b. supra, with respect to the period from March 29, 2005, when Yonemori was appointed as counsel, until March 2006, the record reflects that the delay was due to Yonemori's ineffective assistance of counsel. Furthermore, the record also reflects that Petitioner was diligent in filing a notice of appeal on October 17, 2006, regarding the court's ruling on her Rule 60 motion and Yonemori's motion to withdraw. Petitioner did not learn that her October 17, 2006 appeal was premature until January 12, 2007, when the ICA issued its opinion dismissing the appeal for lack of jurisdiction. Shortly after the ICA issued its opinion on January 12, 2007, Petitioner, through new counsel, timely filed her Rule 60 Motion in this case.
Contrary to the majority's assertion that "the record does not reflect" the reasons "why [Petitioner] did not act sooner with regard to Yonemori's failure to timely appeal," majority opinion at ___, 229 P.3d at 1094, Petitioner has provided the "exceptional circumstances" to mitigate the delay. Admonishing Petitioner for the delay is unjust because the record in this case, as stated supra, is replete with evidence of delay admitted *1132 by appointed appellate counsel during this period. Because the record in this case established that any delay was due to the ineffective assistance of appellate counsel, Petitioner carried her burden under Hayashi and therefore, with all due respect, the majority's assertion "that [Petitioner] failed to provide any information regarding her own understanding of what was transpiring between the issuance of the [Termination Order] and her filing of her pro se Motion for Relief from Judgment on March 10, 2006," id. at ___, 229 P.3d at 1095 n. 26, is incongruous.
As discussed supra, the record reflects that "Petitioner ha[d] been coming to [Yonemori's] office every week" and was "understandably quite anxious" about bringing her appeal. Both of Yonemori's declarations of counsel filed on March 17, 2006 stated that the delays in filing Yonemori's appeal were due to Yonemori's actions and were in no way caused by Petitioner. Further, Petitioner's affidavit attached to her March 10, 2006 pro se Motion for Relief stated that "[c]ounsel assigned by this court remains ineffective to bring this matter to justice." (Emphasis added.) It is fundamentally wrong to lay the fault for the failure to file a timely motion for reconsideration and the resulting delay at the feet of Petitioner, rather than appellate counsel, as the majority does. The majority's decision cannot be justified by relying on the findings and conclusions terminating Petitioner's parental rights where Petitioner has been denied the opportunity to respond to those findings and conclusions on direct appeal because of ineffective assistance of counsel.

D.
As to its fourth assertion, the majority faults Petitioner for "fail[ing] to include in the appellate record any transcripts of proceedings[[17]] relevant to determining whether the family court abused its discretion." Id. at ___, 229 P.3d at 1095. As discussed above, with respect to Petitioner's post-termination proceedings, Yonemori's ineffectiveness as appellate counsel was clearly demonstrated and admitted in the record. Because the error is manifest from the record and the transcripts are not needed to establish ineffective assistance of counsel error on appeal, Petitioner has met her burden of showing Yonemori's error "by reference to matters in the record[.]" Bettencourt v. Bettencourt, 80 Hawai`i 225, 230, 909 P.2d 553, 558 (1995).

XII.
Finally, Petitioner's second argument is that she should be allowed to "see the `confidential records' in [Petitioner's] file." However, Petitioner does not indicate, nor does it seem possible, that any information contained in records pertinent to proceedings occurring after November 9, 2006, would have any relevance to the proceedings that resulted in the Termination Order, from which Petitioner seeks relief.[18] Thus, the ICA did not gravely err in determining that the court "did not err in limiting [Petitioner's] access to the post-November 6, 2006 confidential record in this case." RGB, 2009 WL 953392, at *3.[19]
NOTES
[1] The Honorable Ben H. Gaddis presided.
[2] No transcripts of this or any other proceeding in this case were included in the record on appeal.
[3] Mother did not dispute the family court's FsOF in her February 6, 2007 motion, in her appeal to the ICA, or in her application to this court, and we therefore rely on the family court's FsOF for the purposes this appeal. Cf. Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawai`i 224, 239, 982 P.2d 853, 868 (1999) (holding that "[f]indings of fact that are unchallenged on appeal are the operative facts of a case"), superseded by statute on other grounds as recognized in Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, 113 Hawai`i 77, 107, 148 P.3d 1179, 1209 (2006).

Moreover, we note that the dissent relies in part on the family court's FsOF regarding Mother's mental health condition to dispute the propriety of the family court's decision to discharge Mother's counsel, Dissenting Opinion at ___, 229 P.3d at 1127, and also relies on DHS's Answering Brief to the ICA, which draws significantly from the FsOF, for its own recitation of the facts, Dissenting Opinion at ___-___, 229 P.3d at 1098-99.
[4] Thoene is referred to variously in the record as "Alexander" and "Alika." For the purposes of this opinion, we adopt the phrasing reflected in the family court's FsOF and appointment of counsel, and utilize the name "Alexander."
[5] Several of the family court's FsOF are misnumbered, and several numbers appear more than once. The original numbering is preserved here.
[6] Father was defaulted from the proceedings in October 2001.
[7] In its Termination Order, the family court noted that it made its decision to discharge Iopa "[b]ased on representations as to changes in [Mother's] resource status." Although we do not have a transcript of the proceedings to indicate what was represented to the family court, Mother's prior statements to the family court concerning her resources include her September 17, 2004 Motion for Dismissal of Counsel in which she stated, "[a]ffiant has enough money today to secure independent counsel[,]" and a February 1, 2005 Pro Se Closing Argument and Request in which Mother stated, "[m]y financial future is more secure based on an inheritance from my parents, currently under probate in Montgomery County, Pennsylvania."
[8] As explained further, infra, on March 17, 2006, Yonemori filed a declaration stating that she had attempted to file a Notice of Appeal "on or about September 30, 2005," but that the documents were returned to her for corrections. Yonemori asserted that she "completely forgot about making the appropriate corrections for this case."
[9] As discussed more fully in Part III(B), infra, HFCR Rule 60(b) permits a party, within certain limitations, to seek relief from a judgment or order for reasons of mistake, inadvertence, excusable neglect, newly discovered evidence, fraud, and "any other reason justifying relief[.]"
[10] On June 28, 2006, this court dismissed the appeal for lack of jurisdiction, stating:

Mother-Appellant did not file a motion for reconsideration within twenty days after entry of the March 11, 2005 findings of fact, conclusions of law, and order, as [Hawai`i Revised Statutes (HRS)] § 571-54 (1993) required. Therefore, Mother-Appellant failed to perfect her right to assert an appeal under HRS § 571-54 (1993), and there is no appealable order. Absent an appealable order, we lack jurisdiction over this case.
[11] Although this document is file-stamped "May 33, 2006," a hand-written date of "June 2" appears above the stamped date.
[12] It is unclear from the record when or how Yonemori withdrew from the case.
[13] On December 23, 2004, Mother filed a Motion to Reconsider Denial of Oral Motion to Continue Trial, and Exclusion of Exhibits. Mother requested that the court "[c]ontinue the evidentiary portion of the proceedings to allow MOTHER to call additional witnesses, whose identities have been previously disclosed[,]" and "[t]o allow the admission into evidence, audio tapes prepared by MOTHER of parent/child visits and MOTHER'S interactions with service providers." Mother's motion was supported by a Declaration of Counsel, in which Iopa attested:

. . .
2. MOTHER has strongly expressed her dissatisfaction with the extent of information before the Court;
3. MOTHER wishes to bring additional witnesses, introduce audio tapes and augment her previous testimony;
4. MOTHER'S desire is to provide the Court with a proper basis for its decision and to ensure a complete record; and
5. MOTHER seeks this additional opportunity as an accommodation for her established disability.
The family court issued its written denial of Mother's motion on March 7, 2005.
[14] On January 11, 2005, Mother filed a Motion to Reinstate Visitation. Mother's motion was supported by a Declaration of Counsel, in which Iopa stated that Mother was receiving care from Care Hawai`i and had been prescribed medication for anxiety, and that the YMCA was willing to supervise visits between Mother and RGB. The family court issued its written denial of Mother's motion on March 7, 2005.
[15] As discussed further, supra, it appears that Mother had full access to the court records in this case until a September 28, 2006 hearing before the family court, following which the family court issued its November 9, 2006 order restricting prospectively Mother's access to court records.
[16] In determining what due process requires under Eldridge, the court must consider "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." See Lassiter, 452 U.S. at 27, 101 S.Ct. 2153.
[17] Article 1, section 5 of the Hawai`i Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws[.]"
[18] We therefore respectfully disagree with the dissent's assertion that we hereby "den[y] indigent persons access to justice in parental termination actions" or that we have adopted a "discretionary appointment approach[.]" Dissenting Opinion at ___, 229 P.3d at 1097, 1115. We recognize instead that, because the family court properly determined that Mother had a due process right to appointed counsel under the U.S. Constitution, the determination of what protections the Hawai`i Constitution provides to indigent parents is not properly before us.
[19] At the time the Termination Order was filed, it was subject to appeal only following the family court's decision on a motion for reconsideration, which was required to be filed within twenty days of the entry of the order. HRS § 571-54 (2005). However, a 2006 amendment to HRS § 571-54, which was designed to "speed the resolution of child protective services cases," eliminated the requirement that a motion for reconsideration precede an appeal. S. Stand. Comm. Rep. No. 2245, in 2006 Senate Journal, at 1132. Nevertheless, HFCR Rule 72(b) requires that a notice of appeal be filed within 30 days of a final decision or order. Accordingly, a direct appeal was not available to Mother at the time she filed her February 6, 2007 motion.

Similarly, a motion for new trial was no longer available to Mother, because HFCR Rule 59(b) requires that a motion for new trial be made within 10 days after the entry of judgment. In addition, a motion for relief from judgment under Rule 60(b)(1), (2), or (3) must be made not more than one year following judgment, and thus was no longer available to Mother. Finally, although relief under Rule 60(b)(4) and (5) is not subject to the one-year limitation, those rules do not appear to have been applicable to Mother's circumstances.
[20] We note that RGB has not yet been adopted, and that this case is distinguishable from one in which adoption has already occurred. Our conclusion therefore does not authorize a challenge to the termination of parental rights based on ineffective assistance of counsel in a case where adoption of the child has already taken place.
[21] In State v. Antone, 62 Haw. 346, 615 P.2d 101 (1980), we articulated the standard under the Hawai`i constitution for reviewing ineffective assistance of counsel claims in criminal cases as follows:

The burden of establishing ineffective assistance of counsel rests upon the appellant. His burden is twofold: First, the appellant must establish specific errors or omissions of defense counsel reflecting counsel's lack of skill, judgment or diligence. Second, the appellant must establish that these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.
Id. at 348-49, 615 P.2d at 104 (citations omitted); see Dan v. State, 76 Hawai`i 423, 427, 879 P.2d 528, 532 (1994) ("no showing of `actual' prejudice is required to prove ineffective assistance of counsel" in a criminal case) (quoting Briones v. State, 74 Haw. 442, 464, 848 P.2d 966, 977 (1993)).
With regard to ineffective assistance of appellate counsel in the criminal context, this court has held that, "[i]f . . . an appealable issue is omitted as a result of the performance of counsel whose competence fell below that required of attorneys in criminal cases then appellant's counsel is constitutionally ineffective." Briones, 74 Haw. at 467, 848 P.2d at 978. Where appellate counsel's ineffectiveness results in the failure to timely file a notice of an appeal, this court has, under certain circumstances, "relax[ed] the deadline for filing a notice of appeal." State v. Shinyama, 101 Hawai`i 389, 393 n. 6, 69 P.3d 517, 521 n. 6 (2003); see also State v. Caraballo, 62 Haw. 309, 316, 615 P.2d 91, 96 (1980) (permitting a late-filed appeal where defendant had withdrawn his initial appeal based on counsel's erroneous advice).
[22] For example, the Court of Appeals of Kansas has held that an attorney's withdrawal mid-trial constituted a complete denial of counsel, and therefore prejudice was presumed. In re Rushing, 9 Kan.App.2d 541, 684 P.2d 445, 450 (1984). As discussed further, infra, failure to file a notice of appeal in a criminal proceeding may be per se prejudicial under certain circumstances.
[23] We therefore respectfully disagree with the dissent's assertion that the best interests of the child can only be considered "after Petitioner is given the opportunity to present her side of the case." Dissenting Opinion at ___, 229 P.3d at 1128 (emphasis added).
[24] However, we note that, even if the holding in Flores-Ortega were to apply in termination of parental rights cases, counsel's failure to file a notice of appeal will only be considered per se ineffective where the party has specifically instructed his or her counsel to file a notice of appeal. 528 U.S. at 477, 120 S.Ct. 1029. Although there are references in the record here which indirectly support an inference that Mother conveyed her desire to appeal to Yonemori, there is nothing in the record to directly confirm that she did so.
[25] The June 2, 2006 report is the last report in the record before the family court's September 28, 2006 hearing, after which it issued its November 9, 2006 written order prohibiting Mother from having access to the family court record going forward.
[26] As discussed supra, "diligence by the moving party" is a threshold requirement of a Rule 60(b)(6) motion. Hayashi, 4 Haw.App. at 290-91, 666 P.2d at 174-75. We therefore require a showing by the movant of "exceptional circumstances" to mitigate any delay. Id. at 291, 666 P.2d at 175. We respectfully disagree with the dissent's assertion that, by doing so, we have "[laid] the fault for the failure to file a timely motion for reconsideration . . . at the feet of Petitioner[.]" Dissenting Opinion at ___, 229 P.3d at 1132. To the contrary, we express no view on the diligence or lack thereof of Mother, but rather observe that Mother has failed to provide any information regarding her own understanding of what was transpiring between the issuance of the Termination Order on March 11, 2005 and her filing of her pro se Motion for Relief from Judgment on March 10, 2006.
[27] We note that Mother failed to include with her application a statement of the facts material to our consideration of the question presented concerning her access to records as required by HRAP Rule 40(d)(3), and her argument may accordingly be disregarded. Nevertheless, we address the merits of Mother's argument.
[28] HRS § 587-73(b)(4) now appears as HRS § 587-73(b)(1)(D) (Supp.2008).
[1] For the purposes of preserving confidentiality, Petitioner/Mother-Appellant is referred to a "Petitioner" and the subject child is referred to as "RGB" or "the child."
[2] HRS § 571-54 provided in relevant part:

An order or decree entered in a proceeding based upon section 571-11(1), (2), (6), or (9) shall be subject to appeal to the supreme court only as follows:
Within twenty days from the date of the entry of any such order or decree, any party directly affected thereby may file a motion for a reconsideration of the facts involved. The motion and any supporting affidavit shall set forth the grounds on which a reconsideration is requested and shall be sworn to by the movant or the movant's representative. The judge shall hold a hearing on the motion, affording to all parties concerned the full right of representation by counsel and presentation of relevant evidence. The findings of the judge upon the hearing of the motion and the judge's determination and disposition of the case thereafter, and any decision, judgment, order, or decree affecting the child and entered as a result of the hearing on the motion shall be set forth in writing and signed by the judge. Any party deeming oneself aggrieved by any such findings, judgment, order, or decree shall have the right to appeal therefrom to the supreme court upon the same terms and conditions as in other cases in the circuit court and review shall be governed by chapter 602; provided that no such motion for reconsideration shall operate as a stay of any such findings, judgment, order, or decree unless the judge of the family court so orders; provided further that no informality or technical irregularity in the proceedings prior to the hearing on the motion for reconsideration shall constitute grounds for the reversal of any such findings, judgment, order, or decree by the appellate court.
(Emphases added.) Because the Termination Order in this case was issued pursuant to HRS Chapter 587, the jurisdictional provision in HRS § 571-11(9) (1993 & Supp.2005) applied, and, thus, pursuant to the foregoing portion of HRS § 571-54, a motion for reconsideration was required prior to appeal. HRS § 571-54 has since been amended. The current version of the statute does not require a motion for reconsideration as a prerequisite to appeal.
[3] The due process clause of article I section 5 of the Hawai`i Constitution provides in part that "[n]o persons shall be deprived of life, liberty or property without due process of law[.]"
[4] This declaration was attached to Yonemori's Motion to Extend Time to File and Docket Record on Appeal from March 31, 2005 to September 30, 2005. The motion to extend was dated September 27, 2005. The back of the declaration indicates the documents were "Received (LDB) SEP 27, 2005," but the motion was filed on March 17, 2006.
[5] This declaration is attached to Yonemori's Motion to Extend time to File and Docket Record on Appeal from September 30, 2005 to March 17, 2006, dated March 10, 2006, and filed on March 17, 2006.
[6] The "exceptional circumstances" requirement stated in Hayashi v. Hayashi, 4 Haw.App. 286, 666 P.2d 171 (1983), was taken from the standard applied under Hawai`i Rules of Civil Procedure (HRCP) Rule 60(b)(6) in Isemoto Contracting Co. v. Andrade, 1 Haw.App. 202, 616 P.2d 1022 (1980). Although termination proceedings under Chapter 587 are technically civil, as discussed herein, the liberty interests at stake here are rare to civil proceedings, and thus, the "exceptional circumstance" requirement is satisfied in part by the nature of the termination proceedings themselves.

Moreover, in Hayashi, the ICA indicated that "exceptional circumstances" were necessary to justify the lengthy delay in that case, stating that, "[i]n the instant case, Wife waited six years before filing her Rule 60(b)(6) motion. Such a delay may or may not be unreasonable depending upon whether any exceptional circumstances are present which would mitigate the lengthy delay in bringing the motion." 4 Haw.App. at 291, 666 P.2d at 175 (emphases added). Thus, it appears that, in Hayashi, the second and third factors were related, inasmuch as "justify[ing] relief" by showing "exceptional circumstances" was necessary in part to justify the lengthy delay. For the reasons discussed below, there were numerous circumstances in this case justifying Petitioner's two-year delay in filing the motion at issue.
[7] As noted supra, however, a motion for reconsideration was a prerequisite to filing the Notice of Appeal in this case.
[8] In a divorce case, Lowther v. Lowther, 99 Hawai`i 569, 57 P.3d 494 (App.2002), the ICA suggested that "gross neglect" on the part of counsel might be considered an "egregious" form of the conduct covered by HFCR Rule 60(b)(1), and might be allowed outside of the one-year limitation on motions under Rule 60(b)(1) if the court were to instead in its discretion consider it under Rule 60(b)(6), thereby eliminating the one-year limitation:

HFCR Rule 60(b)(1) permits relief from a divorce decree for the reasons of "mistake, inadvertence, surprise, or excusable neglect" but requires the motion to be made not more than one year after the decree. HFCR Rule 60(b)(6) permits relief from a divorce decree for "any other reason justifying relief from the operation of the judgment." In other words, HFCR Rule 60(b)(6) does not permit relief for the reasons of "mistake, inadvertence, surprise, or excusable neglect[.]" More specifically,
[t]here are two situations that courts sometimes characterize as "other reasons," but that are more likely egregious forms of conduct covered under another clause of Rule 60(b), and clause (6) is invoked to circumvent the one-year limitation. The first occurs when a party comes in more than a year after judgment to assert that he is the victim of some blunder by counsel. Claims of this kind seem to fit readily within the grounds of mistake, inadvertence, and excusable neglect set out in clause (1), and numerous courts have so held and have denied relief. However, when there is gross neglect by counsel and an absence of neglect by the party, some courts have refused to impute the attorney's negligence to the party and have granted relief under Rule 60(b)(6). Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2864 (1995) (citation omitted).
In this case, there was gross neglect by counsel for [movant] and by [movant]. Therefore,... the family court did not abuse its discretion when it declined [movant's] request to set aside or modify other parts of the Divorce Decree....
Lowther, 99 Hawai`i at 576-77, 57 P.3d at 501-02. However, no constitutional right to effective counsel has been established in the context of a divorce proceeding, and Lowther did not address the question of whether a claim for relief based on ineffective assistance on constitutional due process grounds could properly be considered under HFCR Rule 60(b)(1). Inasmuch as a constitutional right to effective counsel cannot be equated with "mistake, inadvertence, surprise, or excusable neglect" under Rule 60(b)(1), but is instead an error of constitutional magnitude, it does not properly fall under Rule 60(b)(1), and, thus, would be encompassed under HFCR Rule 60(b)(6). Therefore, the discussion in Lowther is inapposite here.
[9] It may be observed that "[n]ational child welfare experts generally consider Hawai`i to be at the forefront of most states in services to families in child abuse and neglect ... cases." Iokona Baker and Faye Kimura, Access to Justice: Parents' Rights to Counsel in Termination of Parental Rights, 12-DEC Haw. B.J. 11 (2008). However, trial courts in Hawai`i "have refused to decide whether counsel must be appointed for all indigent parents in [parental termination] cases." Id. at 12. Thus, "[s]ince children of Native Hawaiian descent represent the largest ethnic group in Hawaii's foster care system, barriers to obtaining timely quality legal counsel in child welfare cases has had and will continue to have a profound effect on the character of the statewide community as more and more Native Hawaiian parents lose the right to have their children return home." Id.
[10] While Yonemori rendered ineffective assistance to Petitioner with respect to her failure to file the motion for reconsideration, the record reflects that Yonemori's actions were not due to ill-will or bad faith.
[11] See Kansas v. Ventris, ___ U.S. ___, 129 S.Ct. 1841, 1844-45, 173 L.Ed.2d 801 (2009) (right to counsel under the Sixth Amendment applies to the states through the Fourteenth Amendment); Lassiter, 452 U.S. at 35, 101 S.Ct. 2153 ("The decision ... that the Sixth Amendment right to counsel did not apply to the States and that the due process guarantee of the Fourteenth Amendment permitted a flexible, case-by-case determination of the defendant's need for counsel in state criminal trials-was overruled in Gideon v. Wainwright, 372 U.S. [335,] 345[, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).]"); Gideon, 372 U.S. at 342, 83 S.Ct. 792 ("A provision of the Bill of Rights which is `fundamental and essential to a fair trial' is made obligatory upon the [s]tates by the Fourteenth Amendment.").
[12] The majority argues that "a civil [termination] proceeding focuses on the best interest of the child and not on guilt or innocence," that "procedural rules governing criminal cases are not necessarily applicable or even desirable in [family] courts," that the "burden of proof in termination cases is clear and convincing evidence rather than proof beyond a reasonable doubt" and that "judicial involvement is much more intensive than it is in the usual criminal case." Majority opinion at ___-___, 229 P.3d at 1090-91 (citations omitted). These differences apparently were not considered relevant by the Lassiter majority or dissent.
[13] Relevant to Yonemori's level of competence, it is not entirely clear from the record that Yonemori was aware, even after the fact, that a motion for reconsideration had to be filed as a prerequisite to filing an appeal, but only that she failed to timely "appeal."
[14] As noted before, HRS § 571-54 no longer requires that a motion for reconsideration be filed as a prerequisite to appeal in cases arising under HRS chapter 587. With regard to the 2006 amendments, which removed the requirement, the Committee on Judiciary and Hawaiian Affairs stated that "[t]he purpose of this measure is to eliminate the requirement for a motion for reconsideration in the appellate process for child protective cases[,]" and further explained:

Under the current law, a party must first file a motion for reconsideration with the family court judge who issues a child protective order before the party may appeal the order. This requirement means that the party must file the motion for reconsideration, give notice of the motion to the other parties, have a hearing, and obtain a decision from the same judge who issues the order. Often, parties may miss the deadline for filing the motion for reconsideration and are thereafter estopped from challenging the order on appeal.
Your Committee finds that this requirement builds unnecessary delay into the appellate review system. To speed the resolution of child protective services cases, this measure will remove the motion for reconsideration as a prerequisite to the appellate process.
Sen. Stand. Comm. Rep. No. 2245, in 2006 Senate Journal, at 1132 (emphases added). Thus, the legislature specifically addressed the unfairness and delay that results, in a case such as the one at bar, deleting the requirement that a motion for reconsideration be filed prior to appeal.
[15] The majority states that (1) Petitioner's Rule 60(b) motion "contained no allegations whatsoever about what errors had occurred in the family court proceedings leading up to the entry of the Termination Order[,]" majority opinion at ___, 229 P.3d at 1069, and also that (2) "[Petitioner] ha[d] failed to point to any alleged errors apparent in the record[,]" id. at ___, 229 P.3d at 1092.
[16] The majority's note that "[o]ur conclusion [] does not authorize a challenge to the termination of parental rights based on ineffective assistance of counsel in a case where adoption of the child has already taken place[,]" majority opinion at ___, 229 P.3d at 1087 n. 20, is not an issue raised, argued, or briefed by any party in this case. Nor is there a factual basis in the record to support this issue. Thus, the majority's note improperly decides an issue not before this court. See, e.g., Kapuwai v. City & County of Honolulu, 121 Hawai`i 33, 41, 211 P.3d 750, 758 (2009); Trustees of Office of Hawaiian Affairs v. Yamasaki, 69 Haw. 154, 171, 737 P.2d 446, 456 (1987); State v. Fields, 67 Haw. 268, 274, 686 P.2d 1379, 1385 (1984); Wong v. Bd. of Regents, Univ. of Haw., 62 Haw. 391, 394-95, 616 P.2d 201, 204 (1980).
[17] The majority faults Petitioner for not including the transcripts for the permanent plan hearing, the April 6, 2006 hearing, and the hearing of Petitioner's February 6, 2007 Rule 60(b)(6) motion on April 24, 2007. Majority opinion at ___, 229 P.3d at 1095.
[18] At the time the court entered its order, HRS § 587-73(b)(4) (2006 Repl.) provided that

[i]f the court determines that the criteria set forth in subsection (a) are established by clear and convincing evidence,[] the court shall order... [t]hat such further orders as the court deems to be in the best interest of the child, including, but not limited to, restricting or excluding unnecessary parties from participating in adoption or other subsequent proceedings, be entered[.]
(Emphasis added.) In addition to the November 9, 2006 order, the court had determined in the Termination Order that "[i]t is in [RGB's] best interests that the participation of [Petitioner] and Father in subsequent hearings be limited or restricted to appearances on any motions for relief from this decision and order or any motions necessary to pursue an appeal."
[19] The court's decision to restrict Petitioner's participation in subsequent proceedings involving RGB, including access to court records, does not appear to be an abuse of discretion. See In Interest of Doe, 77 Hawai`i 109, 115, 883 P.2d 30, 36 (1994) ("The family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Under the abuse of discretion standard of review, the family court's decision will not be disturbed unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason." (Citations, quotation marks, ellipsis, and brackets omitted.))